# United States Tax Court

T.C. Memo. 2023-146

CHARLES G. BERWIND TRUST FOR DAVID M. BERWIND, DAVID
M. BERWIND, D. MICHAEL BERWIND, JR.; GAIL B. WARDEN,
LINDA B. SHAPPY AND VALERIE L. PAWSON,
TRUSTEES, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 26218-08, 26219-08,       Filed December 4, 2023.
26220-08, 26221-08,
26222-08.

————————

*John William Schmehl*, *Thomas S. Biemer*, *Marc Alan Feller*, and
*Benjamin S. Bolas*, for petitioners.

*Philip S. Yarberough* and *John Anthony Guarnieri*, for respondent.

## CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION .................... 4

FINDINGS OF FACT ....................................................................... 7

1.      In 1963, Charles G. Berwind, Sr., established trusts to hold
the stock of Berwind Corporation for his four children. .............. 7

---

[1] Cases of the following petitioners are consolidated herewith: Duncan Warden and Gail Warden, Docket No. 26219-08; Russell Shappy, Jr., and Linda B. Shappy, Docket No. 26220-08; David M. Berwind and Jeanne M. Berwind, Docket No. 26221-08; and D. Michael Berwind, Jr., and Carol R. Berwind, Docket No. 26222-08.

2

[*2]
2. Under the control of Charles G. Berwind, Sr.'s son, Graham Berwind, Berwind Corporation redeemed all of the shares of the trusts for daughters Margaret and Emery and half the shares owned by the trust for son David. .............................. 9

3. In 1978, Berwind Corporation bought Colorcon, Inc. ................. 10

4. In 1983, BPSI was added to the corporate structure above Colorcon, Inc. ...................................................................................... 11

5. In 1985, Berwind Corporation redeemed the remaining shares owned by the David Berwind Trust. .............................. 15

6. BPSI changed its articles of incorporation to authorize preference stock and preferential stock. .................................... 17

7. The Graham Berwind Trust and the Graham Children Trusts consolidated their shares of Berwind Corporation and the common stock of BPSI; BPSI's articles of incorporation were corrected to add terms regarding its preference and preferential stock. ............................................. 17

8. Under Pennsylvania law regarding short-form mergers, a parent corporation may merge with its 80%-owned subsidiary without a vote by the subsidiary's other shareholders; however, these shareholders have the right to demand the fair market value of their sares. ........................ 26

9. In December 1999, a short-form merger was formalized between BPSI and its newly formed parent corporation, but this merger was challenged by the David Berwind Trust, which also asserted its right to receive the fair market value of its BPSI shares. ................................................. 40

OPINION .................................................................................................... 96

I. On December 16, 1999, there was a "sale or exchange" of the David Berwind Trust's shares of BPSI common stock within the meaning of section 483. ............................................. 99

   A. The plan of merger between BPSI Acquisition and BPSI did not violate BCL § 1922(a)(3); even if the plan of

**[\*3]**      merger did violate that provision, the merger was not void. .................................................................. 102

        1.      The plan of merger complied with BCL § 1922(a)(3). ... 102

        2.      Even if the plan of merger violated BCL § 1922(a)(3), the merger was not void. ................................................ 104

    B.      The merger of BPSI Acquisition and BPSI did not violate BPSI's articles of incorporation. ............................ 107

    C.      The remedies of the plaintiffs in the *Warden* litigation would not have been limited to the dissenters-rights provisions had the merger been tainted with fraud or fundamental unfairness. However, petitioners do not ask us to determine that the merger was so tainted. ......... 108

    D.      Count XIII of the amended complaint in the *Warden* litigation should not be treated as failing to state a claim on the grounds that the Graham Berwind and McKenney's resignations as trustees of the David Berwind Trust were effective. ............................................ 110

    E.      Application of the origin-of-the-claim test does not lead to the conclusion that the sale or exchange occurred on November 25, 2002. ........................................................... 113

    F.      *Lyeth v. Hoey* does not require us to determine the tax consequences of the payment by BPSI to the David Berwind Trust for the Trust's BPSI common stock as if the plaintiffs in the *Warden* litigation had successfully enjoined the merger between BPSI Acquisition and BPSI. .............................................................................. 117

    G.      The 2002 settlement agreement did not provide that the merger was rescinded or that the merger was void. ........... 118

    H.      Merely because the David Berwind Trust's holding period of BPSI common stock would have included the period from December 16, 1999, to November 25, 2002, for purposes of section 1231 of the Internal Revenue Code of 1954, does not mean that the sale or exhange of the trust's BPSI common stock did not occur on December 16, 1999, for purposes of section 483. ................. 120

4

**[\*4]**

I.    That the sale or exchange of the David Berwind Trust's BPSI common stock occurred on December 16, 1999, is not inconsistent with *Megargel v. Commissioner*, 3 T.C. 238 (1944), and cases following it ....................................... 125

J.    That the sale or exchange of the David Berwind Trust's BPSI common stock occurred on December 16, 1999, is not inconsistent with *Victor E. Gidwitz Family Tr. v. Commissioner*, 61 T.C. 664 (1974) ..................................... 129

K.    That the sale or exchange of the BPSI common stock of the David Berwind Trust occurred on December 16, 1999 is not inconsistent with judicial interpretations of section 163(a). ................................................................... 131

II.    The plan of merger was the contract for the sale or exchange of the David Berwind Trust's BPSI shares. ............. 135

III.    The payment from BPSI to the David Berwind Trust for its BPSI common stock was "under" the plan of merger even if the David Berwind Trust did not voluntarily contract to receive the payment as part of the plan of merger. ................. 136

IV.    The payment made by BPSI to the David Berwind Trust for the trust's BPSI shares was a $191,257,353 payment that was made on December 31, 2002. ................................... 138

V.    Conclusion ........................................................................... 140

### MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: Respondent (hereinafter the IRS) mailed a notice of deficiency to the Charles D. Berwind Trust for David M. Berwind. We refer to this trust as the "David Berwind Trust". The notice of deficiency mailed to the David Berwind Trust reflected a determination that $31,096,783 of the David Berwind Trust's income for the 2002 taxable year constituted imputed interest that had been improperly reported as capital gain on the trust's Form 1041, U.S. Income Tax Return for Estates & Trusts. The notice of deficiency stated that the deficiency was $5,363,331.

[*5]    The David Berwind Trust had four beneficiaries, each of whom filed a joint return for 2002 with their respective spouses. The beneficiaries and their respective spouses were:

- David McMichael Berwind (David Berwind) and Jeanne M. Berwind,

- David McMichael Berwind, Jr. (Michael Berwind) and Carol R. Berwind,

- Duncan Warden and Gail Berwind Warden, and

- Russell Shappy, Jr. and Linda Berwind Shappy.

(Michael Berwind, Gail Berwind Warden, and Linda Berwind Shappy are the children of David Berwind.)  The IRS also mailed notices of deficiency to the beneficiaries and their respective spouses, determining deficiencies in their income taxes for 2002.  The notices mailed to the beneficiaries and their respective spouses determined that, as a result of the adjustment to the David Berwind Trust's income reflected in the notice of deficiency mailed to the David Berwind Trust, each beneficiary received taxable distributions from the David Berwind Trust during the 2002 tax year in excess of the amounts reported on their respective Forms 1040, U.S. Individual Income Tax Return.  The notices of deficiency mailed to the beneficiaries and their respective spouses determined income-tax deficiencies in the following amounts for the 2002 tax year:

| Taxpayer | Deficiency |
|---|---|
| Michael Berwind & Carol Berwind | $102,783 |
| David Berwind & Jeanne Berwind | 12,603 |
| Duncan Warden & Gail Berwind Warden | 104,441 |
| Russell Shappy & Linda Berwind Shappy | 108,375 |

On October 28, 2008, a timely Petition was filed as to the notice of deficiency that had been mailed to the David Berwind Trust.  The Petition was signed by (1) an attorney for the trust and (2) the trustees of the trust in their capacity as trustees.  The Petition named as non-governmental parties in the caption (1) the David Berwind Trust, (2) David Berwind (as trustee), (3) Michael Berwind (as trustee), (4) Gail Berwind Warden (as trustee), (5) Linda Berwind Shappy (as trustee), and (6) Valerie Pawson (as trustee).  The David Berwind Trust's principal office was in Massachusetts and its trust situs was in the state of Pennsylvania by virtue of the state residence of the settlor when the

[*6] trust was founded. The states in which the trustees resided were as follows: David Berwind (Florida), Michael Berwind (Massachusetts), Gail Berwind Warden (Massachusetts), Linda Berwind Shappy (Massachusetts), and Pawson (unknown). We do not take a position on whether the trust is the petitioner or whether instead the trustees of the trust are the petitioners.

On October 28, 2008, timely petitions were filed by the four beneficiaries of the David Berwind Trust (and their respective spouses) as to their four respective notices of deficiency. When Michael and Carol Berwind filed their Petition, they resided in Massachusetts. When David and Jeanne Berwind filed their Petition, they resided in Florida. When Duncan Warden and Gail Berwind Warden filed their Petition, they resided in Massachusetts. When Russell Shappy and Linda Berwind Shappy filed their Petition, they resided in Massachusetts.

The Court has jurisdiction under section 6213(a).[2] We assigned five separate docket numbers to reflect that five separate notices of deficiency were challenged in the Petitions. The Court later consolidated the five cases.

The issues in the case concern the tax treatment of a settlement payment received by the David Berwind Trust to resolve a lawsuit challenging a squeeze-out merger designed to extinguish its 16.4% common stock interest in Berwind Pharmaceutical Services, Inc. (BPSI), a lawsuit that also included an appraisal action to (a) determine the value of the interest and (b) require BPSI to pay that value to the David Berwind Trust. The amount of the payment, and the date it was received by the David Berwind Trust, are matters in dispute in the present case.

On December 14, 1999, the David Berwind Trust had owned 16.4% of the common stock of BPSI. On December 16, 1999, BPSI filed with the Pennsylvania Department of State articles of merger providing that it merged with its majority shareholder, BPSI Acquisition Corporation (BPSI Acquisition), and that its common stock was cancelled. On November 25, 2002, BPSI and other defendants agreed to settle the lawsuit. On November 25, 2002, BPSI transferred $191,000,000 to an escrow account for the benefit of the David Berwind

_____

[2] Unless otherwise indicated, all references to sections are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*7] Trust. On November 26, 2002, $191,007,012.05 was transferred from the escrow account to an escrow account with PNC. On December 31, 2002, $191,257,353 was released from the PNC escrow account to the David Berwind Trust. We hold:

 I. The sale or exchange of the David Berwind Trust's shares of BPSI common stock occurred on December 16, 1999, not November 25, 2002.

 II. The sale or exchange was pursuant to a contract.

 III. The payment from BPSI to the David Berwind Trust for its BPSI common stock was "under" the plan of merger even if the David Berwind Trust did not voluntarily contract to receive the payment as part of the plan of merger.

 IV. The payment by BPSI to the David Berwind Trust for the Trust's shares was a $191,257,353 payment on December 31, 2002, not a $191,000,000 payment on November 25, 2002.

### FINDINGS OF FACT

The Court adopts the stipulations of fact entered into by the parties. Most of these stipulations are stated here. We also state other findings of fact that are not found in the stipulations.

1. *In 1963, Charles G. Berwind, Sr., established trusts to hold the stock of Berwind Corporation for his four children.*

Founded in 1883, Berwind Corporation was a closely held business that was engaged in coal mining. In the 1960s, Berwind Corporation began to diversify its holdings by investing in other industries such as pharmaceutical and health science.

In 1963, Charles G. Berwind, Sr., established four trusts, one for each of his four children. His children were (1) David Berwind, (2) Charles G. Berwind, Jr., referred to here as Graham Berwind, (3) Emery Berwind, and (4) Margaret Berwind. Each child was the primary beneficiary of the respective trust. Each trust was named for the respective child beneficiary: the David Berwind Trust, the Graham Berwind Trust, the Emery Berwind Trust, and the Margaret Berwind Trust. To each trust, Charles G. Berwind, Sr., transferred shares of Berwind Corporation. The Graham Berwind Trust received 53,200

[*8] shares; each of the other children's trusts received only 45,600. The reason for the disparity was that Charles G. Berwind, Sr., intended that Graham Berwind should be the one among his children who would eventually run Berwind Corporation. Graham Berwind had already been working for Berwind Corporation when the children's trusts were created. By contrast, David Berwind took a career path outside the company, becoming the headmaster of a boys' school.

The table below shows the ownership of Berwind Corporation by the children's trusts when the trusts were created:

*Shares of Berwind Corp. held by the trusts for the benefit of the children of Charles G. Berwind, Sr.*

| Graham Berwind Trust | David Berwind Trust | Emery Berwind Trust | Margaret Berwind Trust |
|---|---|---|---|
| 53,200 | 45,600 | 45,600 | 45,600 |

The David Berwind Trust had three trustees when it was created: (1) David Berwind, (2) Graham Berwind, and (3) a lawyer named Albert Gilmer. The table below shows these initial trustees:

*Trustees of the David Berwind Trust*

David Berwind
Graham Berwind
Albert Gilmer, attorney

Paragraph 11.G of the David Berwind Trust's deed of trust provides that "[a]ny individual trustee may resign at any time without court approval, so long as he or she has executed the instrument referred to in paragraph [11.]A." Paragraph 11.A provides that "each trustee, upon assuming office, shall execute a written acceptance of trusteeship and shall also lodge with the other trustees within a reasonable time an instrument designating two or more individuals as a succession of successor trustees, to serve in the event that he or she ceases to act . . . ." The deed of trust also contains the following provision: "The fact that any trustees may be interested in Berwind Corporation or any of its subsidiaries as director, stockholder, manager, agent or employee shall not constitute an adverse or conflicting interest, and the acts of such trustee shall be judged as if he had no interest in the Corporation."

[*9] 2. *Under the control of Charles G. Berwind, Sr.'s son, Graham Berwind, Berwind Corporation redeemed all of the shares of the trusts for daughters Margaret and Emery and half the shares owned by the trust for son David.*

Charles G. Berwind, Sr., died in 1972. Graham Berwind then assumed day-to-day control of Berwind Corporation. He sought to consolidate the ownership of Berwind Corporation by directing the corporation to repurchase its outstanding common stock.

In 1972, Berwind Corporation redeemed the shares of its common stock owned by the Margaret Berwind Trust and the Emery Berwind Trust, which by that time were the only owners of Berwind Corporation common stock other than the Graham Berwind Trust and the David Berwind Trust. After these 1972 redemptions, the ownership of Berwind Corporation common stock was as follows:

*Ownership of Berwind Corp. common stock*

| *Graham Berwind Trust* | *David Berwind Trust* |
|---|---|
| 53,200 | 45,600 |

In 1976, Berwind Corporation redeemed half of the shares of common stock owned by the David Berwind Trust. After this 1976 redemption, the ownership of Berwind Corporation common stock was as follows:

*Ownership of Berwind Corp. common stock*

| *Graham Berwind Trust* | *David Berwind Trust* |
|---|---|
| 53,200 | 22,800 |

From this point until 1985, there is no information in the record about changes in the ownership of the common stock shares of Berwind Corporation held by the Graham Berwind Trust, the David Berwind Trust, and other owners.[3]

---

[3] As explained *infra* FINDINGS OF FACT, Part 5, in 1985 Berwind Corporation redeemed all of the shares of its common stock owned by the David Berwind Trust (which by then totaled 21,132). At the time of this redemption, the Graham Berwind Trust and the Graham Children Trusts (terms which are defined *infra* FINDINGS OF FACT, Part 4) owned 104,078 shares.

**[*10]**  3.  *In 1978, Berwind Corporation bought Colorcon, Inc.*

In 1978, Berwind Corporation bought all the shares of Colorcon, Inc.  Colorcon, Inc., was in the business of applying color coatings to pharmaceutical tablets.  The corporate structure thus became:

Figure 1
Corporate structure after Berwind Corporation bought Colorcon, Inc., in 1978



In December 1979, Gilmer resigned as a trustee of the David Berwind Trust.  He appointed Thomas Morris, Jr., a partner at the law firm of Dechert, Price, and Rhoads LLP, as his successor trustee.  Thus, the trustees were:

*Trustees of the David Berwind Trust*

David Berwind
Graham Berwind
Thomas Morris, Jr., attorney

**[*11]** 4. *In 1983, BPSI was added to the corporate structure above Colorcon, Inc.*

In 1983, BPSI was formed.[4]  BPSI issued 16.4% of its common stock (6,500 shares) to the David Berwind Trust.  It issued the remaining 83.6% of its common stock (33,440 shares) to four new trusts that Graham had established for the benefit of his children.  The four new trusts are referred to here as the "Graham Children Trusts".

When BPSI was formed, it was also authorized to issue (but did not immediately issue) shares of preferred stock with par value of $50 per share.  BPSI's articles of incorporation contained the following provisions governing the redemption of preferred stock:

> The Company [BPSI], by action of its Board of Directors, subject to the terms and conditions upon which shares of any particular series are subject to redemption, may redeem the whole or any part of . . . the [p]referred [s]tock, at any time or from time to time, by paying in cash the redemption price for the shares . . . fixed therefor as herein provided, together with accrued but unpaid dividends to the date fixed for such redemption.  Notice of every such redemption (pursuant to a sinking fund requirement or otherwise) shall be given at least thirty (30) days and not more than ninety (90) days prior to the date fixed for such redemption by hand delivery or first class mail, to the holders of record of the shares of the [p]referred [s]tock so to be redeemed, at their respective addresses as the same shall appear on the books of the Company. . . . The Board of Directors shall have full power and authority, subject to the limitations and provisions herein contained, to prescribe the manner in which and the terms and conditions upon which the shares of the [p]referred [s]tock shall be redeemed from time to time.  If such notice of redemption shall have been duly given and if on or before the redemption date specified in such notice all funds necessary for such redemption shall have been set aside by the Company, separate and apart from its other funds, in trust for the account of the holders of the shares of [p]referred [s]tock to be redeemed, so as to be and continue

---

[4] The corporation was initially named Pharmaceutical Specialties Corporation, but in 1985 its name was changed to Berwind Pharmaceutical Services, Inc.

**[*12]** to be available therefor, then, notwithstanding that any certificate for shares of [p]referred [s]tock so called for redemption shall not have been surrendered for cancellation, from and after the date fixed for such redemption, the shares represented thereby shall no longer be deemed outstanding, the right to receive dividends thereon shall cease to accrue and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive, out of the funds so set aside in trust, the amount payable upon the redemption thereof, without interest.

BPSI's articles of incorporation also contained the following provision requiring consent of the majority of the preferred stockholders to a merger:

So long as any shares of the [p]referred [s]tock are outstanding:

. . . .

(B) the [c]ompany [i.e., BPSI] shall not, without the consent (given by vote at a meeting called for that purpose) of the holders of at least a majority of the total number of shares of the [p]referred [s]tock . . . then outstanding, merge . . . with any other corporation unless:

(a)(i) the agreement of merger . . . shall provide that all authorized shares and all outstanding shares of the [p]referred [s]tock shall continue, respectively, to be authorized and outstanding after such merger . . . and (ii) the corporation resulting from such merger . . . would not have after such merger . . . any authorized class of shares ranking prior to or on a parity with the [p]referred [s]tock as to either assets or dividends, except the same number of shares of the same par value (or shares having the same aggregate par value, or an aggregate stated value equal to the aggregate of the par value) with the same rights and preferences as the authorized shares of the [c]ompany immediately preceding such merger . . . ; or

13

**[*13]**                     (b)(i) the agreement of merger . . . shall provide for the conversion of all shares of the [p]referred [s]tock into an equal number of shares of a class of capital stock (hereinafter called the "[c]onversion [s]tock") of the resulting corporation of the same par value (or shares having the same aggregate par value, or an aggregate stated value equal to the aggregate of the par value) and having comparable rights and preferences (allowing for differences of form and minor substance) as the shares of the . . . resulting corporation would not have after such merger . . . any authorized class of shares prior to or on a parity with the [c]onversion [s]tock as to either assets or dividends, except the same number of shares of the same par value (or shares having the same aggregate par value, or an aggregate stated value equal to the aggregate of the par value) with the same rights and preferences as the authorized shares of the [c]ompany immediately preceding such merger . . . .

In 1983, Berwind Corporation sold the common stock of Colorcon, Inc., to BPSI. In exchange for the Colorcon, Inc. stock, BPSI transferred to Berwind Corporation 120,000 shares of BPSI preferred stock and a note. The corporate structure thus became:

**[*14]**

Figure 2

Corporate structure after interposition of BPSI between Berwind Corporation and Colorcon, Inc., in 1983



**[*15]**  5. *In 1985, Berwind Corporation redeemed the remaining shares owned by the David Berwind Trust.*

In 1985, Berwind Corporation redeemed the remaining 21,132 shares of its common stock owned by the David Berwind Trust. This did not affect the ownership of BPSI stock.[5] The corporate structure thus was:

---

[5] Immediately before this redemption, the David Berwind Trust owned 21,132 shares. The Graham Berwind Trust and the Graham Children Trusts owned 109,078 shares.

**[*16]**

Figure 3
Corporate structure after Berwind Corporation's redemption of the David Berwind
Trust's shares in 1985



**[*17]** 6. *BPSI changed its articles of incorporation to authorize preference stock and preferential stock.*

On October 31, 1989, BPSI amended its articles of incorporation to authorize 3,480,000 shares of preference stock with a $1.00 par value and 600,000 shares of preferential stock with a $1.00 par value.[6]

7. *The Graham Berwind Trust and the Graham Children Trusts consolidated their shares of Berwind Corporation and the common stock of BPSI; BPSI's articles of incorporation were corrected to add terms regarding its preference and preferential stock.*

In 1990, the Graham Berwind Trust and the Graham Children Trusts contributed their BPSI common stock to Berwind Group Partners, a general partnership that was owned by these trusts. The Graham Berwind Trust held a 47.528% interest in the partnership; each of the four Graham Children Trusts held a 13.118% interest. Following the contributions, Berwind Group Partners owned 83.6% of BPSI's common stock.

The Graham Berwind Trust and the Graham Children Trusts also transferred their shares in Berwind Corporation to Berwind Group Partners. The date of this transfer is not clear from the record. For purposes of discussion, we assume the transfer took place in 1990. After the transfer, the corporate structure thus was:

---

[6] The record does not contain information about who owned these shares during the period from October 31, 1989, to December 14, 1999. By December 14, 1999, all shares of BPSI preference stock would be owned by Berwind Corporation. By December 14, 1999, the shares of BPSI preferential stock would be owned by the David Berwind Trust (13.12%), Graham Berwind (2%), Berwind Group Partners (66.88%), and Berwind Corporation (18%).

**[*18]**

Figure 4

Corporate structure after interposition of Berwind Group Partners

Graham Berwind
Trust

Graham Children
Trusts

47.528%

52.472%

Berwind Group
Partners

David Berwind
Trust

100% common

16.4% common

Berwind
Corporation

83.6% common

120,000
preferred
plus note

BPSI

100% common

Colorcon, Inc.

**[*19]** In 1993, Graham Berwind, on behalf of Berwind Group Partners, offered to buy the David Berwind Trust's stock in BPSI for $29 million. The David Berwind Trust did not accept the offer.

In 1994, three of David Berwind's children—Michael Berwind, Linda Berwind Shappy, and Gail Berwind Warden—were approved as additional trustees of the David Berwind Trust. This brought the total number of trustees of that trust to six. The trustees at this point were:

*Trustees of the David Berwind Trust*

David Berwind
Graham Berwind
Tom Morris, Jr., attorney
Michael Berwind
Linda Berwind Shappy
Gail Berwind Warden

In 1996, Berwind Group Partners formed ZYAC Holding Corporation (ZYAC Holding) to acquire from a third party all the outstanding shares of Zymark Corporation (Zymark), a company which performed pharmaceutical testing. To finance ZYAC Holding's purchase of Zymark stock, BPSI loaned $20 million to ZYAC Holding in exchange for a note that bore interest at the prime rate. Sometime in 1996, ZYAC Holding succeeded in acquiring a 100% interest in Zymark from the third party. In September 1996, in connection with ZYAC Holding's acquisition of Zymark, BPSI acquired 1,000 shares of ZYAC Holding Series A 8.75% noncumulative preferred stock for $10 million.[7] BPSI never acquired any of the ZYAC Holding common stock. At all times, the common stock of ZYAC Holding was owned by Berwind Group Partners. Zymark continued as an operating business after its acquisition by ZYAC Holding. The corporate structure at this point was as follows:

---

[7] The record does not reveal if BPSI acquired the preferred stock from ZYAC Holding or from Zymark.

**[*20]**

Figure 5

Corporate structure after creation of ZYAC Holding and its purchase of Zymark in 1996



[*21] In the summer of 1997, Graham Berwind, on behalf of Berwind Group Partners, offered $53.5 million for the David Berwind Trust's shares of BPSI. The David Berwind Trust made a counterproposal to sell its shares at a significantly higher price, but Berwind Group Partners did not respond favorably to this proposal.

On June 26, 1997, Graham Berwind signed a document entitled "Designation of Successor Trustee" stating: "I hereby designate . . . Bruce J. McKenney . . . to succeed me as trustee [of the David Berwind Trust]." On the same day, Graham Berwind and McKenney signed a document in which Graham Berwind stated that he "resigns as a trustee" of the David Berwind Trust "effective only upon acceptance of trusteeship by the successor trustee previously designated" and McKenney stated that he "hereby accepts appointment as a successor trustee" of the David Berwind Trust. On the same day, McKenney signed another document, entitled "Designation of Successor Trustee," stating: "I hereby designate . . . [Graham Berwind] to succeed me as trustee" of the David Berwind Trust.

On October 28, 1997, the semiannual meeting of the trustees of the David Berwind Trust was held in Philadelphia. The meeting minutes stated that "[d]uring the summer, a decision was made to move the administration of the trust" from (a) Berwind Corporation in Philadelphia to (b) Boston. The meeting minutes stated: "As part of this, [Graham Berwind] resigned as trustee . . . ." The minutes stated that Russell Shappy and Gail Berwind Warden would take over the accounting function and handle it in Massachusetts.

On December 30, 1997, McKenney signed a document entitled "Resignation as Trustee" stating that he "resigns as a trustee" of the David Berwind Trust "effective immediately."

On December 2, 1998, Michael Berwind sent a memorandum to David Berwind, Linda Berwind Shappy, and Gail Berwind Warden. The memorandum, entitled "BPSI Valuation", stated that "Berwind" (probably meaning Berwind Corporation or Berwind Group Partners) had made various offers to buy the BPSI stock owned by the David Berwind Trust. The memorandum explained that the David Berwind Trust was in the process of supplying data to Merrill Lynch to "obtain an independent valuation" (of the BPSI stock). The memorandum also explained that "our stated objective" is "to gain liquidity by selling our shares in BPSI at a price on the lower end of fair."

[*22]  On July 27, 1999, Merrill Lynch prepared a report to the David Berwind Trust stating that the value of the trust's 16.4% interest in BPSI was in the range of $68.2 to $93.3 million.

On August 11, 1999, Edward Kosnik, the President and Chief Operating Officer of Berwind Corporation and a member of BPSI's board of directors, sent a letter to the David Berwind Trust.  The letter stated that over the last few years BPSI had been negotiating with the David Berwind Trust for BPSI to redeem the trust's shares in BPSI.  The letter stated that the redemption would be in the interests of the trust by allowing it to "diversify its holdings and liquefy a deep minority equity investment."  The letter further stated:

> We very much would like to negotiate a mutually satisfactory purchase/sale, but we are prepared to start a process that will result in our ownership of 100% of BPSI at a price to be determined by us and our financial advisors.  This will be a costly, time-consuming and legalistic process that we would prefer to avoid, but one that we are prepared to undertake, if necessary. . . . [I]f we don't hear from you by September 7, 1999, we will start down our path with the intention of completing a transaction by year end.

On August 30, 1999, as part of its internal discussions of the value of the David Berwind Trust's interest in BPSI stock, BPSI sent to its counsel, Howard Meyers of Morgan Lewis & Bockius, three possible valuations of the interest.  These valuations were:

| Source of valuation | Valuation method | Value |
| --- | --- | --- |
| 1999 budget | 15 times net income from operations | $78,767,000 |
| 1998 actual | 15 times net income from operations | $66,504,000 |
| 1997 March forecast | 20 times net income from operations minus 25% minority discount | $51,534,000 |

The parties in the present case do not take a position on how exactly these valuations take into account (1) the value of BPSI's preferred stock interest in ZYAC Holding, (2) the value of the note issued by ZYAC Holding to BPSI, or (3) the earnings of Zymark.

23

**[*23]** By October 27, 1999, the David Berwind Trust had retained Justin Klein of the Ballard Spahr law firm to represent it with respect to the acquisition by BPSI of the trust's shares of BPSI.

On October 27, 1999, Michael Berwind wrote a memorandum to Klein, Russell Shappy, and Pawson stating that for the "David Berwind Family" the "current minimum acceptable base value" of "BPSI" was $135 million before any "[a]djustment[ ]" for "Zyac Holding Company." The $135 million amount was purportedly based on a "[m]ultiple of earnings" of "27.5."

On November 5, 1999, BPSI filed with the Pennsylvania Department of State a statement of correction to its articles of incorporation. The statement of correction added provisions governing the redemption of preference stock. The added provisions were similar to the provisions governing the redemption of preferred stock in the articles of incorporation of BPSI, quoted in FINDINGS OF FACT, Part 4, *supra.* The provisions in the statement of correction were:

> The Company [BPSI], by action of its Board of Directors, subject to the terms and conditions upon which shares of any particular series are subject to redemption, may redeem the whole or any part of . . . the [p]reference [s]tock, at any time or from time to time, by paying in cash the redemption price for the shares . . . fixed therefor as herein provided, together with accrued but unpaid dividends to the date fixed for such redemption. Notice of every such redemption shall be given at least thirty (30) days and not more than ninety (90) days prior to the date fixed for such redemption by hand delivery or first class mail, to the holders of record of the shares of the [p]reference [s]tock so to be redeemed, at their respective addresses as the same shall appear on the books of the Company . . . The Board of Directors shall have full power and authority, subject to the limitations and provisions herein contained, to prescribe the manner in which and the terms and conditions upon which the shares of the [p]reference [s]tock shall be redeemed from time to time. If such notice of redemption shall have been duly given and if on or before the redemption date specified in such notice all funds necessary for such redemption shall have been set aside by the Company, separate and apart from its other funds, in trust for the account of the holders of the shares of

**[*24]** [p]reference [s]tock to be redeemed, so as to be and continue to be available therefor, then, notwithstanding that any certificate for shares of [p]reference [s]tock so called for redemption shall not have been surrendered for cancellation, from and after the date fixed for such redemption, the shares represented thereby shall no longer be deemed outstanding, the right to receive dividends thereon shall cease to accrue and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive, out of the funds so set aside in trust, the amount payable upon the redemption thereof, without interest.

On November 5, 1999, BPSI filed with the Pennsylvania Department of State a statement of correction to its articles of incorporation. The statement of correction added provisions governing the redemption of preferential stock. The added provisions were similar to the provisions governing the redemption of preferred stock in the articles of incorporation of BPSI quoted in FINDINGS OF FACT, Part 4, *supra*. The provisions in the statement of correction were:

The Company [BPSI], by action of its Board of Directors, subject to the terms and conditions upon which shares of any particular series are subject to redemption, may redeem the whole or any part of . . . the [p]referential [s]tock, at any time or from time to time, by paying in cash the redemption price for the shares . . . fixed therefor as herein provided, together with accrued but unpaid dividends to the date fixed for such redemption. Notice of every such redemption shall be given at least thirty (30) days and not more than ninety (90) days prior to the date fixed for such redemption by hand delivery or first class mail, to the holders of record of the shares of the [p]referential [s]tock so to be redeemed, at their respective addresses as the same shall appear on the books of the Company . . . The Board of Directors shall have full power and authority, subject to the limitations and provisions herein contained, to prescribe the manner in which and the terms and conditions upon which the shares of the [p]referential [s]tock shall be redeemed from time to time. If such notice of redemption shall have been duly given and if on or before the redemption date specified in such notice

**[*25]** all funds necessary for such redemption shall have been set aside by the Company, separate and apart from its other funds, in trust for the account of the holders of the shares of [p]referential [s]tock to be redeemed, so as to be and continue to be available therefor, then, notwithstanding that any certificate for shares of [p]referential [s]tock so called for redemption shall not have been surrendered for cancellation, from and after the date fixed for such redemption, the shares represented thereby shall no longer be deemed outstanding, the right to receive dividends thereon shall cease to accrue and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate, except only the right of the holders thereof to receive, out of the funds so set aside in trust, the amount payable upon the redemption thereof, without interest.

On November 18, 1999, Klein (counsel to the David Berwind Trust) sent a letter to Meyers (counsel to BPSI) transmitting proposed confidentiality agreements under which the David Berwind Trust's advisors would be prohibited from disclosing financial information about BPSI. The purpose of the confidentiality agreements was to facilitate the disclosure of BPSI financial information to the David Berwind Trust's advisors so the trust could negotiate the sale of its shares of BPSI. Klein's letter enclosed a "draft time table for this transaction." Klein's letter stated that the draft timetable was based on a November 15, 1999 telephone conversation between Klein and Meyers.[8] The letter stated: "We would also reiterate our request that you agree that BPSI will not take action to consummate a merger prior to January 31, 2000 and to notify our clients at least ten days in advance of such merger. We would, of course agree that during the time prior to such notice, our clients would not initiate any legal process." The letter stated that enclosed with the letter was "an agreement embodying these terms." However, the record does not contain a copy of the agreement. Nor does the record contain a copy of the proposed confidentiality agreements or the draft timetable.

On November 19, 1999, Meyers responded to Klein's letter. Meyers enclosed "a letter agreement that I have been authorized to execute on behalf of Berwind Group Partners and Berwind

---

[8] Besides the November 18, 1999 letter from Klein, there is little in the record about the November 15, 1999 telephone conversation.

[*26] Pharmaceutical Services, Inc." Meyers stated that the proposed confidentiality agreements that Klein had enclosed with his letter were unacceptable but asked Klein to call him promptly to discuss the "proper form" of the confidentiality agreements. The proposed agreement attached to Meyers' letter provided that BPSI would not take any action to institute a merger until January 31, 2000. The proposed agreement would bar the David Berwind Trust from instituting any legal proceeding prior to January 31, 2000. The proposed agreement stated that Berwind Group Partners and BPSI desired to work with the David Berwind Trust to strike a "mutually acceptable agreement for the acquisition of the [BPSI] stock owned by the Trust." The proposed agreement contained a time schedule for negotiating the acquisition agreement. Under the time schedule, a final agreement would be executed on or before January 31, 2000. The proposed agreement contained a signature line that permitted Klein to accept it on behalf of the David Berwind Trust. The proposed agreement was never executed.

8. *Under Pennsylvania law regarding short-form mergers, a parent corporation may merge with its 80%-owned subsidiary without a vote by the subsidiary's other shareholders; however, these shareholders have the right to demand the fair market value of their shares.*

The David Berwind Trust correctly anticipated that BPSI would attempt to eliminate its BPSI shares through a short-form merger.

The mechanics of a short-form merger under Pennsylvania law, and the remedies available to a dissenting shareholder, are discussed below.

The provisions governing a short-form merger are in the Pennsylvania Business Corporation Law of 1988. Hereafter we refer to the Pennsylvania Business Corporation Law of 1988 as the BCL. The BCL consists of §§ 1101 to 4162 of title 15 of Pennsylvania's Consolidated Statutes. 15 Pa. Cons. Stat. § 1101 (West 1995). When we cite to a provision of the BCL we give the particular section of title 15 of Pennsylvania's Consolidated Statutes to which the provision corresponds. The provisions of the BCL to which we refer are in the version of the BCL enacted by the General Association Act of 1988, 1988 Pa. Laws 1444, as amended by the GAA Amendments Act of 1990, 1990 Pa. Laws 834, and as amended by the GAA Amendments Act of 1992, 1992 Pa. Laws 1333, but before any amendments by the GAA Amendments Act of 2001, 2001 Pa. Laws 418, and before subsequent amendments. One notable set of subsequent amendments was made by

[*27] the Association of Transactions Act, 2014 Pa. Laws 2640. The act repealed, reorganized, and modified the provisions in BCL §§ 1921–1966 and codified them in the BCL with new section numbers. *See* BCL § 1101(a). BCL § 1921(a) provides that two corporations may, "in the manner provided" in subchapter C of the BCL (i.e., §§ 1921 to 1932 of the BCL), be merged into one of the corporations, which is referred to as the "surviving corporation". BCL § 1921(a). The provisions in subchapter C of the BCL set forth five steps for effecting a merger between two corporations:

| | |
|---|---|
| BCL § 1922(a) | A plan of merger must be prepared. |
| BCL § 1922(c) | The plan of merger must be approved by each corporation's board of directors and submitted to the shareholders of each corporation for a shareholder vote. |
| BCL § 1924 | The plan of merger must be adopted by the shareholders of each corporation by a majority vote. |
| BCL § 1926 | Articles of merger must be executed by each corporation. |
| BCL § 1927 | The articles of merger must be filed. |

We now discuss these steps in detail.

BCL § 1922(a) requires that "[a] plan of merger . . . shall be prepared" (in the event of a merger). The plan of merger must set forth the terms and conditions of the merger. BCL § 1922(a)(1). The plan of the merger also must set forth the changes, if any, that would be made in the articles of incorporation of the surviving corporation. BCL § 1922(a)(2)(i). The plan of the merger also must set forth

> [t]he manner and basis of converting the shares of each corporation into shares or other securities or obligations of the surviving . . . corporation, as the case may be, and, if any of the shares of any of the corporations that are parties to the merger . . . are not to be converted solely into shares or other securities or obligations of the surviving . . . corporation, the shares or other securities or obligations of any other person or cash, property or rights that the

**[\*28]** holders of such shares are to receive in exchange for, or upon conversion of, such shares . . . .

BCL § 1922(a)(3).

BCL § 1922(c) provides that "[e]very merger . . . shall be proposed in the case of each . . . corporation by the adoption by the board of directors of a resolution approving the plan of merger." The same subsection further provides that "the board of directors shall direct that the plan [of merger] be submitted to a vote of the shareholders entitled to vote" unless approval of the shareholders is unnecessary under subchapter C of the BCL (i.e., §§ 1921 to 1932 of the BCL).

BCL § 1924(a) and (b) requires a plan of merger be adopted by each merging corporation and specifies how the plan of merger is adopted:

(a) General rule.—The plan of merger . . . shall be adopted upon receiving . . . a majority of the votes cast by all shareholders entitled to vote thereon of each . . . corporation[] that is a party to the merger . . . and, if any class or series of shares is entitled to vote thereon as a class . . . a majority of the votes cast in each class vote . . . . A proposed plan of merger . . . shall not be deemed to have been adopted by the corporation unless it has also been approved by the board of directors, regardless of the fact that the board has directed or suffered the submission of the plan to the shareholders for action.

(b) Adoption by board of directors.—

(1) Unless otherwise required by its bylaws, a plan of merger . . . shall not require the approval of the shareholders of a . . . corporation if:

. . . .

(ii) immediately prior to the adoption of the plan and at all times thereafter prior to its effective date, another corporation that is a party to the merger . . . owns directly or indirectly 80% or more of the outstanding shares of each class of the corporation; or . . .

. . . .

(3) If a merger . . . of a subsidiary corporation with a parent corporation is effected pursuant to paragraph (1)(ii), the plan of merger . . . shall be deemed adopted by the subsidiary corporation when it has been

**[\*29]** adopted by the board of the parent corporation and execution of articles of merger . . . by the subsidiary corporation shall not be necessary.

The exception found in BCL § 1924(b)(1)(ii) applies if the parent corporation owns 80% of each class of shares of the subsidiary. When BCL § 1924(b)(1)(ii) was originally enacted by the General Association Act of 1988, Act No. 1988-177, the relevant percentage was 90%. 1988 Pa. Laws 1444, at 1566. The percentage was changed to 80% by the GAA Amendments Act of 1992, 1992 Pa. Laws 1333, at 1343, 1372, effective 60 days after December 18, 1992. It is this percentage threshold that governs the short-form merger by BPSI.

The effect of BCL § 1924(b)(1)(ii) is that for a parent to merge with its 80%-owned subsidiary, there is no requirement that the merger be approved by the shareholders of the subsidiary absent such a requirement in the subsidiary's bylaws. Furthermore, BCL § 1924(b)(1)(ii) and (iii) has been interpreted by some commentators to mean that such a merger need not be approved by (1) the board of directors of the subsidiary or (2) the shareholders of the parent. Rafael A. Porrata-Dorias, Jr., The Proposed Pennsylvania Business Corporation Law: A Horse Designed By Committee, 59 Temple L.Q. 437, 449 (1986) ("Finally, the New BCL provides that a parent corporation that owns ninety percent or more of the stock of a subsidiary, directly or indirectly, may merge with the subsidiary without the approval either of the shareholders of the parent corporation, or of the board of directors or shareholders of the subsidiary. [fn: New BCL Section 1924(b)(1)(ii).]"); Vincent F. Garrity, Jr. & Sandra A. Ballard, What the General Practitioner Should Know About Pennsylvania's New Business Corporation Law, 61 Pa. Bar Ass'n Q. 23, 24 (Jan. 1990) ("SHORT FORM MERGERS. The 1988 BCL authorizes a parent corporation's board to effect a merger with a 90%-owned subsidiary without obtaining the approval of the subsidiary's board or the parent's shareholders, similar to current Delaware law (§ 1924(b))."))[9] Cautious practitioners

---

[9] The parties have stipulated that under a short-form merger a "shareholder vote" is not required, but it is unclear whether the stipulation is referring to a vote of the shareholders of the subsidiary or a vote of the shareholders of both the parent and the subsidiary. Here is the text of the stipulation:

> The BCL provided that, generally, a corporate merger was to be adopted by the affirmative vote of a majority of the shareholders entitled to such a vote. *See* BCL section 1924(a). However, the BCL also provided a procedure often referred to as a "short-form-merger,"

**[*30]** might have advised their clients to secure both types of approvals anyway.[10]

A merger governed by BCL § 1924(b)(1)(ii) is referred to as a "short-form merger." *Warden v. McLelland*, 288 F.3d 105, 116 (3d Cir. 2002).

BCL § 1926 provides that "[u]pon the adoption of the plan of merger . . . by the corporations desiring to merge", each corporation must execute articles of merger except as provided in BCL § 1924(b)(3). The articles of merger must set forth (1) the plan of merger, (2) the effective date of the plan of merger (if the plan of merger is to be effective on a specified date), and (3) certain other information. *Id.*

BCL § 1928 provides that "[u]pon the filing of the articles of merger . . . in the Department of State or upon the effective date specified in the plan of merger . . ., whichever is later, the merger . . . shall be effective."

BCL § 1929 provides that "[u]pon the merger . . . becoming effective", the two corporations that are parties to the merger will be a single corporation that is the corporation designated in the plan of merger as the surviving corporation and the existence of the other corporation shall cease.

Figure 6 illustrates the steps necessary to effectuate a merger of corporations A and B when neither corporation owns 80% of the shares of the other.

---

by which the board of directors of a parent corporation owning 80 percent or more of the outstanding shares of each class of stock of a corporation (the "merging corporation") could adopt a plan of merger and potentially eliminate a minority shareholders' interest in the merging corporation without a shareholder vote. *See* BCL section 1924(b).

[10] In 2001, BCL § 1924(b)(3) was amended to expressly provide that if a merger is effected pursuant to BCL § 1924(b)(1)(ii), "approval of the plan by the board of directors of the subsidiary corporation . . . shall not be necessary." GAA Amendments Act of 2001, P.L. 418, No. 34, § 3. The amendment was effective 60 days after June 22, 2001.

**[*31]**

Figure 6
Steps required for merger of corporations A and B



Plan of merger prepared
(BCL § 1922)

Board A approves plan of merger (BCL § 1922(c))

Board B approves plan of merger (BCL § 1922(c))

Board A submits plan of merger to shareholders for vote (BCL § 1922(c))

Board B submits plan of merger to shareholders for vote (BCL § 1922(c))

Shareholders of A approve plan of merger by vote (BCL § 1924(a))

Shareholders of B approve plan of merger by vote (BCL § 1924(a))

Plan of merger considered adopted by A (BCL § 1924(a))

Plan of merger considered adopted by B (BCL § 1924(a))

Articles of merger executed by A (BCL § 1926)

Articles of merger executed by B (BCL § 1926)

Articles of merger filed with Secretary of State (BCL § 1927)

Merger is effective on date specified in plan of merger (BCL § 1928)

**[\*32]** When A owns 80% of the shares of B, a merger of the two corporations is a short-form merger governed by BCL § 1924(b)(1)(ii). Figure 7 illustrates the steps necessary to effectuate a merger of A and B when A owns 80% of the shares of B.

**[*33]**

Figure 7
Steps required for merger of corporations A and B (where A owns ≥ 80% of B)



[*34] Figure 7 assumes that the plan of merger must be approved by the board of directors of B and by the shareholders of A. However, as discussed earlier, some commentators believe that approvals by the board of directors of the subsidiary and by the shareholders of the parent are unnecessary. Because both such approvals were made of the merger at issue in the present case, we need not decide if they were necessary.

On a parallel track with the procedures for merging two corporations discussed so far, there are provisions for dissenters rights set forth in BCL §§ 1571 through 1580.

BCL § 1571(a) provides that "any shareholder of a . . . corporation shall have the right to dissent from, and to obtain payment of the fair value of his shares in the event of, any corporate action, or to otherwise obtain fair value for his shares, where this part [BCL §§ 1101–4162] expressly provides that a shareholder shall have the rights and remedies provided in this subchapter [BCL §§ 1571–1580]." One of the provisions of "this part" (BCL §§ 1101–4162) is BCL § 1930(a).

BCL § 1930(a) provides that "[i]f any shareholder of a . . . corporation that is to be a party to a merger . . . objects to the plan of merger . . . and complies with the provisions of Subchapter D of Chapter 15 [§§ 1571–1580 of the BCL] (relating to dissenters rights), the shareholder shall be entitled to the rights and remedies of dissenting shareholders therein provided, if any." *See also* BCL § 1571(a) (second sentence) (giving 13 examples from "this part" (15 Pa. Stat. and Cons. Stat. Ann. §§ 501–7701 (West 1995 & 2012 Cum. Ann. Pocket Pt.)) of provisions granting a shareholder the rights and remedies provided in subchapter D of chapter 15 of the BCL (BCL §§ 1571–1580); one of the 13 examples is BCL § 1930). Therefore, a shareholder of a corporation that merges with another corporation has the rights and remedies set forth in §§ 1571–1580 of the BCL. BCL §§ 1571–1580, which we summarize in relevant part here, employ the term "dissenter" to mean a "shareholder . . . who is entitled to and does assert dissenters rights under this subchapter [BCL §§ 1571–1580] and who has performed every act required up to the time involved for the assertion of those rights."

BCL § 1574 provides that if the proposed corporate action of the type that must be approved by a vote at a shareholder meeting (such as a long-form merger), the shareholder wishing to receive payment for shares must (1) before the vote, file with the corporation a written notice of intention to demand payment of the fair value of shares if the

**[\*35]** proposed action is effectuated and (2) refrain from voting in favor of the proposed corporate action. The corporation must send a notice to demand payment to all shareholders who filed the notice of intention to demand payment and who refrained from voting in favor of the proposed corporation action. BCL § 1575(a). BCL § 1575(a) provides that if the proposed corporate action is to be taken without a vote of the shareholders (such as a plan of merger governed by the short-form-merger provision of BCL § 1924(b)(1)(ii) as to the subsidiary's shareholders), the corporation must send the notice to demand payment (which must be accompanied by a notice that the corporation action was adopted) to "all shareholders who are entitled to dissent and demand payment of the fair market value of their shares."

For both types of proposed actions (i.e., those that require a vote of the shareholders and those that don't) the notice to demand payment must "[s]tate where and when a demand for payment must be sent and certificates for certificated shares must be deposited in order to obtain payment." BCL § 1575(a). The deadline for demanding payment and depositing shares set forth in the notice to demand payment must be 30 days or more after the mailing date of the notice to demand payment. BCL § 1575(b). BCL § 1576(a) provides that a "shareholder who fails to timely demand payment, or fails . . . to timely deposit certificates, as required by a notice pursuant to section 1575 (relating to notice to demand payment) shall not have any right under this subchapter [BCL §§ 1571–1580] to receive payment of the fair value of his shares."[11]

BCL § 1577(c) provides that "[p]romptly after effectuation of the proposed corporate action [such as a merger, *see* BCL § 1571(a), 1930(a)] or upon timely receipt of demand for payment if the corporate action has already been effectuated, the corporation shall either remit to dissenters who have made demand and . . . have deposited their [share] certificates the amount that the corporation estimates to be the fair value of the shares, or give written notice that no remittance under this section will be made."[12] Under BCL § 1577(c)(1), (2), and (3), respectively, the remittance, or the notice of no remittance, as the case may be, must be accompanied by (1) the corporation's latest financial statements, (2) a

---

[11] Such a shareholder "shall retain all other rights of a shareholder until those rights are modified by effectuation of the proposed corporate action." BCL § 1576(c).

[12] BCL § 1577(a) provides that if the corporation fails to effectuate the "proposed corporate action" (such as a merger) within 60 days from the deadline for demanding payment and depositing shares, then it must return the deposited shares to the dissenting shareholder.

**[*36]** statement of the corporation's estimate of the value of the shares,[13] and (3) a notice of the right of the dissenter to demand supplemental payment. Additionally, if the corporation notifies the dissenting shareholders that it will not make a remittance, it (1) must return the deposited shares and (2) "may make a notation" on the share certificate that the shareholder had demanded payment. BCL § 1577(d). BCL § 1578(a) provides that if the corporation remits payment of its estimate of the value of the dissenter's shares, or if the corporation notifies the dissenting shareholder it will not remit payment and states its estimate of the value of the shares, and the dissenting shareholder believes the amount estimated or remitted is less than the value of the shares, the dissenting shareholder may send to the corporation his or her own estimate of the value of the shares, "which shall be deemed a demand for payment of the amount or the deficiency." If the dissenting shareholder does not send the corporation such a dissenters estimate, he or she is entitled only to the corporation's remittance or estimate of value. BCL § 1578(b).[14] BCL § 1579(a) provides that, within 60 days of the later of (1) effectuation of the proposed corporate action, (2) timely receipt of any demands for payment, or (3) the timely receipt of any dissenter's estimates pursuant to BCL § 1578(a), if the demand for payment remained unsettled, the corporation may file an application for relief in the Pennsylvania Court of Common Pleas requesting "in the name of the corporation" that the fair value of the shares be determined by the court. In such an appraisal proceeding, the Pennsylvania Court of Common Pleas may appoint an appraiser to take evidence and to

---

[13] When, under BCL § 1577(c), the corporation remits payment to the shareholders, the amount of that remittance is to be equal to the corporation's estimate of the fair value of the shares. Thus, in those instances in which the corporation chooses to remit to dissenters the amount the corporation estimates to be the fair value of the shares, BCL § 1577(c)(2) somewhat redundantly requires the corporation to include with the remittance a statement of the corporation's estimate of the fair value of the shares.

[14] The legislative history explains the process as follows:

A dissenter to whom the corporation has made payment (or who has been offered payment) must make his supplemental demand within 30 days after receipt of the payment (or offer of payment) in order to permit the corporation to make an early decision on initiating appraisal proceedings. If he fails to do so, he loses the right to demand additional payment.

Amended Committee Comment—1990, as *printed in* 15 Pa. Cons. Stat. Ann. § 1578 (1995).

[*37] recommend a value.  BCL § 1579(c).  The dissenting shareholder[15] is entitled to "recover the amount by which the fair value of his shares is found to exceed the amount, if any, previously remitted, plus interest."  BCL § 1579(d).  For this purpose, "interest" is defined in BCL § 1572 as follows:

> Interest from the effective date of the corporate action until the date of payment at such rate as is fair and equitable under all the circumstances, taking into account all relevant factors, including the average rate currently paid by the corporation on its principal bank loans.

If the corporation fails to file an application for relief within the 60-day period specified by BCL § 1579(a), any dissenting shareholder who had made an as-yet-unsettled demand for payment for shares may file an application for relief on behalf of the corporation within 30 days after the expiration of the 60-day period.  BCL § 1579(e).  BCL § 1579(e) provides: "If a dissenter does not file an application within the 30-day period, each dissenter entitled to file an application shall be paid the corporation's estimate of the fair value of the shares and no more, and may bring an action to recover any amount not previously remitted."

BCL § 1105 limits the rights of a minority shareholder whose shares are or would be eliminated by a merger.  It provides:

> A shareholder of a business corporation shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan . . . authorized under any provision of this subpart [BCL §§ 1101–4162], nor any right to claim the right to valuation and payment of the fair value of his shares because of the plan . . . except that he may dissent and claim such payment if and to the extent provided in Subchapter D of Chapter 15 (relating to dissenters rights) [BCL §§ 1571–1580] where this subpart [BCL §§ 1101–4162] expressly provides that dissenting shareholders shall have the rights and remedies provided in that subchapter.  Absent fraud or fundamental unfairness, the rights and remedies so provided shall be exclusive.  Structuring a plan or transaction for the purpose or with the effect of eliminating

---

[15] All dissenters whose demands had not been settled are joined to the proceeding.  BCL § 1579(b).

**[\*38]**  or avoiding the application of dissenters rights is not fraud or fundamental unfairness within the meaning of this section.

BCL § 1105 refers to a "proposed plan . . . authorized under any provision of this subpart." This term includes a plan of merger. This is because the provisions of "this subpart", i.e., BCL §§ 1101–4162, include (1) BCL § 1921(a), which authorizes the merger of two corporations, and (2) BCL § 1922, which requires a plan of merger to be prepared. Thus BCL § 1105 limits the rights of a minority shareholder in a merger.

The dissenters-rights procedure for a corporation that has adopted a plan of merger without the requirement of a shareholder vote is illustrated as follows:

**[*39]**

Figure 8

Dissenters-rights procedures for shareholders of a corporation that has adopted a
plan of merger without a shareholder vote

Corporation sends shareholder notice of adoption of plan of merger with deadline for depositing shares and demanding payment (BCL § 1575(a))

Shareholder deposits shares and demands payment for shares (BCL § 1575(a), (b))

Shareholder does not respond. Shareholder forfeits right to receive payment for shares (BCL § 1576(a))

Corporation remits to shareholder its estimate of value of shares (BCL § 1577(c))

Corporation notifies shareholder of its share value; returns shares; may make notation on returned shares (BCL § 1577(d))

Shareholder may send higher estimate to corporation within 30 days (BCL § 1578(a))

If shareholder does not send higher estimate, shareholder entitled only to the amount remitted (BCL § 1578(b))

Shareholder may send higher estimate of value to corporation within 30 days (BCL § 1578(a))

If shareholder does not send higher estimate, shareholder entitled to only the amount of corporation's estimate (BCL § 1578(b))

If after 60 days any shareholder's demand for payment remains unsettled, the corporation may file suit in Pennsylvania Court of Common Pleas to determine value of shares (BCL § 1579(a))

[*40] 9. *In December 1999, a short-form merger was formalized between BPSI and its newly formed parent corporation, but this merger was challenged by the David Berwind Trust, which also asserted its right to receive the fair market value of its BPSI shares.*

On November 22, 1999, four trustees of the David Berwind Trust filed a Complaint for Equitable and Legal Relief in the U.S. District Court for the Eastern District of Pennsylvania. The four trustees were Gail Berwind Warden, Linda Berwind Shappy, Michael Berwind, and David Berwind. The action was captioned *Gail B. Warden, et al. v. M. B. McLelland et al.*, Civil Action No. 99-CV-5797 (E.D. Pa. 1999). We refer to this action as the "*Warden* litigation."[16]

The action was brought on behalf of the David Berwind Trust and derivatively on behalf of BPSI.[17] The defendants were (1) eight present or former directors of BPSI (including Graham Berwind),[18] (2) Berwind Corporation, (3) Berwind Group Partners, (4) Graham Berwind (in his capacity as alleged trustee of the David Berwind Trust), and (5) McKenney (in his capacity as alleged trustee of the David Berwind Trust). In the complaint, the plaintiffs alleged that the resignations of both Graham Berwind and McKenney as trustees of the David Berwind Trust were invalid because neither Graham nor McKenney named two or more successor trustees (as required by the David Berwind Trust deed of trust). Based on this alleged invalidity of their resignations, the David Berwind Trust argued Graham Berwind and McKenney were still

---

[16] Gail Berwind Warden, the lead plaintiff, was a daughter of David Berwind and one of the trustees of the David Berwind Trust. As discussed later, the *Warden* litigation would later be consolidated with another action we will refer to as the "appraisal proceeding".

[17] The David Berwind Trust was a shareholder in BPSI, and therefore its trustees were entitled to bring shareholder-derivative claims on behalf of BPSI. Counts I through V were shareholder-derivative claims. A shareholder-derivative claim is a "corporate claim that a shareholder may assert only derivatively on behalf of the corporation." Deborah A. DeMott, Shareholder Deriv. Actions L. & Prac. § 2:2 (2022–2023). The claim is property of the corporation. *Id.* ("Claims or causes of action that constitute property of the corporation do not belong to its shareholders individually; nor do corporate claims become the property of the shareholder who acts as plaintiff in a derivative action . . . [I]n virtually all instances, any judgment recovered in the action and any settlement amount go to the corporation rather than to the plaintiff or other individual stockholders.") (Footnotes omitted).

[18] The present or former directors of BPSI named as defendants were Michael B. McLelland, John J. Byrne, Jr., J.S. Dulaney, James L. Hamling, Edward F. Kosnik, Lawrence C. Karlson, Robert M. Cohn, and Graham Berwind.

[*41] trustees of the David Berwind Trust at the time the merger took place and that they breached a fiduciary duty owed to the David Berwind Trust by attempting to have the David Berwind Trust sell its stock to BPSI.

The complaint alleged ten different claims designated as "counts".

Count I alleged that the defendants engaged in a pattern of activity constituting mail and wire fraud and that this pattern was a racketeering offense under 18 U.S.C. § 1962(c). Count I specifically referred to seven separate communications from the defendants that allegedly constituted mail and wire fraud. For example, Count I alleged that the August 11, 1999 letter from Kosnik to David Berwind was fraudulent. Count I was a shareholder-derivative claim. Count I sought treble damages.

Count II alleged the defendants engaged in a conspiracy to commit racketeering under 18 U.S.C. § 1962(d) as to the same conduct alleged in Count I. Count II was a shareholder-derivative claim. Count II sought treble damages.

Count III alleged that the BPSI board of directors usurped a corporate opportunity of BPSI by allowing BPSI assets to purchase equity interests in Zymark to be held by Berwind Group Partners and Berwind Corporation. This claim was a shareholder-derivative claim for monetary damages.

Count IV was a claim that BPSI's board of directors violated their fiduciary duty to BPSI through the following actions: (1) causing BPSI to provide equity financing and loan collateral to Berwind Aviation, which was allegedly "a holding entity for jet aircraft used substantially by [Graham] Berwind and his family for personal travel," (2) causing BPSI to pay excess amounts, including management fees, to Berwind Corporation, and (3) causing BPSI to make loans to Berwind Group Partners and Berwind Corporation at below market interest rates. This claim was a shareholder-derivative claim for monetary damages.

Count V was a claim that Berwind Group Partners and Berwind Corporation aided and abetted the breach of fiduciary duty of loyalty by the BPSI board of directors alleged in Count IV. This was a shareholder-derivative claim for monetary damages.

Count VI was a claim for equitable relief to enjoin Berwind Group Partners and the BPSI board of directors from taking steps to affect the

[*42] David Berwind Trust's minority shareholder interest in BPSI or the standing of the David Berwind Trust to assert the shareholder-derivative claims in the complaint. The relief was requested to remedy the Berwind Group Partners and BPSI board of directors' alleged violation of their fiduciary obligations to the David Berwind Trust as a shareholder in BPSI. In particular, Count VI alleged that that they refused to provide the David Berwind Trust with information concerning BPSI's operations and assets sufficient to form a fair valuation of the minority interest in BPSI, and are using the squeeze-out merger to defraud the David Berwind Trust, deprive it of the value of its BPSI shares, and prevent it from asserting the shareholder-derivative claims in the complaint.

Count VII was a claim for equitable relief to require Berwind Partners and the BPSI board of directors to provide an accounting of, and information on, the operations and management of BPSI from January 1, 1985.

Count VIII was a claim for equitable relief to rescind the squeeze-out merger and grant David Berwind Trust an interest in "the corporate entity into which BPSI or its assets has been merged." The factual theory underlying Count VIII was that the purpose of the squeeze-out merger was to "prevent the David Berwind Trust from seeking legal relief for the misappropriation of corporate opportunities, the misuse of corporate assets, and breaches of fiduciary duty and breaches of trust alleged herein." The claim was brought against Berwind Group Partners and the BPSI directors. Because the squeeze-out merger had not yet occurred when this complaint was filed, Count VIII was premature.

Count IX was a claim invoking the David Berwind Trust's right to a statutory appraisal under BCL § 1571(a) to receive the value of the Davd Berwind Trust's interest in BPSI. Because the squeeze-out merger had not yet occurred when this complaint was filed, Count IX was premature.

Count X was a claim that Graham Berwind and McKenney breached their duties as trustees of the David Berwind Trust to administer the trust solely in the interest of the beneficiaries. Count X alleged that the resignations of Graham Berwind and McKenney as trustees of the trust were ineffective. Count X alleged that there were four types of conduct by which Graham Berwind and McKenney breached their duties as trustees: (1) "usurping corporate opportunities

[*43] available to BPSI for the benefit of Berwind [Group] Partners, Berwind [Corporation], and/or affiliates thereof," (2) "using the assets of BPSI for the benefit of Berwind [Group] Partners, Berwind [Corporation], and/or affiliates thereof," (3) "approving and/or ratifying the squeeze-out merger of the interest of the David Berwind Trust in BPSI," and (4) "causing the interest of the David Berwind Trust in BPSI to be eliminated for less than fair price." This was a claim for monetary damages. Also, the claim requested that the income from the alleged breaches of duty be placed in a constructive trust.

During November and December of 1999, Berwind Group Partners and Berwind Corporation took steps that were intended to consolidate BPSI's ownership entirely in Berwind Group Partners through a short-form merger under BCL § 1924(b)(1)(ii).

In November 1999, BPSI's counsel, Morgan Lewis, & Bockius, on behalf of BPSI, retained Duff & Phelps "to determine the current fair value of the common stock of [BPSI]." The resulting report, dated December 15, 1999, stated that Duff & Phelps was an "independent financial advisor." The Duff & Phelps' valuation report provided an "Equity Value Range" of "$485,000,000 – $510,000,000" for BPSI and the report provided a "valuation opinion" of $505,000,000 for BPSI's common stock, of which the David Berwind Trust held 16.4% as of November 1999.

On December 10, 1999, Morris resigned as a trustee of the David Berwind Trust. Pawson was designated to replace him. On December 28, 1999, Pawson accepted the appointment.

As of December 14, 1999, BPSI had four types of stock outstanding: common, preferred stock, preference stock, and preferential stock.

As of December 14, 1999, the David Berwind Trust owned 16.4% of BPSI's common stock while Berwind Group Partners owned the remaining 83.6%. Berwind Corporation owned 100% of BPSI's outstanding shares of preferred stock (120,000 shares) and preference stock (3,474,936 shares). Berwind Corporation owned 108,000 shares of preferential stock, which was 18% of that class. Berwind Group Partners owned 401,280 shares of preferential stock, which was 66.88% of that class. Berwind Group Partners and Berwind Corporation owned, collectively, 84.88% of BPSI's preferential stock. The David Berwind

[*44] Trust and Graham Berwind owned 13.12% (78,720 shares) and 2% (12,000 shares) of the preferential stock, respectively.

As of December 14, 1999, the percentage ownership of BPSI's four classes of stock was as follows:

| Shareholder | Common Stock | Preferred Stock | Preference Stock | Preferential Stock |
| --- | --- | --- | --- | --- |
| David Berwind Trust | 16.4% | — | — | 13.12% |
| Graham Berwind | — | — | — | 2% |
| Berwind Group Partners | 83.6% | — | — | 66.88% |
| The Berwind Corp. | — | 100% | 100% | 18% |

The record does not clarify when the owners of the preference stock and preferential stock acquired their interests in these classes of stock.

The corporate structure at this point (December 14, 1999) was as follows:

**[\*45]**

Figure 9
Corporate Structure on Dec. 14, 1999



[*46] On December 15, 1999, Berwind Group Partners formed BPSI Acquisition with Berwind Group Partners as its sole shareholder.

On December 15, 1999, Berwind Group Partners and Berwind Corporation transferred all of their shares of BPSI stock to BPSI Acquisition through the following transfers:

- Berwind Group Partners contributed all of its BPSI common and preferential stock to BPSI Acquisition; and

- Berwind Corporation transferred all of its BPSI preferred, preference, and preferential stock to BPSI Acquisition in exchange for notes.

After these transfers, the percentage ownership of BPSI's four classes of stock was as follows:

| Shareholder | Common Stock | Preferred Stock | Preference Stock | Preferential Stock |
|---|---|---|---|---|
| David Berwind Trust | 16.4% | — | — | 13.12% |
| Graham Berwind | — | — | — | 2% |
| BPSI Acquisition | 83.6% | 100% | 100% | 84.88% |

The corporate structure thus looked like this:

**[*47]**

Figure 10
Corporate structure after creation of BPSI Acquisition



**[\*48]** On December 15, 1999, BPSI issued redemption notices to the holders of its outstanding preferred, preference, and preferential stock. The notices called for the redemption of their shares on January 15, 2000, a date referred to by the notices as the "redemption date." The notices stated that the redemption price was equal to (a) a fixed price per share ($50 for preferred, $1 for preference, and $1 for preferential) plus (b) "accrued but unpaid dividends to the [r]edemption [d]ate." The redemption notices stated that BPSI had deposited with First Union National Bank a sum sufficient to pay the redemption price, with irrevocable instructions to pay the redemption price to the holders upon surrender of their stock certificates. The redemption notices stated that as "a result of such action"[19] the shares of the preferred stock, preference stock, and preferential stock, respectively, "shall no longer be outstanding as provided in Section 1758(d) of the Pennsylvania Business Corporation Law." BCL § 1758(d) provides:

> Unless otherwise provided in the articles, redeemable shares that have been called for redemption shall not be entitled to vote on any matter and shall not be deemed outstanding shares after written notice has been mailed to holders thereof that the shares have been called for redemption and that a sum sufficient to redeem the shares has been deposited with a specified financial institution with irrevocable instruction and authority to pay the redemption price to the holders of the shares on the redemption date, in the case of uncertificated shares, or upon surrender of certificates therefore in the case of certificated shares, and the sum has been so deposited.

As explained above, BPSI's articles of incorporation contain provisions regarding the effect of redemption notices. FINDINGS OF FACT, Parts 4 (preferred stock) & 7 (preference and preferential stock), *supra*.

On December 15, 1999, a plan of merger of BPSI Acquisition into BPSI, with BPSI as the surviving corporation, was approved by the following entities:

- BPSI Acquisition's board of directors;

---

[19] The term "such action" apparently meant (1) mailing the redemption notices and (2) making the deposits.

**[*49]** • BPSI Acquisition's sole shareholder, Berwind Group Partners; and

• BPSI's board of directors.

The plan of merger was not submitted to the common shareholders of BPSI for their approval because the merger was intended and structured as a short-form merger under BCL § 1924(b).

The plan of merger contained the following statement about BPSI's preferred, preference, and preferential stock:

> Berwind Pharmaceutical has previously issued notices of redemption for the outstanding shares of the . . . [p]referred stock, the . . . [p]reference stock, and the . . . [p]referential stock and deposited a sum sufficient to pay the redemption price in a financial institution with . . . instructions to pay the redemption price to the holders thereof upon surrender of the certificates therefor. Therefore, the [stock is] no longer deemed outstanding, and [has] no rights with respect to the transactions contemplated by this Agreement and Plan of Merger.

(The plan of merger was self-titled "Agreement and Plan of Merger." The stipulation refers to the document as the "plan of merger.")

The plan of merger provided that when the articles of merger are filed, the David Berwind Trust's BPSI common stock "shall be converted into the right to receive" a subordinated promissory note from BPSI in the principal amount of $82,820,000 ($12,625 for each of its 6,560 shares), with all principal and 10% interest (compounded annually) payable at December 31, 2001, and no payments due before that date. The note was to be "subordinate and junior in right of payment . . . to all existing and future indebtedness of the Company [BPSI], including . . . trade payables." The note was to be nonnegotiable: it would obligate BPSI to make payment specifically to the David Berwind Trust. The plan of merger also acknowledged that the David Berwind Trust had "dissenters rights" under Pennsylvania law "to dissent from the Merger and to obtain payment of the fair value of [its] shares . . . ."

The plan of merger provided that all shares of BPSI common stock owned by BPSI Acquisition "shall be cancelled."

[*50] The plan of merger provided that each share of BPSI Acquisition common stock (all of which were held by Berwind Group Partners) shall be converted into one share of common stock of BPSI.

The plan of merger was executed by one officer from BPSI and one officer from BPSI Acquisition. The David Berwind Trust did not execute the plan of merger and had no vote regarding its approval. The David Berwind Trust contested the validity of the merger in the *Warden* litigation.

On December 16, 1999, BPSI filed articles of merger with the Secretary of State of Pennsylvania. The articles of merger stated that BPSI had merged with BPSI Acquisition and that the surviving corporation was BPSI. The articles of merger stated that the plan of merger had been adopted by (1) BPSI Acquisition's board of directors through written consent of all board members, (2) BPSI Acquisition's sole shareholder (i.e., Berwind Group Partners) by written consent, and (3) BPSI's board of directors by written consent of all board members. The plan of merger of BPSI Acquisition into BPSI, with BPSI as the surviving corporation, was attached to (and incorporated into) the articles of merger. The articles of merger stated that "[t]he plan of merger shall be effective upon filing these Articles of Merger in the Department of State."

As explained before, the plan of merger of BPSI Acquisition into BPSI provided that the David Berwind Trust's common stock in BPSI would be converted into an $82.82 million note from BPSI. Because the David Berwind Trust contested the validity of the disputed merger and because (as described later) it demanded cash payment for its BPSI stock on January 26, 2000, the note was never issued to the David Berwind Trust, and no payments were made with respect to the note. The only payment received by the David Berwind Trust from BPSI on or after December 16, 1999, was the redemption payment for its preferential stock (which the David Berwind Trust received on April 4, 2000) and the payment received by the David Berwind Trust in late 2002 under the settlement agreement that is described later.

On or around December 17, 1999, BPSI issued to the David Berwind Trust a notice to demand payment under BCL § 1575(a). The notice to demand payment stated that to receive payment for its BPSI common shares the trust must send a demand for payment to BPSI on or before January 31, 2000, accompanied by the share certificates.

**[*51]** On January 4, 2000, the plaintiffs in the *Warden* litigation filed an amended complaint with thirteen counts (the amended complaint).

The first ten counts in the amended complaint were essentially the same as the ten counts in the original complaint. Counts XI, XII, and XIII were new.

Count XI alleged that Graham Berwind engaged in a pattern of activity constituting mail and wire fraud and that this pattern constituted a racketeering offense under 18 U.S.C. § 1962. In particular, Count XI alleged that Graham Berwind "orchestrated a series of transactions designed to deprive the David Berwind Trust of the fair value of its interest in BPSI, and to prevent the David Berwind Trust from seeking redress for the breaches of fiduciary duty alleged herein." The claim was for treble damages. Unlike the other RICO claims in Counts I and II, Count XI was a direct claim (i.e., it was not a shareholder-derivative claim).

Count XII sought a declaratory judgment that the disputed merger was void because it did not comply with the BCL and because it was intended to deprive the David Berwind Trust of standing to pursue the shareholder-derivative claims in the amended complaint.

Count XIII was a claim for equitable relief seeking to enjoin the defendants from taking steps to affect the David Berwind Trust's minority shareholder interest in BPSI or the standing of the David Berwind Trust to assert the shareholder-derivative claims in the amended complaint. The relief was requested as a remedy for Graham Berwind's and McKenney's alleged violation of their fiduciary obligations as trustees of the David Berwind Trust. In particular, Count XIII alleged that Graham Berwind and McKenney directed the defendants to refuse to provide the David Berwind Trust with information concerning BPSI's operations and assets sufficient to form a fair valuation of the minority interest in BPSI, are using the squeeze-out merger to defraud the David Berwind Trust and deprive it of the value of its BPSI shares, and used the squeeze-out merger to block the David Berwind Trust from asserting the shareholder-derivative claims in the amended complaint.

Below is a summary of the complaint and the amended complaint in the *Warden* litigation:

| [*52] | Plaintiffs | Defendants | Type of claim | Remedy sought |
|---|---|---|---|---|
| I | BPSI (derivatively by David Berwind Trust) | All | Pattern of racketeering consisting of mail and wire fraud in violation of 18 USC § 1962(c) | Monetary damages (trebled) |
| II | BPSI (derivatively by David Berwind Trust) | All | Conspiracy to commit racketeering, consisting of acts of mail and wire fraud alleged in count I, in violation of 18 USC § 1962(d) | Monetary damages (trebled) |
| III | BPSI (derivatively by David Berwind Trust) | Directors of BPSI | Usurpation of BPSI corporate opportunity by BPSI directors, specifically, by using BPSI assets to buy equity interests in Zymark to be held by Berwind Group Partners and Berwind Corp. Original complaint was the same but used the word "diversion" rather than usurpation. | Monetary damages |
| IV | BPSI (derivatively by David Berwind Trust) | Directors of BPSI | Breach of fiduciary duty by having BPSI (1) provide equity financing and loan collateral to Berwind Aviation; (2) pay excess management fees to Berwind Corp.; (3) forego profits to make BPSI minority shares less valuable to reduce price to paid for them in squeeze-out merger; (4) make loans to Berwind Group Partners and Berwind Corp. at below market interest rates. | Monetary damages |
| V | BPSI (derivatively by David Berwind Trust) | Berwind Group Partners; Berwind Corp. | Aiding and abetting the duty-of-loyalty breaches alleged in Count IV. | Monetary damages |
| VI | David Berwind Trust | Berwind Group Partners; BPSI Directors | Breach of fiduciary duty by (1) attempting to squeeze out the trust's interest in BPSI to deprive the trust of the value of its interest and prevent the trust from lodging a shareholder-derivative suit against the BPSI board, and (2) refusing to provide the trust with financial information about BPSI. | Equitable relief to enjoin Berwind Group Partners and BPSI directors from taking steps to affect the minority shareholders interest of the trust in BPSI. |

| [*53] | Plaintiffs | Defendants | Type of claim | Remedy sought |
|---|---|---|---|---|
| VII | David Berwind Trust | Berwind Group Partners; BPSI Directors | Refusing to provide the trust with financial information about BPSI. | Equitable relief to require Berwind Group Partners and BPSI directors to provide an accounting of, and information on, the operation and management of BPSI from 1/1/1985. |
| VIII | David Berwind Trust | Berwind Group Partners; BPSI Directors | Orchestrating squeeze-out merger to prevent the trust from seeking legal relief for the alleged misappropriation of corporate opportunity, misuse of corporate assets, and breaches of fiduciary duty and breaches of trust. | Equitable relief to rescind the squeeze-out merger and grant trust an interest in the corporate entity into which BPSI has been merged. |
| IX | David Berwind Trust | Berwind Group Partners; BPSI Directors | The defendants offered the trust less than the fair value of its interest in BPSI. | Demand for statutory appraisal under BCL § 1571(a) to receive the fair value of the trust's interest in BPSI. |
| X | David Berwind Trust | Graham Berwind and McKenney | Graham Berwind and McKenney breached their duties as trustees of the trust by (1) usurping corporate opportunities available to BPSI for the benefit of Berwind Group Partners and Berwind Corporation, (2) using assets of BPSI for the benefit of Berwind Group Partners and Berwind Corporation, (3) approving the squeeze-out merger to eliminate the trust's interest in BPSI, (4) causing the interest to be eliminated at less than a fair price. | Monetary damages; place income from alleged breaches of duty in a constructive trust |

| [*54] | Plaintiffs | Defendants | Type of claim | Remedy sought |
|---|---|---|---|---|
| XI | David Berwind Trust | Graham Berwind | Pattern of racketeering consisting of mail and wire fraud in violation of 18 USC § 1962(c) | Monetary damages (trebled) |
| XII | David Berwind Trust | All defendants | Plan of merger not authorized and did not comply with the BCL. Also, sole purpose of plan of merger was to deprive the trust of standing to pursue the *Warden* litigation. | Declaratory judgment that plan of merger is null and void. |
| XIII | David Berwind Trust | Graham Berwind and McKenney | Graham Berwind and McKenney violated their duties as trustees of the trust by directing the defendants to refuse to provide the trust with financial information about BPSI and by using the squeeze-out merger to defraud the trust and deprive it of the value of its BPSI shares, and using the squeeze-out merger to prevent the trust from asserting the shareholder-derivative claims in the amended complaint. | Equitable claim to enjoin Graham Berwind and McKenney from taking any action to modify the minority shareholder interest of the trust in BPSI. |

On January 13, 2000, the defendants in the *Warden* litigation filed (1) a motion to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) and (2) a memorandum of law in support of the motion. One of the reasons given in the memorandum of law was as follows:

> [P]laintiffs have no right to demand any of the forms of equitable relief that they seek: injunction, accounting or rescission. Because the merger has now been consummated . . ., Pennsylvania law now limits plaintiffs to their remedies under the appraisal statute. Accordingly, Counts VI through VIII should be dismissed.

The motion and memorandum of law sought dismissal of all counts in the amended complaint, not just Counts VI through VIII (the counts mentioned in the excerpt above). However, the motion and memorandum of law did not seek to dismiss the appraisal proceeding.

On January 13, 2000, the plaintiffs in the *Warden* litigation filed a motion for a temporary restraining order and a preliminary injunction. A copy of this filing is not in the record of the present case.

[*55] On January 13, 2000, the parties in the *Warden* litigation entered into a stipulation to maintain the status quo with respect to BPSI's capital and corporate structure until January 18, 2000. On June 1, 2000, the parties to the *Warden* litigation extended the status-quo-maintenance date from (1) January 18, 2000, to (2) 30 days after the resolution of BPSI's motion to dismiss the *Warden* litigation.

On January 26, 2000, the David Berwind Trust exercised its dissenters rights under the BCL §§ 1571–1580 by sending to BPSI a demand for payment and returning its common stock certificate to BPSI, as required by BCL § 1575(a). In a cover letter transmitting a copy of the demand for payment, the David Berwind Trust's attorney (Steven L. Friedman of the law firm of Dilworth Paxon) made the following statement:

> As you know, we have taken the position on behalf of the [David Berwind] Trust that the purported merger did not comply with Pennsylvania law and is invalid and of no effect. The [David Berwind] Trust is submitting the Demand for Payment pursuant to Section 1575 of the Pennsylvania Business Corporation Law as a precautionary measure. However, the Demand for Payment shall not be construed as an acknowledgment by the [David Berwind] Trust that the purported merger was valid or effective (which it clearly was not) or operate as a waiver of any claims or rights that the [David Berwind] Trust may have in connection with the purported merger, including, without limitation, any of the claims asserted by the [David Berwind] Trust in the above-referenced litigation.

On January 28, 2000, the defendants in the *Warden* litigation filed a memorandum of law in opposition to the January 13, 2000 motion for a temporary restraining order and a preliminary injunction.

On January 28, 2000, the plaintiffs in the *Warden* litigation filed a memorandum of law in opposition to the defendants' motion to dismiss the amended complaint. In the memorandum, the plaintiffs argued that the disputed merger was invalid because, the plaintiffs asserted, the plan of merger did not comply with § 1922(a) of the BCL by allegedly failing to provide terms for the manner and basis of converting the outstanding preferred stock, preference stock, or preferential stock,

[*56] which the plaintiffs asserted were still outstanding under BPSI's articles of incorporation, into other shares or other consideration.

On February 4, 2000, the plaintiffs in the *Warden* litigation filed a memorandum of law in reply to defendants' opposition to plaintiffs' motion for a temporary restraining order and a preliminary injunction.

On or about February 4, 2000, BPSI sent the David Berwind Trust a notice responding to the trust's January 26, 2000 demand for payment. The notice stated that BPSI would not make a remittance. The notice stated that BPSI estimated that the fair value of the trust's shares of BPSI was $82,820,000. The notice also stated that BPSI had the right to make another demand for payment under BCL § 1578(a) (allowing dissenter who receives a notice of non-remittance to send to the corporation the dissenter's estimate of fair value). The notice also included BPSI's audited financial statement for the calendar year 1998 and unaudited interim financial statement for the 12-month period ending September 30, 1999. Pursuant to BCL § 1577(d), BPSI returned to David Berwind Trust its BPSI common stock certificate, on which BPSI made the following notation:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE THE SUBJECT OF A NOTICE TO DEMAND PAYMENT UNDER THE DISSENTERS RIGHTS PROVISIONS OF THE PENNSYLVANIA BUSINESS CORPORATION LAW, 15 P.C.S. § 1575 ET SEQ., AND MAY ONLY BE TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED SUBJECT TO SUCH PROVISIONS.

On February 16, 2000, the defendants in the *Warden* litigation filed a reply memorandum in support of their motion to dismiss the amended complaint. In the reply memorandum, the defendants in the *Warden* litigation argued that the disputed merger was valid because, they asserted, the plan of merger provided terms for the manner and basis of converting the preferred, preference, and preferential stock into other shares or other consideration by acknowledging that such stock had been called for redemption and that sufficient funds were deposited with a financial institution with irrevocable instructions to pay on the redemption date.

In early 2000, the David Berwind Trust hired Howard, Lawson & Co, LLC (Howard Lawson), to assist it in providing its estimate of value

**[*57]** to perfect its appraisal rights. Howard Lawson issued a valuation report to the David Berwind Trust on February 23, 2000 (the 2/23/2000 valuation report). The 2/23/2000 valuation report, which relied, in part, on BPSI's unaudited financial results for the 12 months ended September 30, 1999, as adjusted by Howard Lawson, estimated the value of David Berwind Trust's interest in BPSI and Zymark combined at a range between $165 million and $204 million and recommended that the David Berwind Trust use $190 million as its estimate, stating "[I]t is best to lead with an aggressive, but supportable estimate at this time." This amount included the value of a 16.4% equity interest in Zymark, which is $40 million of this estimate, because the David Berwind Trust maintained that Zymark was a corporate opportunity of BPSI usurped by Graham Berwind. The 2/23/2000 valuation report explained that its conclusions were tentative: "The process of adjusting BPSI's financials is imperfect and requires numerous assumptions. Because of the lack of meaningful financial information, the assumptions are likely to be significantly modified after discovery."

On March 3, 2000, the David Berwind Trust sent BPSI a notice of estimate of fair value of its BPSI shares pursuant to BCL § 1578(a). In the notice, the David Berwind Trust stated that its "estimate of the fair value of the shares is $190,000,000." In the cover letter to the notice, the David Berwind Trust's attorney (Roger Wood of Dilworth Paxon) wrote that the David Berwind Trust was preserving its position that the disputed merger was "invalid and ineffective" and that BPSI "failed to provide financial and other information that the Trust and its advisers need to properly value the Company and its shares." The letter stated that the David Berwind Trust "is complying with the dissenters rights provisions of the Pennsylvania Business Corporation Law as a precautionary measure."

On March 14, 2000, BPSI filed a statutory appraisal action in the Court of Common Pleas of Philadelphia County, captioned *Berwind Pharmaceutical Services, Inc. v. Warden, et al.*, to seek a judicial determination of the fair value of the BPSI shares on December 16, 1999, pursuant to BCL § 1579. We refer to this action as the "appraisal proceeding".

On March 20, 2000, the appraisal proceeding was removed to federal court and consolidated with the *Warden* litigation.

On April 4, 2000, the David Berwind Trust received the redemption payment for its preferential stock.

**[\*58]** On April 25, 2000, the District Court granted the motion by the defendants in the *Warden* litigation to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The only explanation given by the District Court for the dismissal was as follows: "The Court approves and adopts [the January 13, 2000 motion to dismiss the amended complaint filed by the defendants in the *Warden* litigation and the February 16, 2000 reply memorandum filed by the defendants in support of their motion to dismiss the amended complaint, as supplemented] which collectively set forth the legal authority which is dispositive of [p]laintiff's cause of action." *See Warden v. McLelland*, 288 F.3d 105, 109 (3d Cir. 2002).[20]

In June 2000, the parties to the *Warden* litigation and appraisal proceeding agreed to a mediation process in an effort to resolve the claims set forth by each party in the two actions.

In November 2000, the David Berwind Trust (through its counsel) obtained a second appraisal from Howard Lawson, which valued a 16.4% interest in BPSI and Zymark as of December 16, 1999. Howard Lawson created the report "in [c]onnection with [a]nalysis of [i]nterests [o]wned by the [David Berwind] Trust" and for use in mediation discussions between the David Berwind Trust and BPSI. In preparing the report, Howard Lawson reviewed financial statements and forecasts of BPSI and Zymark and interviewed managers of BPSI and Zymark. The report concluded that the David Berwind Trust's interest in BPSI and Zymark (as if it were a subsidiary of BPSI) as of December 16, 1999, had a value of $177.8 million (based on enterprise values of $900 million for BPSI and $184 million for Zymark), but the "inclusion of acquisition activity in the case of BPSI" would increase the value of the David Berwind Trust's interest to $218.8 million in the aggregate.

On January 26, 2001, the David Berwind Trust's trustees met to discuss prospective settlement negotiations for the *Warden* litigation and the appraisal proceeding. At the meeting, Michael Berwind, as managing trustee,[21] recommended that (1) $148 million should be the David Berwind Trust's "walk away" number below which the David Berwind Trust would opt to continue litigation and (2) $188 million was "what we want." At the meeting, Michael Berwind explained to the

---

[20] The supplement to the February 16, 2000 reply memorandum is not in the record.

[21] The record does not reveal when Michael Berwind became the managing trustee.

**[*59]** trustees that (1) a 30 multiple of 1999 BPSI earnings resulted in a value of approximately $143 million, (2) removing the implied minority discount in "CGB/BPSI's $82.8 million offer" brought CGB/BPSI's number to $96 million, (3) interest, fees, and expenses were "really nonnegotiable," and (4) to "avoid the continued litigation pain and potential downside litigation risk . . . the walk away number should contain certain discounts."[22]  Michael Berwind calculated the "walk away" amount by adding (1) a $132 million principal amount and (2) interest at a 10% annual rate accruing over 13 months.  Michael Berwind calculated the $188 million "what we want" amount by adding (1) a $168 million principal amount and (2) interest at a 10% annual rate accruing over 13 months.  After discussing the matter, David Berwind, Michael Berwind, Linda Berwind Shappy, and Pawson agreed that the trust's "walk away" amount should be $158 million.  Gail Berwind Warden, who was not able to attend the trustee meeting, also agreed to that number.

On January 26, 2001, Michael Berwind wrote and sent a memorandum to Klein, copying Russell Shappy and Pawson, describing Klein's settlement authority in the mediation process for the period from "January 30 through February 15, 2001."  We refer to this as the "1/26/2001 Michael Berwind memo."  The 1/26/2001 Michael Berwind memo stated that the David Berwind Trust "would like to receive $188 million dollars to settle the two lawsuits [i.e., the *Warden* litigation and the appraisal proceeding]."  The 1/26/2001 Michael Berwind memo described the David Berwind Trust's "walk away number," at which the trustees opt to continue the litigation, as $165 million dollars.  While the 1/26/2001 Michael Berwind memo contains no reference to interest, in a memo dated January 31, 2002, Michael Berwind wrote to Pawson and Russell Shappy that the $165 million calculation "included interest at 10 percent for 13 months."  The 1/26/2001 Michael Berwind memo also stated that "[t]he [David Berwind] Trust remains willing to acquire 100% of BPSI and Zymark at the same price the Trust is asking to receive (however the Trust would not be willing to agree to subsection b above [compensation to the seller if a transaction occurs prior to December 31, 2006] as it would require that flexibility in order to finance the 83.6% transaction)."  On or about January 26, 2001, Michael Berwind also provided to Justin Klein a one-page spreadsheet similar to that in the two-page document "Thoughts on Mediation Compromise."

---

[22] "CGB" refers to Charles Graham Berwind, Jr., who we refer to as Graham Berwind.  The $82.8 million offer refers to BPSI's February 4, 2000 notice that BPSI estimated that the value of the David Berwind Trust's shares in BPSI was $82,820,000.

**[*60]** We refer to the one-page spreadsheet as "Michael Berwind's second 1/26/2001 mediation compromise spreadsheet". On Michael Berwind's second 1/26/2001 mediation compromise spreadsheet, he included $18 million for "Interest on BPSI & Zymark" in the desired $188 million settlement number and $16 million for "Interest on BPSI & Zymark" in the $165 million "walk away" number. Michael Berwind's second 1/26/2001 mediation compromise spreadsheet also contained a table entitled "After-Tax Analysis," which contained a column entitled "After-Tax Proceeds . . . Assuming 100% of Settlement is Treated as Stock Sale Proceeds."

On January 31, 2001, Justin provided Meyers with a spreadsheet that Meyers faxed to McKenney on the same day. The spreadsheet compared (1) the David Berwind Trust's position regarding the value of its BPSI interest and the *Warden* litigation claims to (2) BPSI's assigned value for such items. In the spreadsheet, the David Berwind Trust attributed $177.616 million to BPSI and Zymark before the line for "Claims" and $19.242 million to "Interest on BPSI & Zymark." The numbers on the spreadsheet were derived from Michael Berwind's second 1/26/2001 mediation compromise spreadsheet.

On January 31, 2001, Klein sent a fax to Russell Shappy and Pawson, transmitting two undated one-page documents prepared by BPSI and respectively titled "Settlement Proposal" and a "Comparison of Valuations." The settlement-proposal document contained a settlement offer from BPSI of $96,514,000 next to which was a handwritten notation made by Klein that states "102 w/ interest . . . 5.66% interest rate." We interpret this fax to mean that on January 31, 2001, BPSI had made a settlement offer, which was communicated by the settlement-proposal document, under which BPSI would pay the David Berwind Trust $96,514,000, brought up to $102,000,000 with interest.

On February 9, 2001, Klein met with Meyers to discuss settlement of the *Warden* litigation and the appraisal proceeding. During or around the time of this meeting, Klein made a settlement offer of $188 million to Meyers. The parties to the *Warden* litigation and the appraisal proceeding were unable to reach a settlement during 2001.

On February 23, 2001, the U.S. Court of Appeals for the Third Circuit vacated the District Court's dismissal of the amended complaint in the *Warden* litigation, and remanded the case to the District Court "for it to set forth, in a reasoned opinion, the relevant facts, legal

**[\*61]** principles, and authorities that support its decision." The Third Circuit order stated "we maintain jurisdiction over this case and hold this appeal in abeyance, pending our receipt of the reasoned opinion from the District Court."

On August 8, 2001, the District Court issued an opinion on remand dismissing the amended complaint claims in the *Warden* litigation under Fed. R. Civ. P. 12(b)(6*). Warden v. McLelland*, 2001 WL 910934 (E.D. Pa.).

In part B of its opinion,[23] the District Court held that counts I–V should be dismissed because they were shareholder-derivative claims that did not meet the "demand" requirement that they be submitted to the board of directors of BPSI. *Id.* at \*2–5. The District Court explained that for a shareholder-derivative claim to be heard by a court, the shareholder must first make written demand upon the board of directors of the corporation, unless the shareholder (1) shows that irreparable injury to the corporation would occur if the shareholder had made the demand before the commencement of the action and (2) made the demand promptly after the commencement of the action. *Id.* at \*3. The District Court stated that no demand on the board of directors of BPSI had been made before the amended complaint was filed. *Id.* at \*4. Furthermore, the District Court stated that the plaintiffs did not make any demand on the BPSI board of directors even after the action was commenced. *Id.* The District Court held that even though the amended complaint had alleged that BPSI would suffer irreparable harm if demand had been made before commencement of the suit, it had failed to "show with any degree of specificity how, when or why BPSI would be irreparably harmed if a demand were required to be made or what the irreparable harm would be." *Id.*

In parts C.1, C.2, C.3, and C.4 of its opinion, the District Court held that the RICO claims (which were Counts I, II, and XI) were not pled with particularity and should be dismissed. *Id.* at \*4–10. The District Court identified the following four defects in the RICO claims: (1) the amended complaint did not "allege the RICO predicate acts with particularity," (2) the amended complaint did not sufficiently plead "any injury that flowed from the purported predicate acts," (3) the amended complaint failed to plead a pattern of racketeering activity because the alleged predicate acts did not pose a "threat of continued criminal

---

[23] This is part II.B of the District Court's opinion, but we omit the "II" when referring to this subpart and other subparts of part II of the District Court opinion.

**[\*62]** activity," and (4) the amended complaint did not allege the plaintiffs "relied upon any alleged predicate acts by the defendants." *Id.*

In part C.5 of its opinion, the District Court held that the RICO claims in Counts I and II should be dismissed against four former directors of BPSI (Byrnes, Dulaney, Karlson, and Cohn) because these people were not directors in BPSI in December 1998. *Id.* at \*11. December 1998 was when the fraudulent communications allegedly began, according to the amended complaint. *Id.* at \*5, \*8.

In part C.6 of its opinion, the District Court held that Count XI, the RICO aiding-and-abetting claim against Graham Berwind, should be dismissed because it was brought as a direct claim and should have been brought as a shareholder-derivative claim. *Id.* at \*11.

Part D of the District Court opinion held that Count III, and portions of Count IV and V, were barred by the two-year statute of limitations regarding claims of breach of fiduciary duty by BPSI directors. *Id.* at \*11–12. The District Court opinion held that Count III in its entirety was time barred. *Id.* This was because, according to the District Court, Count III alleged that the BPSI board of directors breached its duties to BPSI shareholders by allowing the Zymark acquisition to occur without BPSI being the owner of Zymark. *Id.* at \*12. The Zymark acquisition allegedly was consummated on September 3, 1996. *Id.* However, the original complaint was not filed until November 22, 1999, more than two years later. *Id.* The District Court also held that portions of Count IV and Count V (aiding and abetting for breach of fiduciary duty) were time barred because Count IV alleged conduct that began in approximately 1992 or in the mid-1990s. *Id.* The original complaint was filed more than two years later, on November 22, 1999. *Id.*

In part E of the opinion, the District Court held that Counts VI (injunction against merger), VII (accounting), and VIII (rescission of merger) should be dismissed. *Id.* at \*12–13. In the District Court's view, these claims were precluded by BCL § 1105 and *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980). *Warden v. McLelland*, 2001 WL 910934, at \*12–13. The District Court stated:

> The BCL expressly provides that appraisal rights shall be the exclusive remedy for the dissenting shareholder. 15 Pa.C.S.A. § 1105. While Section 1105 does allow a dissenting shareholder to challenge a merger on the

**[\*63]** limited basis of fraud or fundamental unfairness, Jones & Laughlin made clear that once the merger has been completed, the appraisal statute provides the only remedy. Moreover, nothing in the BCL allows a dissenting shareholder to obtain an accounting or to rescind a merger.

*Id.* at \*13.

In part F of the opinion, the District Court held that Counts VI (injunction against merger) and XIII (rescission of merger) should be dismissed because the plaintiffs failed to show they would be irreparably harmed if they did not prevail on these equitable claims. *Id.* at \*13–14. The District Court explained that the "claim [was] based upon inadequate price" and that such "claim [was] compensable by money damages." *Id.* at \*15. Also significant, explained the District Court, was that the amended complaint "acknowledges that the minority interest has been converted into the right to receive a note for almost $83 million in an amount equal to $12,625 per share." *Id.*

In part G of the opinion, the District Court held that Count IX (right to statutory appraisal) should be dismissed. *Id.* at \*15–16. The District Court gave five reasons why Count IX did not state a valid claim. First, the District Court held that the David Berwind Trust had failed to timely demand payment for its shares and timely deposit share certificates as required by BCL §§ 1575 and 1576. *Warden v. McLelland*, 2001 WL 910934, at \*15–16.[24] Second, the District Court held that the David Berwind Trust failed to provide its own estimate of the value of its interest in BPSI as required by BCL § 1578(a) and (b). *Warden v. McLelland*, 2001 WL 910934, at \*15–16.[25] Third, the District Court held that under BCL § 1579(a), the David Berwind Trust's appraisal action was premature. *Warden v. McLelland*, 2001 WL 910934, at \*15–16. The District Court explained that the David Berwind Trust was barred from commencing an appraisal action until the 60-day window of BCL § 1597(a) had expired. *Warden v. McLelland*, 2001 WL 910934, at \*16. Fourth, the District Court held that an appraisal action under BCL § 1579(a) could be commenced only in the Pennsylvania Court of

---

[24] However, as we have explained, the David Berwind Trust demanded payment for its shares and returned its common stock certificate to BPSI on January 26, 2000. The deadline for doing so was five days later, on January 31, 2000.

[25] However, as we have explained, the David Berwind Trust sent BPSI a notice of its estimate of the fair value of its BPSI shares pursuant to BCL § 1578(a) on March 3, 2000. The estimate was $190,000,000.

[*64] Common Pleas. *Warden v. McLelland*, 2001 WL 910934, at *16. Thus, by filing suit in the District Court, the plaintiffs filed suit in the "wrong court." *Id.* Fifth, the District Court held that the named defendants were the "wrong parties" to an appraisal proceeding because "nothing in the appraisal statute [BCL § 1579(e)] allows plaintiffs to bring a claim against the directors or majority shareholder" and because BCL § 1579(e) "directs that an appraisal proceeding be brought 'in the name of the corporation.'" *Warden v. McLelland*, 2001 WL 910934, at *16.

In part H of the opinion, the District Court held that Counts VI, VII, VIII, IX, XI, and XII should be dismissed as to the present and former directors of BPSI. *Id.* at *16–17. The District Court observed that Counts VI, VII, VIII, and IX asserted direct claims against the present and former BPSI directors (although they also went against Berwind Group Partners). *Id.* at *17. The District Court also observed that Count XI was a claim against Graham Berwind in his capacity as a director of BPSI. *Id.* at *17. The Court also observed that Count XII was a declaratory judgment claim against all defendants, including the present and former directors of BPSI. *Id.* at *17. The District Court held that these counts, to the extent they went against present and former directors of BPSI, were direct claims barred by BCL § 1717 (which provides that the duties of the directors are solely to the corporation and which, the District Court explained, "may not be enforced directly by a shareholder."). *Warden v. McLelland*, 2001 WL 910934, at *16–17. Recall that in part C.6 of the District Court opinion, the District Court had also explained why Count IX was an impermissible direct claim by a shareholder against a BPSI director, Graham Berwind. *Id.* at *11. The legal reasoning in part C.6 is similar to that in part H, although different authorities are cited in part C.6. For example, part C.6 did not rely on BCL § 1717. But setting aside the difference in authorities, part H is redundant with part C.6 as to Count IX.

In part I of the opinion, the District Court held that Counts X and XIII should be dismissed. *Warden v. McLelland*, 2001 WL 910934, at *17–18. Counts X and XIII alleged that Graham Berwind and McKenney engaged in a breach of trust as trustees of the David Berwind Trust. In terms of remedy, Count X sought monetary damages against Graham Berwind and McKenney. Count XIII sought an injunction. As an initial matter, the District Court interpreted Count XIII to have been brought not against all defendants, but only against Graham Berwind and McKenney: "Count XIII is somewhat ambiguous in that it appears

**[\*65]** to be brought against [Graham Berwind] and . . . McKenney . . . , but it then asks for relief against all defendants. . . . For purposes of this motion to dismiss, defendants [sic: the District Court] will treat Count XIII as attempting to state a claim against the two individuals because nothing in the allegations of Count XIII would support an injunction against all defendants." *Id.* at \*17 n.10. The reasons that Counts X and XIII should be dismissed, according to the District Court, were threefold. First, the District Court held that Graham Berwind and McKenney had resigned as trustees of the David Berwind Trust. *Id.* at \*17. The District Court held that any failure by them to appoint their successors as part of their resignation process "would have been mere surplusage" because "there were already five trustees." *Id.* The District Court also stated that the plaintiffs "had no interest in any successor trustees because the purpose of the resignations was to separate the brothers' interests" and that the plaintiffs would not have "welcomed" anyone affiliated with Graham Berwind and McKenney as additional trustees. *Id.* Second, the District Court held that the plaintiffs could not hold both Graham Berwind and McKenney liable as trustees because McKenney only became a trustee when Graham Berwind resigned as trustee. *Id.* at \*18. Third, the District Court held that liability could not be imposed on Graham Berwind and McKenney based on any "purported conflict of interest" because the deed of trust of the David Berwind Trust provided as follows: "The fact that any trustee may be interested in Berwind Corporation or any of its subsidiaries as director, stockholder, manager, agent or employee shall not constitute an adverse or conflicting interest, and the acts of such trustee shall be judged as if he has no interest in the Corporation." *Id.*

Part J of the District Court opinion held that Count XII (seeking a declaratory judgment that the merger was void) should be dismissed. *Id.* at \*17. The District Court held that even though the amended complaint alleged that the "merger did not comply with the BCL", in actuality the merger "was specifically contemplated and authorized by the BCL" and "defendants' actions with respect to the merger were proper." *Id.* at \*18. The District Court also held that a claim for declaratory judgment, standing alone, is not a valid claim because to seek declaratory judgment is only to name the relief sought, not the legal theory upon which relief is predicated. *Id.*

In accordance with its August 8, 2001 opinion (which we have summarized above), the District Court again granted the motion of the defendants in the *Warden* litigation to dismiss the amended complaint

[*66] under Fed. R. Civ. P. 12(b)(6). *Warden v. McLelland*, 2001 WL 910934, at *19.

On January 18, 2002, the Third Circuit heard oral argument regarding the appeal of the dismissal of the *Warden* litigation.[26]

During 2002, Pawson and Russell Shappy, the latter as the financial manager of the David Berwind Trust, conducted settlement negotiations on behalf of the David Berwind Trust.

On January 26, 2002, Michael Berwind sent a memorandum to Russell Shappy, with copies to the David Berwind Trust trustees (except for alleged trustees Graham Berwind and McKenney), addressing what he stated was Russell Shappy's "settlement authority" as to "[m]ediation" for the period ending May 1, 2002. The memorandum stated that (1) the David Berwind Trust's desire was to receive a settlement of $168 million dollars "before interest, fees, and expenses;" (2) the David Berwind Trust's "walk away number" at which the trustees would opt to continue the litigation was "$147 million dollars before interest, fees, and expenses;" and (3) there were several conditions on the potential settlement with BPSI. Condition "a" was that "Graham/BPSI/etc. must either remove all tax consequences to the Trust that result from the December 16, 1999 merger and the $82,800,000 [$82,820,000] Note or must pay those tax consequences." Condition "b" was that "[i]f BPSI goes public or is sold prior to December 31, 2004, the Trust should receive its proportionate share of any profit." The memorandum also stated that "[t]he [David Berwind] Trust remains willing to acquire 100% of BPSI and Zymark at the same price the Trust is asking to receive (however the Trust would not be willing to agree to subsection b above as it would require that flexibility in order to finance the 83.6% transaction)."

On January 31, 2002, Michael Berwind sent a memorandum to Pawson and Russell Shappy entitled "BPSI - Negotiation Strategy". In the memorandum, after setting forth numerous considerations and strategies, including continuing the litigation, Michael Berwind explained his "thoughts on our post-3d Circuit Court hearing negotiation strategy" as follows: "I would agree to the present value of

---

[26] Recall that in its February 23, 2001 order, the Third Circuit had stated "we maintain jurisdiction over this case and hold this appeal in abeyance, pending our receipt of the reasoned opinion from the District Court." Thus, as of January 18, 2002, the Third Circuit still had jurisdiction over the case consisting of the *Warden* litigation and the appraisal proceeding.

**[*67]** $147,000,000 as of December 15, 1999 with interest at 10% for BPSI and 6% for all claims including Zymark from December 15th, 1999 plus fees and expenses." The memorandum characterized this $147,000,000 amount as reflecting the "walk away" position. A spreadsheet embedded in the memorandum explained that the total settlement to the David Berwind Trust was $182,000,000, when interest was included. The spreadsheet also calculated that a "Would Be Happy" settlement amount would be $207,000,000, including interest. The spreadsheet was as follows:

|  | Valuation[1] | |
| --- | --- | --- |
| *Item* | *Walk Away* | *Would Be Happy* |
| BPSI | 120 | 133 |
| Zymark | 20 | 25 |
| Subtotal | 140 | 158 |
| Claims | 7 | 10 |
| Subtotal | 147 | 168 |
| Interest on above | 33 | 37 |
| Subtotal | 180 | 205 |
| Fees and expenses | 2 | 2 |
| Total | 182 | 207 |

[1]The amounts in the table are in millions.

On February 16, 2002, Michael Berwind wrote and sent a draft memorandum to Russell Shappy (and a copy to Pawson). In the draft memorandum, Michael Berwind provided his views regarding how to respond to "Potential Difficult Questions from Bruce McKenney," including the following:

1. Does the David Berwind family want to sell its stock in BPSI?

   a. Prior to the onset of hostilities by Graham Berwind in August of 1999, the answer had been an unqualified "no".

   b. Post August 1999 -- the answer has become a qualified "yes". The David Berwind family is willing to sell its stock in BPSI to Graham Berwind if:

   i.   Fair value can be established/agreed-upon and a control premium paid by Graham [Berwind] to obtain what he desires.

**[\*68]**　　ii.　　Graham [Berwind] is going to continue to distinguish between active and inactive stockholders with respect to liquidity.

　　　　　　iii.　　Graham [Berwind] is going to continue to withhold pertinent financial information from inactive stockholders.

　　　　　　iv.　　Majority stockholders could someday in the future again initiate a forced liquidation by a minority stockholder.

Page 2 of Michael Berwind's February 16, 2002 draft memo stated: "We are prepared to either (1) determine a price for BPSI stock, or (2) determine whether we are a buyer or a seller at a price determined by Graham [Berwind]."

On April 30, 2002, the Third Circuit reversed the dismissal under Fed R. Civ. P. 12(b)(6) and issued an opinion.

The Third Circuit addressed the question of whether Counts I–V should be dismissed because those claims failed the "demand" requirement that as shareholder-derivative claims they first had to be submitted to the board of directors of BPSI. *Warden v. McLelland*, 288 F.3d 105, 110–14 (3d Cir. 2002). The Third Circuit held that the amended complaint sufficiently alleged that BPSI would have been irreparably harmed had the demand been made to the board of directors of BPSI. *Id.* at 111. The Third Circuit explained that it could be inferred from the amended complaint that had the David Berwind Trust made the demand of the BPSI board, BPSI would have responded by executing the squeeze out-merger, that the squeeze-out merger would have removed the David Berwind Trust as a shareholder, and that therefore the David Berwind Trust would not have standing to file its shareholder-derivative claims. *Id.* The Third Circuit next held that the David Berwind Trust's failure to make the demand after the squeeze-out merger was excusable. *Id.* at 111–12. After the squeeze-out merger, the David Berwind Trust was "[n]o longer a shareholder" and was "no longer in a position to make demand on the board—by no fault of its own". *Id.* at 112. In summary, the Third Circuit opinion rejected the analysis in part B of the District Court opinion. *Warden v. McLelland*, 2001 WL 910934, at \*2–5.[27]

---

[27] The Third Circuit also discussed the question of whether the demand requirement should be superseded by section 7.01(d) of the ALI Principles. *Warden v.*

**[\*69]** The Third Circuit addressed the holdings in parts C.1, C.2, C3, and C.4 of the District Court opinion dismissing the RICO claims (i.e., Counts I, II, and XI) for failure to allege predicate acts with particularity, establish a causal connection between predicate acts with injury, establish sufficient continuity to constitute a pattern, and establish reliance. *Warden v. McLelland*, 2001 WL 910934, at \*4–10 (E.D. Pa.). The Third Circuit did not dispose of the issue, observing only that the complaint "does provide a reasonably clear overall picture of what has been alleged." *Warden v. McLelland*, 288 F.3d at 114. The Third Circuit held:

> We believe this issue, along with the other RICO pleading issues, is best resolved by reexamination of the sufficiency of the complaint by the District Court. We are confident the District Court will permit plaintiffs to amend their complaint, if appropriate . . . . The District Court will be able to consider these issues in light of any amendments it permits, something we are in no position to do.

*Id.* at 114–15. It appears that by "the other RICO pleading issues" the Third Circuit was referring to part C.5 of the District Court opinion (dismissing Counts I and II against BPSI directors who were not directors in December 1998) and part C.6 of the District Court opinion (dismissing Count XI against Graham Berwind because it was brought as a direct claim). *See* 2001 WL 910934, at \*5, \*8, \*11 (E.D. Pa.).

The Third Circuit addressed the holding in part D of the District Court opinion that Count III, and portions of Count IV and V, were barred by the two-year statute of limitations on lawsuits for breach of fiduciary duty. *Warden v. McLelland*, 288 F.3d at 115, vacating *Warden v. Mclelland*, 2001 WL 910934, at \*11–12. The Third Circuit explained that on appeal the plaintiffs contended that even though some of the events occurred more than two years before they brought suit, "the statute of limitations should be tolled because defendants fraudulently

---

*McLelland*, 288 F.3d at 112. The Third Circuit stated that "this case would seem to be a good candidate" for application of section 7.01(d) of the ALI Principles. *Warden v. McLelland*, 288 F.3d at 112. However, the Third Circuit did not make a dispositive ruling with respect to the issue of the effect of section 7.01(d) of the ALI Principles. *Warden v. McLelland*, 288 F.3d at 114. The Third Circuit observed that the parties in the *Warden* litigation did not brief the issue extensively and there may be uncertainty as to the appropriateness of applying section 7.01(d) of the ALI Principles to the case. *Warden v. McLelland*, 288 F.3d at 114. Therefore, the Third Circuit "left [this issue] . . . unresolved at this point" and directed the District Court, on remand, to "consider this issue if it proves to be necessary." *Id.*

**[\*70]** concealed information necessary for recognizing these claims." *Warden v. McLelland*, 288 F.3d at 115. The Third Circuit also explained that the defendants had countered that "plaintiffs have failed to meet specific requirements for pleading such tolling." The Third Circuit did not resolve the equitable-tolling issue, explaining "[t]hese matters are better addressed by the District Court in light of any amendments to the pleadings." *Id.*

The Third Circuit addressed the holdings in part E of the District Court opinion, which dismissed Counts VI, VII, and VIII. *Warden v. McLelland*, 288 F.3d at 115; *Warden v. McLelland*, 2001 WL 910934, at \*12–13. The Third Circuit held that the District Court erred in relying on *In re Jones & Laughlin Steep Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980). *Warden v. McLelland*, 288 F.3d at 115. The Third Circuit explained that *Jones & Laughlin* concerned equitable relief sought after the merger had occurred, but the plaintiffs in *Warden v. McLelland* filed suit before the merger. *Warden v. McLelland*, 288 F.3d at 115.

The Third Circuit addressed part F of the District Court opinion, which dismissed Counts VI and XIII. *Warden v. McLelland*, 288 F.3d at 115; *Warden v. McLelland*, 2001 WL 910934, at \*13–14. The Third Circuit held that under *In re Jones & Laughlin Steep Corp.*, 412 A.2d at 1103, a shareholder challenging a merger need not show irreparable harm to enjoin a merger, only that the merger is "fraught with fraud or fundamental unfairness." *Warden*, 288 F.3d at 115 (quoting *In re Jones & Laughlin Steep Corp.*, 412 A.2d at 1103). The Third Circuit stated: "To the extent defendants contend that plaintiffs have insufficiently pled fraud or fundamental unfairness, we leave this matter to the District Court in the first instance." *Id.*

Relatedly, the Third Circuit addressed an argument by the defendants in the *Warden* litigation that *Glassman v. Unocol Exploration Corp.*, 777 A.2d 242, 248 (Del. 2001), compels the conclusion that in a short-form merger, the dissenting shareholder seeking equitable remedies must prove fraud or illegality. *Warden v. McLelland*, 288 F.3d at 115–16. In a passage heavily relied on by petitioners, the Third Circuit stated that even if the legal principle asserted by the defendants in the *Warden* case was generally correct, the principle might not govern the case because of its "special features":

> Nevertheless, we note this case has special features that may require that it be treated differently from standard short-form merger cases. This is not simply a dispute

[*71] between a majority and a minority shareholder in a corporation. Here the majority shareholder [BPSI] was allegedly controlled by Graham Berwind, who was also an alleged trustee of the David Berwind Trust. And Berwind company [footnote omitted] stock was the central holding of the Trust as set up by Charles Berwind. Thus, Graham Berwind's duty to the trust was not simply that owed by a majority shareholder to a minority shareholder, but also a duty owed directly to a trust designed to hold equity in the family business. In these circumstances, the argument in favor of equitable remedies would appear to take on a different character from that of a case focused only on a short-term merger. The resolution of these matters is best reserved for the District Court at this juncture.

*Id.* at 116.

The Third Circuit addressed the holdings in part I of the District Court opinion, which dismissed Counts X and XIII. *Warden v. McLelland*, 288 F.3d at 110; *Warden v. McLelland*, 2001 WL 910934, at *17–18. The Third Circuit rejected the District Court's conclusion that Graham Berwind and McKenney had resigned. *Warden v. McLelland*, 288 F.3d at 110. The Third Circuit reasoned that the plaintiffs' allegation that they had not resigned must be accepted as true for purposes of Fed. R. Civ. P. 12(b)(6). *Warden v. McLelland*, 288 F.3d at 110. The Third Circuit also held that the deed of trust of the David Berwind Trust did not relieve Graham Berwind and McKenney of all liability for breach of trust as trustees. *Id.* The Third Circuit concluded that "we will reverse with respect to plaintiffs' breach of trust claims and leave the precise effect of the exculpatory provision for the District Court to consider on remand." *Id.*

Next the Third Circuit addressed what it called the "[r]emaining claims." It stated:

There are other arguments made by the parties. But many of these seem to have been abandoned; others are clearly ancillary to other arguments or other claims. These remaining issues are best resolved by the District Court in the context of its reexamination of the central issues in the case. Accordingly, we will vacate the remainder of the District Court's opinion.

[*72] *Id*. These sentences were the expression of the Third Circuit's view of all portions of the District Court opinion not addressed specifically in other portions of the Third Circuit opinion. These not-specifically-addressed portions of the District Court opinion were apparently parts C.5, C.6, G, H, and J.

Finally the Third Circuit stated: "For the foregoing reasons, we will reverse the dismissal under Federal Rule of Civil Procedure 12(b)(6) and remand the case to the District Court for proceedings consistent with this opinion." *Warden v. McLelland*, 288 F.3d at 116.

On May 4, 2002, David Berwind sent a letter to Graham Berwind in which he stated "we will commit whatever resources are needed to ensure that the [David Berwind] Trust receives full and fair value for its interest in the family business, if we decide to sell that interest."

On October 10, 2002, Michael Berwind, as managing trustee of the David Berwind Trust, sent an electronic memorandum to Pawson and Russell Shappy regarding "BPSI Negotiation Trustee Authority." In the October 10, 2002 memo, Michael Berwind requested trustee approval "to accept $150 million for the Trust's position in BPSI & Zymark and the claims associated with the 1999 complaint [before interest and payment of our legal fees and other litigation expenses]." (Brackets in original). The October 10, 2002 memo also stated:

> [S]ufficient time has passed since December 1999 [when Graham attempted to impose a squeeze out merger] for us to determine BPSI's value with price earnings valuation calculations.
>
> As detailed in the trustee authority worksheet -- the requested $150 million trustee authority is reached in large part by averaging a 27.5 price earnings multiple of BPSI's 2001 adjusted net income in a five-year weighted average together with BPSI's 2000 adjusted net income unweighted. I believe that a 27.5 price earnings multiple is a reasonable and prudent bottom line authority level.

(Brackets in original).

According to the October 10, 2002 memo, Michael Berwind provided the trustee-authority worksheet "to help [the trustees] understand how [he] arrived at $150 million." The trustee authority

[*73] worksheet detailed "Would Be Happy" and "Walk Away" numbers. The trustee-authority worksheet was as follows:

|  | Valuation[1] | |
| --- | --- | --- |
|  |  | Would Be |
| Item | Walk Away | Happy |
| BPSI | 133 | 148 |
| Zymark | 10 | 16 |
| Subtotal | 143 | 164 |
|  |  |  |
| Claims | 7 | 10 |
| Subtotal | 150 | 174 |
|  |  |  |
| Interest on [BPSI & Zymark] | 24 | 44 |
| Subtotal | 175 | 218 |
|  |  |  |
| Fees and expenses | 2 | 2 |
|  |  |  |
| Total | 177 | 220 |

[1]The amounts in the table are in millions.

On October 10, 2002, the David Berwind Trust trustees held a special meeting. The minutes of the meeting show that four out of five of the trustees voted to give Michael Berwind settlement authority as to the *Warden* litigation and appraisal proceeding of $150 million plus interest and expenses to expire on December 7, 2002." The four trustees voting in favor were David Berwind, Michael Berwind, Valerie Pawson, and Linda Berwind Shappy. The fifth trustee, Gail Berwind Warden, abstained from the vote.

In the present case, petitioners allege that Graham Berwind and McKenney remained as trustees. We do not express a view on this matter. *See infra* OPINION, Part I.D. In any event, the record indicates that Graham Berwind and McKenney did not attend this meeting.

On October 16, 2002, coinciding with the deposition of attorney Norman E. Donaghue that began that day in Philadelphia in the *Warden* litigation, Pawson and Russell Shappy met with Graham Berwind and McKenney (an officer of Berwind Corporation) to discuss settlement of the consolidated *Warden* litigation and appraisal proceeding.

On October 17, 2002, in an email sent to Jes Lawson[28] and others, Russell Shappy wrote: "After two days of discussions, we mutually

---

[28] Jes Lawson was an investment banker advising the David Berwind Trust on the current value of BPSI and Zymark.

**[\*74]** walked away tonight from negotiations with Berwind. We narrowed the gap from \$105M to \$35M!" The deposition continued on October 18, 2002.

On October 21, 2002, Russell Shappy had a conversation with David Berwind Trust attorney John Schmehl of Dilworth Paxson, LLP, which included a discussion of, among other things, an "IRS imputed tax." Later that day, Pawson discussed with Russell Shappy the contents of Shappy's conversation with Schmehl. Later on October 21, 2002, Russell Shappy had a telephone call with McKenney during which they discussed, among other things, McKenney's investigation of a "synthetical" interest rate and resuming settlement negotiations. Later that day, Pawson discussed with Russell Shappy the contents of Shappy's conversation with McKenney.

On October 24, 2002, the parties to the *Warden* litigation and the appraisal proceeding reached an oral settlement agreement. The oral settlement agreement's terms were memorialized in an October 26, 2002 settlement term sheet.

At a date undisclosed by the record, but no later than October 26, 2002, Berwind Group Partners was succeeded by Berwind Company, LLC, a Delaware limited liability company. The first time the Berwind Company, LLC, is mentioned in the record is October 26, 2002 (in the settlement term sheet). For simplicity, we will refer to the Berwind Company, LLC, by the name of its predecessor, Berwind Group Partners.

On November 22, 2002, the Orphans' Court in Montgomery Count, Pennsylvania, held a conference with the parties to the *Warden* litigation and the appraisal proceeding. During the conference, the judge said that the Orphans' Court did not need to see an independent valuation.

On November 25, 2002, the parties to both the *Warden* litigation and the appraisal proceeding entered into a written settlement agreement (the settlement agreement). The settlement agreement superseded the October 24, 2002 oral settlement agreement and the October 26, 2002 settlement term sheet. BPSI was one of the parties to the settlement agreement and it executed the agreement by signature of its executive vice president.

The preamble to the settlement agreement stated that the David Berwind Trust "has asserted that the Disputed Merger [defined as the

**[\*75]** merger of BPSI Acquisition Corporation with, and into, BPSI] did not comply with Pennsylvania law and is invalid and of no effect, and has requested that the Disputed Merger be declared null and void as part of the relief sought." The preamble also stated BPSI "has asserted that the Disputed Merger complied with Pennsylvania law and was valid and effective as of December 16, 1999, and that on that date the BPSI Shares[29] held by the [David Berwind] Trust were converted into the right to receive the fair value of such shares." The preamble also recited that "as a precautionary matter and without prejudice to its claim that the Disputed Merger was invalid, the [David Berwind] Trust made demand upon BPSI for payment of the fair value of the BPSI Shares pursuant to the dissenters rights provisions of Pennsylvania law." It also stated that Berwind Group Partners "owns all of the shares of common stock of BPSI other than the BPSI Shares . . . the legal status of which is an issue in the [*Warden*] Litigation."

The settlement agreement set forth the terms and conditions upon which the parties to the agreement agreed to (1) resolve their respective claims in the *Warden* litigation and the appraisal proceeding and (2) terminate the *Warden* litigation and the appraisal proceeding. The settlement agreement required the David Berwind Trust, BPSI, and the other defendants in the *Warden* litigation, to deliver various items to the "Escrow Agent"[30] concurrently with the execution of the settlement agreement:

- The David Berwind Trust was required to deliver "stock certificate No. C2, which constitutes the only stock certificate of BPSI that the [David Berwind] Trust currently holds;"

- The David Berwind Trust was to deliver general releases from all presently serving trustees of the David Berwind Trust and all current beneficiaries of the David Berwind Trust, as releasors, in favor of BPSI and the defendants in the *Warden* litigation (the David Berwind Trust general release);

- BPSI was to deliver a general release from BPSI, and the Graham Berwind Family Trust trustees and beneficiaries (the Graham Berwind Family Trust release); and

---

[29] The "BPSI Shares" were defined as the 6,560 shares of BPSI common stock owned by the David Berwind Trust.

[30] The "Escrow Agent" was defined in the settlement agreement as PNC Bank.

[*76] • The David Berwind Trust, BPSI, and the defendants in the *Warden* litigation other than BPSI were to deliver stipulations of dismissal of the *Warden* litigation and the appraisal proceeding.

The items to be delivered are collectively referred to as the "escrow items."

Paragraph 1(a)(i) of the settlement agreement provided that "BPSI shall pay to the . . . [David Berwind] Trust the sum of . . . $191,000,000 . . . in immediately available funds, which the [David Berwind] Trust shall direct to be wired by BPSI directly to the Escrow Account (as defined in the Escrow Agreement) for the benefit of the [David Berwind] Trust." The "Escrow Agreement" referred to in the settlement agreement was a separate agreement which was signed by the parties to the *Warden* litigation and the appraisal proceeding (as well as by PNC bank as escrow agent) in conjunction with the settlement agreement. We refer to it as the "escrow agreement". The escrow agreement defined the Escrow Account as "an escrow account at the Escrow Agent in the name of David Berwind Trust Escrow Account". The escrow agreement defined the Escrow Agent as PNC Bank. We refer to the Escrow Account as the "PNC escrow account."

The settlement agreement defined the term "Settlement Amount" to refer to the $191,000,000 amount required by paragraph 1(a)(i) to be paid by BPSI to the David Berwind Trust. The settlement agreement provided that the "Settlement Amount" (i.e., the $191,000,000) and the escrow items had to be held "in escrow" and "not released" except in accordance with the terms of the settlement agreement and the escrow agreement. The settlement agreement required the David Berwind Trust and the Graham Family Trusts to give written notice to PNC Bank that the conditions to the escrow release have been satisfied, in which event PNC Bank was required to "release the Settlement Amount" and the escrow items.[31] This obligation of PNC Bank to "release the Settlement Amount" was specified by the settlement agreement to mean that "the Settlement Amount, together with all interest earned thereon, shall be remitted by wire transfer to the [David Berwind] Trust." One of the conditions to the escrow release was that the Orphans' Court grant the petitions of both the David Berwind Trust

---

[31] The settlement agreement allowed the David Berwind Trust and the defendants in the *Warden* litigation to waive the conditions for the escrow fund release through a written waiver.

**[*77]** and the Graham Family Trusts to approve the settlement agreement. This condition related to paragraph 2(a) of the settlement agreement, which required the David Berwind Trust and the Graham Family Trusts to file petitions with the Orphans' Court seeking approval of the settlement agreement as to each respective trust. If the Orphans' Court declined to approve the settlement agreement, the David Berwind Trust and the defendants in the *Warden* litigation each had the option to terminate the settlement agreement.

As explained above, paragraph 2(a) of the settlement agreement required the David Berwind Trust and the Graham Family Trusts to file petitions with the Orphans' Court seeking the approval of the settlement agreement as to each respective trust. The petition filed by the David Berwind Trust with the Orphans' Court had to "include a request that the Orphans' Court confirm the resignations of [Graham Berwind] and . . . McKenney as trustees of the [David Berwind] trust, effective as of June 26, 1997 and December 30, 1997, respectively."

Paragraph 10 of the settlement agreement required the David Berwind Trust to represent and warrant to BPSI that, as of November 25, 2002, "it owns the BPSI Stock Certificate, and any interest in BPSI evidenced thereby, free and clear of any liens, security interests, pledges or other encumbrances."

As explained before, in conjunction with the settlement agreement, the parties to the *Warden* litigation and the appraisal proceeding signed an escrow agreement, dated as of November 25, 2002. The "Settlement Amount" was defined by the escrow agreement as $191,000,000 that BPSI had agreed to pay the David Berwind Trust pursuant to the settlement agreement and which BPSI had wired to PNC Bank. Under the escrow agreement, PNC Bank, as escrow agent, "agreed to hold the Settlement Amount, together with any and all investments and reinvestments thereof and any interest and other income therefrom," which amounts, in total, were defined as the "Escrow Fund." The escrow agreement required PNC Bank to invest the Escrow Fund in accordance with the instructions of the David Berwind Trust. The escrow agreement required PNC Bank to release the Escrow Fund to the David Berwind Trust by wire transfer if it received a joint written notice from the David Berwind Trust and BPSI that the conditions for escrow release under the settlement agreement had been satisfied. The escrow agreement required PNC Bank to release the Escrow Fund to BPSI if it received a joint written notice from the David Berwind Trust and BPSI that the settlement agreement had been terminated.

[*78] Attached to the escrow agreement was an unsigned[32] copy of the David Berwind Trust general release which provided, in part, that:

> In exchange for good and valuable consideration . . . each of the undersigned [David Berwind] Trust Releasors
>
> . . . hereby release and forever discharge the Releasees . . . from any and all obligations, claims, debts, demands . . . of any nature whatsoever in law or in equity . . . whether based in tort, contract, statute, regulation, equitable principles or any other theory of recovery, direct or indirect, contingent or liquidated, or third party or derivative, which they or any of them ever had . . . against the Releasees or any of them . . . from the beginning of time to the date of this General Release, including but not limited to, all claims . . . arising from, relating to, or based upon any one or more of the following:
>
> A. The disputed December 16, 1999 merger of BPSI Acquisition Corporation with and into BPSI;
>
> B. The fair value of the shares of common stock of BPSI owned by the [David Berwind] Trust prior to the December 16, 1999 merger; and
>
> C. The matters asserted or which could have been asserted in the actions captioned *Warden v. McLelland, et al.*, Civil Action No. 99-CV-5797 and *Berwind Pharmaceutical Services, Inc. v. Warden, et al.*, Civil Action No. 00-CV-1445, pending in the U.S. District Court for the Eastern District of Pennsylvania [i.e., the *Warden* litigation and the appraisal action].

The "[David Berwind] Trust releasors" were defined to include all trustees and beneficiaries of the David Berwind Trust, except for alleged trustees Graham Berwind and McKenney. The "releasees" were defined as Graham Berwind and his daughters, McKenney, and Morris.

Paragraph 5 of the settlement agreement required Berwind Group Partners to make an additional cash payment to the David

---

[32] Despite it being unsigned, none of the parties contend that the general release was not binding.

**[\*79]** Berwind Trust if BPSI or Zymark, or substantial assets of either company, were sold within five years of the date of the settlement agreement and if the sale price exceeded a specified amount. The provisions governing an additional cash payment are summarized by petitioners as follows:

Section 5(a) provided, in pertinent part, as follows:

In the event that at any time after the date of this Agreement and prior to November 25, 2007 (the "Ride-up Period") there shall occur one or more of the following events (each, a "Zymark Triggering Event") . . . and, as a result of any such Zymark Triggering Event, the Berwind Affiliates shall receive in the aggregate a Zymark Net Amount that exceeds the Zymark Base Amount for such Zymark Triggering Event, The Berwind Corporation[33] will make an additional cash payment (a "Ride-up Payment") to the DB Trust in an amount determined in accordance with Annex I hereto, (the "Ride-up Annex"), which shall be deemed incorporated in and made part of this Agreement.

. . . .

The "Zymark Triggering Events" were, generally, sales by ZYAC or Zymark to a third party of substantially all of their assets, sales of all or substantially all of ZYAC's or Zymark's common stock to a third party, or other similar transactions resulting in a shift of ownership of ZYAC/Zymark.

. . . .

Paragraph 2 of the Ride-up Annex defined "Zymark Base Amount," in part, as the sum of $182,926,829 plus 13.2% annum interest from the date of the Settlement Agreement to the closing of any Zymark Triggering Event, compounded on each anniversary of the Settlement Agreement.

---

[33] Apparently a typographical error–the settlement agreement required the Berwind Company, LLC, the successor to Berwind Group Partners, and which we refer to as Berwind Group Partners, to make the ride-up payment, not Berwind Corporation.

**[\*80]** . . . .

In addition, the DB Trust received rights from [Berwind Group Partners] under Section 5(b) of the Settlement Agreement to participate in any increase in the value of BPSI if certain interests in BPSI were sold or transferred within five years of the settlement date.

. . . .

In the event that such interests in BPSI were so sold or transferred, the DB Trust would share in the excess of the "BPSI Net Amount" over the "BPSI Base Amount," which the Settlement Agreement defined, in part, as $838,181,191 plus 13.2% per annum interest from the date of the Settlement Agreement to the closing of any BPSI Triggering Event, compounded on each anniversary of the Settlement Agreement.

. . . .

According to the Settlement Agreement, both the Zymark Base Amount and the BPSI Base Amount were based on "(A) a capital contribution of $47,473,874 made by [Berwind Group Partners] to ZYAC on or immediately prior to the date [of the settlement], the proceeds of which have been paid to BPSI to repurchase the preferred stock of ZYAC held by BPSI and to repay the note of ZYAC held by BPSI, and (B) the payment of the Settlement Amount of $191,000,000 by BPSI to the Escrow Agent for the benefit of the DB Trust concurrently with the execution of this agreement."

Brackets in the excerpt above are in the original brief. References to "ZYAC" are to ZYAC Holding. References to the "DB Trust" are to the David Berwind Trust. References to the "Escrow Agent" are to PNC Bank. The excerpt above is found in petitioners' proposed findings of fact. The IRS does not disagree with these particular proposed findings of fact.

[*81] As explained above, paragraph 2(a) of the settlement agreement required the David Berwind Trust and the Graham Family Trusts to file petitions with the Orphans' Court seeking the approval of the settlement agreement as to each respective trust. The petition filed by the David Berwind Trust with the Orphans' Court had to "be supported by a valuation report of an investment bank or other financial expert selected by the [David Berwind] Trust regarding the value or range of values of the interest and/or claim of the [David Berwind] Trust in and to BPSI and ZYAC Holding . . . and its wholly owned subsidiary, Zymark." The David Berwind Trust was required to "ask the Orphans' Court to avoid making the valuation report part of the public record because of the confidential information in the report regarding BPSI, ZYAC [Holding] and Zymark." The settlement agreement set forth the additional following conditions for submitting the valuation report:

> The valuation report may be submitted to the Orphans' Court by the [David Berwind] Trust after the filing of its Petition to approve this Agreement. The [David Berwind] Trust shall endeavor to submit the valuation report to the Orphans' Court not later than December 6, 2002. The [David Berwind] Trust shall provide a copy of the valuation report to the CGB Family Trustees [trustees of the Graham Family Trusts] for its [sic] review prior to submitting such report to the Orphans' Court.

The David Berwind Trust hired Curtis Financial Group, LLC (Curtis), to create the valuation report and, under the settlement agreement, the trust was responsible for paying the costs of the valuation report. The parties to the *Warden* litigation and the appraisal proceeding never agreed to the specific effective date on which the valuation of BPSI, ZYAC Holding, and/or Zymark was to be determined in Curtis' report.

> Paragraph 6(a) of the settlement agreement provided that:
>
> Unless otherwise permitted by this Section 6(a), neither BPSI nor the Defendants [i.e., the defendants in the *Warden* litigation] shall provide to the [David Berwind] Trust or file with the Internal Revenue Service or any other taxing authorities any information returns with respect to the Settlement Amount or the terms of the Settlement. In the event that counsel to BPSI and the Defendants shall conclude that such reporting is required by law, BPSI and

[*82] the Defendants shall give adequate prior written notice to the [David Berwind] Trust and in any event not later than January 15 of the year following the taxable year for which reporting is required.  The [David Berwind] Trust shall be given an opportunity to respond and provide to BPSI and the Defendants a contrary conclusion from its legal counsel by January 31 of such year.  If the parties cannot agree as to whether the requirement shall apply, counsel to the [David Berwind] Trust and counsel to BPSI and the Defendants shall select an independent tax counsel to render a final opinion, on or before February 20, which shall be governed by a "more likely than not" standard, and the parties shall follow such opinion.  The cost of the independent counsel shall be shared equally by the parties.

The defendants in the *Warden* litigation were Graham Berwind, McKenney, Berwind Corporation, Berwind Group Partners, McLelland, Byrne, Dulaney, Hamling, Kosnik, Karlson, and Cohn.

As explained earlier, the November 25, 2002 settlement agreement required BPSI to transfer $191,000,000 to the PNC escrow account; required PNC Bank to hold the $191,000,000 in escrow, specifically in the PNC escrow account; and required PNC Bank to transmit the $191,000,000, "along with interest thereon," to the David Berwind Trust.  The parties have stipulated that on November 25, 2002, BPSI deposited the $191,000,000 amount "in an escrow account."  Furthermore, the parties stipulated that the deposited amount earned $7,012 before the total of $191,007,012 was then transferred to the PNC escrow account.  The transmittal of the $7,012 of interest by BPSI to PNC Bank, and the holding of the $7,012 of interest by PNC Bank was not directly addressed by the settlement agreement.  However, the escrow agreement defined the "escrow fund" to consist of (1) the $191,000,000 and (2) "any interest and other income therefrom" (and thus, the $7,012 of interest).  The escrow agreement required that the escrow fund be held by PNC Bank in the PNC escrow account.  Furthermore, the escrow agreement required PNC Bank to release the escrow fund if it received written notice from the David Berwind Trust and BPSI stating that the conditions to the escrow release under the settlement agreement have been satisfied.  Furthermore, the escrow agreement provided that the escrow fund (which was the $191,000,000 and "any interest and other income therefrom") was to be released to the David Berwind Trust by "wire transfer" of the "[s]ettlement [a]mount, together with all interest earned thereon."  In summary, the escrow

**[*83]** agreement required that the $191,000,000, and the $7,012 earned as interest on the $191,000,000, be placed by PNC Bank in the PNC escrow account. No party contends otherwise.

The parties in this case having stipulated that $191,007,012 was transferred to the PNC escrow account, the parties have further stipulated that after the $191,007,012 was transferred to the PNC escrow account, "it was first invested in a BlackRock Short Term Fed Treasury account for one day, earning $6,423 in dividends, before being invested in a Federal Fund account, where it earned $243,918 of interest between November 26, 2002 and December 31, 2002, when the escrow was released."

The stipulations regarding the investment returns on the $191,000,000 amount can be summarized as follows:

| Date(s) returns earned | Type of account in which investment was held | Amount of investment return | Type of investment return |
| --- | --- | --- | --- |
| 11/25/02 | An escrow account | $7,012 | Interest |
| 11/26//02 | PNC escrow account (a BlackRock Short Term Treasury account) | 6,423 | Dividends |
| 11/27/02 to 12/31/02 | PNC escrow account (Federal Fund Account) | 243,918 | Interest |

In early December 2002, the David Berwind Trust, the Graham Berwind Trust, and the Graham Children Trusts separately petitioned the Orphans' Court to approve the settlement agreement and confirm the resignations of Graham Berwind and McKenney (the petitions for approval). No valuation report was attached to any of the petitions for approval. Both the David Berwind Trust and the Graham Berwind Family Trusts' petitions for approval contained a request to seal the settlement agreement. The David Berwind Trust's petition made the following representation:

> The Trustees of the [David Berwind] Trust believe, based on advice received from investment banking firms during the Litigation and the Appraisal Proceeding and the settlement negotiations, that the fair value of the [David Berwind] Trust's interest in BPSI approximates the consideration to be received by the [David Berwind] Trust under the Settlement Agreement.

**[*84]** Both petitions for approval acknowledged that the legal status of the David Berwind Trust's BPSI shares was an issue in the litigation.

On December 17, 2002, the Orphans' Court approved the settlement agreement as to the David Berwind Trust and the Graham Children Trusts and confirmed the resignations of Graham Berwind and McKenney as effective June 27, 1997, and December 30, 1997, respectively.

A December 27, 2002 valuation analysis of BPSI and Zymark was sent by Curtis to the David Berwind Trust's attorneys. The analysis, which valued the entities as of November 15, 2002, is referred to as the "Curtis valuation". The Curtis valuation stated that it relied on the most current financial data from BPSI, including financial statements through June 30, 2002, and operating budgets through 2004. The Curtis valuation concluded that the aggregate equity of BPSI and Zymark as an aggregate enterprise as of November 15, 2002, was between $995,000,000 and $1,315,000,000. An earlier draft of the Curtis valuation had been provided to Russell Shappy on December 12, 2002. An earlier draft contained the same range of values as the Curtis valuation, i.e., between $995,000,000 and $1,315,000,000.

The Curtis valuation was never submitted to the Orphans' Court.

On December 27, 2002, the Orphans' Court approved the settlement agreement with respect to the Graham Berwind Trust.

On or about December 31, 2002, pursuant to the requirements and conditions of the settlement agreement, the trustees and beneficiaries of the David Berwind Trust signed a receipt, release, refunding and indemnification agreement (the "release agreement"), filed with the Orphans' Court, through which the David Berwind Trust:

> E. [c]onfirms and acknowledges that . . . C. Graham Berwind, Jr. [i.e., Graham Berwind], resigned as trustee of the [David Berwind] Trust effective June 26, 1997, [and] that Bruce J. McKenney resigned as trustee of the [David Berwind] Trust effective December 30, 1997 . . . and that all such resignations were fully effective as of such dates;

> F. [a]bsolutely remises, releases, quitclaims and forever discharges each and all of the Past Trustees . . . of and from any and all obligations, claims, debts, demands . . . of any nature whatsoever in law or in equity . . .

**[*85]** whether based on tort, contract, statute, regulation, equitable principles or any other theory of recovery, direct or indirect, contingent or liquidated, or third party or derivative, which the undersigned had, has or can, shall or may have upon or by reason of . . . any . . . thing whatsoever against the Past Trustees . . . from the beginning of time to the date hereof . . .

The "Past Trustees" were defined by the release agreement as Graham Berwind, McKenney, and Morris.

As of December 31, 2002, the PNC escrow account had earned $243,918 of interest from the Federal Fund account investment from November 26, 2002, to December 31, 2002.

On December 31, 2002, the PNC escrow account was released to the David Berwind Trust. As of that date, the balance of the PNC escrow account was $191,257,353, which comprised the $191,000,000 settlement payment and the following items of investment income earned on the settlement payment while held in escrow between November 25, 2002, and December 31, 2002:

| | |
|---|---|
| Interest while held in an escrow account on 11/25/02 | $7,012 |
| Dividends while being held in the PNC escrow account (a BlackRock Short Term Treasury account) on 11/26/02 | 6,423 |
| Interest while held in the PNC escrow account (Federal Fund Account) from 11/27/02 to 12//31//02 | 243,918 |
| Total Investment Income from 11/25/02 to 12/31/02 | 257,353 |

We refer to these items of investment income collectively as the "Investment Income Components."

In December 2002, stipulations of dismissal for the litigation were delivered by the David Berwind Trust to BPSI's counsel for filing with the District Court.

No court ever granted an injunction to prevent the disputed merger; issued an order rescinding the disputed merger; or declared the disputed merger null and void or *void ab initio*. No court ever issued a

**[\*86]** ruling that the disputed merger was valid; or modified the stipulation dated June 1, 2000.

On January 14, 2003, BPSI faxed to the David Berwind Trust a notice in which BPSI communicated its position that a portion of the settlement amount was interest income to the David Berwind Trust and that BPSI was required to report the payment of interest income on Form 1099–INT, Interest Income, to the David Berwind Trust and the IRS.

On January 30, 2003, the David Berwind Trust faxed to BPSI a notice that in its view BPSI was not required to file a Form 1099–INT and "if there is such a filing requirement, it can be satisfied by the filing of a Form 1099–MISC."

BPSI and the David Berwind Trust ultimately engaged attorney Victor Keen, a tax partner of the law firm Duane Morris LLP, for the purposes of resolving the information-return issue in keeping with part 6(a) of the settlement agreement.

On February 19, 2003, Keen issued to BPSI and the David Berwind Trust an opinion letter regarding the information-return issue. The opinion letter stated that it was more likely than not that "BPSI is not legally required to file with the Internal Revenue Service a Form 1099 of any kind with respect to any portion of the Settlement Amount paid to the [David Berwind] Trust."

Keen's opinion letter stated that it had been commissioned to address the following questions:

1. Is BPSI legally required to file with the Internal Revenue Service ("IRS") a Form 1099 of some kind with respect to any portion of the Settlement Amount paid to the [David Berwind] Trust?

2. If the answer to question 1 above is yes, can BPSI satisfy such legal requirement by filing a Form 1099–MISC that includes the total Settlement Amount paid to the [David Berwind] Trust less the [David Berwind] Trust's tax basis in the BPSI stock that is the subject of the Settlement Agreement (the "BPSI Stock")?

[*87] 3.     If the answer to question 1 above is yes, can BPSI satisfy such legal requirement by filing a Form 1099–INT that includes only a portion of the total Settlement Amount paid to the [David Berwind] Trust?

4.     If the answer to questions 1, 2, and 3 above are yes, which Form 1099 is most appropriate given all of the facts and circumstances presented by both parties in this case?

Keen's opinion letter defined the "Settlement Amount" as BPSI's "payment to the [David Berwind] Trust of $191 million . . . in late 2002 pursuant to the terms of a settlement agreement dated as of November 25, 2002." Keen's opinion letter stated that Keen had been provided with a copy of the settlement agreement and was to assume that the facts stated in the settlement agreement were true. Keen's opinion letter contained no discussion of legal authorities, such as section 483. Consistent with Keen's opinion letter, BPSI did not issue an information return to BPSI or the IRS with respect to the $191,000,000 deposit.

For its 2002 taxable year, the David Berwind Trust timely filed a Form 1041, "U.S. Income Tax Return for Estates and Trusts." The return reported long-term capital gain of $189,462,989. The return does not reveal how this amount was computed. However, the parties in the present case agree that (1) the amount reflects the gain from the sale of BPSI stock and (2) the gain from the sale of BPSI stock was calculated such that $191,000,000 was the amount realized from the sale.[34] The $257,353 Investment Income Components were reported by the David Berwind Trust as investment income on its Form 1041 for 2002 ($7,012 as interest, $6,423 as dividends, and $243,918 as interest).

The manner in which the return reported the $191,000,000 deposit made by BPSI (i.e., by reporting the deposit as capital gain from the sale or exchange of BPSI common stock) is consistent with petitioners' position that the sale or exchange of BPSI stock occurred on November 25, 2002. If such a position were correct, none of the $191,000,000 deposited by BPSI in an escrow account on November 25, 2002 (or the $191,257,353 released from the PNC escrow account to the

---

[34] Because we do not have other information about how the $189,462,989 amount was computed, we do not know whether the amount includes gain or losses from the sale or exchange of assets other than the BPSI shares. Nor do we know what adjusted basis was used to calculate the gain from the sale or exchange of BPSI stock.

[*88] David Berwind Trust on December 31, 2002) would be treated as interest under section 483.

On its 2002 tax return, BPSI claimed an interest deduction of $31,103,795 in connection with the payment made to the David Berwind Trust for its BPSI common stock. *Colorcon, Inc. v. U.S.*, 110 Fed. Cl. 650, 652 n.2, 658 (2013). Petitioners attempt to explain the computation of this amount as follows:

> In BPSI's 2002 federal tax return, BPSI deducted $31,103,795 of the 2002 Settlement Payment [implicitly defined by petitioners as $191,000,000] as interest by reducing the entire $191,000,000 to present value from December 31, 2002 back to December 16, 1999 at the lowest 3 month mid-term applicable federal rate applicable to a December 1999 transaction, which was 5.47%.

The IRS argues that petitioners' explanation is not supported by the record. We agree with the IRS. We make no finding as to how the $31,103,795 amount was computed. Furthermore, the record does not reveal whether BPSI separately claimed a deduction for the $257,353 of Investment Income Components. *See also id.* at 658.

In July 2003, Berwind Group Partners sold its interest in Zymark to Caliper Technologies, Inc. (Caliper), an unrelated third-party. BPSI calculated the total purchase price of Zymark at $79,720,744, which included a cash payment of approximately $55 million and shares of Caliper stock worth approximately $24 million. The sale price did not exceed the Zymark Base Amount so the David Berwind Trust received no consideration from Berwind Group Partners under the ride-up provisions of the settlement agreement.

Effective January 1, 2006, BPSI changed its name to Colorcon, Inc. We nonetheless will continue to refer to the company as BPSI.

On July 25, 2008, the IRS mailed the David Berwind Trust a notice of deficiency determining a deficiency of $5,363,311 for the 2002 tax year. The notice of deficiency determined that total unstated interest was $31,103,795. This calculation assumed that (1) the "sum of the payments" to which section 483 applies was $191,000,000 and (2) the $191,000,000 amount should be discounted from December 31, 2002 to December 16, 1999. Having computed total unstated interest was $31,103,795, the notice of deficiency subtracted from this amount $7,012. Recall that $7,012 was the interest earned by the $191,000,000

[*89] on November 25, 2002, while being held in "an escrow account." Recall further that the David Berwind Trust reported this $7,012 as income along with the rest of the $257,353 of Investment Income Components. Having subtracted the $7,012 from $31,103,795, the notice of deficiency determined that the difference ($31,096,783) was imputed interest. Thus, the total increase in the David Berwind Trust's interest income was $31,096,783. The notice of deficiency did not determine an adjustment to the way the David Berwind Trust reported the Investment Income Components, i.e., the trust's inclusion of this amount as interest income. Petitioners and the IRS agree that the notice of deficiency made three errors in computing total unstated interest. First, because the assumed payment date was December 31, 2002, the payment amount should have been $191,257,353 (not $191,000,000 as assumed by the notice of deficiency). Second, because the assumed payment date was December 31, 2002, the number of days assigned to the time variable in the formula for total unstated interest should have been 3.04109589 years (not 3.041666 years as assumed by the notice of deficiency). Third, the total unstated interest should not have been reduced by $7,012. Correcting these errors results in a total unstated interest of $31,140,364. This is the IRS's position in the present case because the IRS contends that the date of the sale or exchange of the David Berwind Trust's common stock of BPSI was December 16, 1999; and that the payment for these shares was a $191,257,353 payment on December 31, 2002. In addition, the IRS takes the position that the David Berwind Trust's income should be reduced by $257,353.

On July 25, 2008, the IRS mailed a notice of deficiency to David and Jeanne Berwind determining a $12,603 deficiency for their 2002 tax year. The notice stated that, as a result of the determination that $31,096,783 of income reported as capital-gain income by the David Berwind Trust was interest income, there was a change in the "taxable nature" of a $40,000 distribution from the trust to David and Jeanne Berwind, such that $39,556 of the distribution was taxable.

On July 25, 2008, the IRS mailed a notice of deficiency to Michael and Carol Berwind determining a $102,783 deficiency for the 2002 tax year. The notice stated that, as a result of the determination that $31,096,783 of income reported as capital-gain income by the David Berwind Trust was interest income, there was a change on the "taxable nature" of a $300,000 distribution from the trust to Michael and Carol Berwind, such that $296,671 of the distribution was taxable.

**[\*90]**  On July 25, 2008, the IRS mailed a notice of deficiency to Duncan Warden and Gail Berwind Warden determining a $104,441 deficiency for the 2002 tax year.  The notice stated that, as a result of the determination that $31,096,783 of income reported as capital-gain income by the David Berwind Trust was interest income, there was a change on the "taxable nature" of a $300,000 distribution from the trust to Gail Berwind Warden, such that $296,671 of the distribution was taxable.

On July 25, 2008, the IRS mailed a notice of deficiency to Russell Shappy and Linda Berwind Shappy determining a $108,375 deficiency for the 2002 tax year.  The notice stated that, as a result of the determination that $31,096,783 of income reported as capital-gain income by the David Berwind Trust was interest income, there was a change on the "taxable nature" of a $300,000 distribution from the trust to Linda Berwind Shappy, such that $296,671 of the distribution was taxable.

On July 25, 2008, the IRS mailed a notice of deficiency to BPSI that determined a deficiency of tax of $10,883,874 for BPSI's 2002 tax year.  It also determined a substantial understatement penalty of $2,176,775.  The deficiency resulted from the IRS's disallowance of BPSI's interest deduction.

On October 23, 2008, all the taxpayers who had received the aforementioned notices of deficiency filed with the Tax Court timely petitions for redetermination of the deficiencies (except BPSI).

On December 19, 2008, BPSI paid the deficiency, penalty, and deficiency interest.

On January 29, 2009, BPSI filed a timely administrative claim for refund.  The claim for refund asserted that BPSI was entitled to an interest deduction of $31,096,783.  *See Colorcon, Inc.*, 110 Fed. Cl. at 652 n.2, 658.  This was the amount of adjustment made in the David Berwind Trust's notice of deficiency.

On June 1, 2009, the IRS disallowed BPSI's refund claim.

On September 10, 2009, BPSI filed a timely tax-refund suit with the U.S. Court of Federal Claims claiming the $31,096,783 deduction.

On October 21, 2009, we consolidated the Tax Court cases.  We refer to the petitioners in the consolidated cases as "petitioners."

[*91]  On November 2, 2010, Graham Berwind died.

On April 30, 2013, the U.S. Court of Federal Claims entered an opinion in favor of BPSI in *Colorcon, Inc. v. United States*, 110 Fed. Cl. 650 (2013).  By the time of the Court of Federal Claims litigation, BPSI had changed its name to Colorcon, Inc.  For ease of discussion, we refer to Colorcon, Inc., the plaintiff in the Court of Federal Claims suit, as BPSI.  *Colorcon* involved the question of whether there should be a deduction to BPSI for an amount of total unstated interest under section 483 on the theory its deposit of $191,000,000 was a deferred payment for a sale or exchange of the David Berwind Trust's shares of BPSI that had occurred on December 16, 1999.  *Colorcon, Inc.*, 110 Fed. Cl. at 658.  In its opinion, the Court of Federal Claims held

> (1) BPSI merged with BPSI Acquisition in December 1999 pursuant to the short form merger statute of the Pennsylvania BCL; and (2) BPSI's $191,000,000 settlement payment was made solely 'in lieu' of its obligation to compensate the [David Berwind] Trust for the shares redeemed under that 1999 merger.

*Colorcon, Inc.*, 110 Fed. Cl. at 663.  It held that BPSI "ha[d] established that it correctly imputed interest on the deferred $191,000,000 payment" because "the parties [i.e., BPSI, the plaintiff, and the United States, the defendant] agree that [BPSI] computed its interest in a manner consistent with the method of computing interest under Section 483." *Id.* at 663–64.

Having described the holdings in *Colorcon*, we now describe *Colorcon's* reasoning.  The Court of Federal Claims described the dispute as involving two issues:

> First, the parties [i.e., BPSI and the United States] dispute whether a short-form merger that is subject to a suit for rescission should be treated, for the purposes of Section 483, as having been consummated as of the date of the merger, rather than as of the date when the suit for rescission is settled or a final judgment entered.  Second, if Section 483 requires treating the settlement payment as resolving BPSI's obligation to pay the fair value of the [David Berwind] Trust's shares in BPSI following the 1999 short-form merger, whether there is a genuine dispute as to how the $191,000,000 settlement payment should be

**[*92]** allocated across the various claims in the consolidated *Warden* Litigation and dissenters rights action.

110 Fed. Cl. at 659–60. Addressing the first issue, *Colorcon* observed that the United States conceded that the filing of the articles of merger in 1999 was a "contract" within the meaning of section 483(c) (providing section 483 applies only to a "payment on account of a sale or exchange of property . . . under a contract"). 110 Fed. Cl. at 658 n.16. Furthermore, *Colorcon* observed that the United States conceded that the filing of the articles of merger "effected a sale or exchange of property" within the meaning of section 483(c). 110 Fed. Cl. at 660. *Colorcon* stated that the United States took the position that "the 2002 settlement agreement superseded any payment obligation of [BPSI] for the [David Berwind] Trust shares in BPSI under the 1999 merger" and that "because the 1999 merger was challenged, and the parties settled the litigation prior to the final judgment, the court must treat the [David Berwind] Trust's claim for rescission in the *Warden* litigation as if it had been granted." 110 Fed. Cl. at 660. The United States thus concluded that "the $191,000,000 payment could not have been made to satisfy a payment obligation stemming from the merger in 1999, but rather was consideration as part of a settlement agreement that was consummated in 2002." 110 Fed. Cl. at 660. In support of its argument, the United States contended that *Lyeth v. Hoey*, 305 U.S. 188 (1938), "requires, when characterizing settlement payments, the court to treat a plaintiff's request for an equitable remedy as having been granted." *Colorcon, Inc.*, 110 Fed. Cl. at 661. In *Lyeth*, a grandson challenged his grandmother's will (under which his inheritance would have been modest) alleging a lack of testamentary capacity and undue influence. 305 U.S. at 189. The suit was settled under a settlement by which the heir received a $200,000 payment. *Id.* at 190. *Lyeth* held the settlement payment should be considered an inheritance, which is exempt from income tax, reasoning that "if the contest had been fought to a finish and petitioner [the grandson] had succeeded, the property which he would have received would have been exempt under the federal act." *Id.* at 196. *Lyeth* held that it was irrelevant that under Massachusetts law the settlement payment would be treated as a payment under a contract. *Id.* at 193–95. *Lyeth* held that state law affects the federal tax treatment if the federal tax law implies that the federal tax treatment depends on the operation of state law. *Id.* at 194. In application of this last principle, *Colorcon, Inc.*, 110 Fed. Cl. at 661, held that section 483 does not define the terms "sale" or "exchange" and therefore section 483 implies that state law determines whether there has been a sale or exchange. *Colorcon, Inc.*, 110 Fed. Cl. at 661–62, held there was a sale

[*93] or exchange under the Pennsylvania BCL because (1) the David Berwind Trust "sought to receive the fair value of its shares by invoking its dissenters rights under the BCL; (2) the [David Berwind] Trust obtained an appraisal of the 1999 value of its interest in BPSI; and (3) BPSI . . . filed a statutory appraisal action that was . . . consolidated with the *Warden* litigation." Addressing the second issue, *Colorcon* rejected the United States' argument that "even if the settlement resolved the [David Berwind] Trust's claim for dissenters rights, the 2002 settlement payment also included compensation for other claims on which Colorcon could not impute interest." *Id.* at 662. *Colorcon* agreed with BPSI that "the [David Berwind] Trust's sole claim against BPSI was for the value of the dissenters rights obligation," that "the "derivative claims and RICO claims were against BPSI's directors or other individuals," and that "BPSI's payment of $191,000,000 must, therefore, have been made solely in lieu of the one claim—dissenters rights—for which BPSI faced liability." *Id.* at 662. The United States had also argued that "the settlement agreement's references to the [David Berwind] Trust's rights in ZYAC and Zymark must mean that the settlement payment included money for resolving claims other than the appraisal action, because the [David Berwind] Trust only owned BPSI stock." *Id.* at 662. *Colorcon* agreed with BPSI that Berwind Group Partners, not BPSI, was "the party liable to the [David Berwind] Trust with respect to those payments under the terms of the settlement agreement" and that "for this reason . . . the Ride-Up agreement has no connection to the $191,000,000 payment." *Id.* at 663.

On July 19, 2016, petitioners and the IRS entered into stipulations regarding the effect of section 483 in the present case. We quote these stipulations in full:

181. The following table represents the applicable Federal rates (compounded semiannually) for October, November, and December 1999 as respectively published in Revenue Rulings 99-41, 99-45, and 99-48:

**Oct-99**
Short-term (<3 yrs): 5.47%
Mid-term (3–9 yrs): 5.93%
**Nov-99**
Short-term (<3 yrs): 5.49%
Mid-term (3–9 yrs): 6.99%
**Dec-99**
Short-term (<3 yrs): 5.66%
Mid-term (3–9 yrs): 6.11%

**[*94]** 182. To calculate the total unstated interest under IRC § 483(b) asserted in the [David Berwind] Trust Notice [the July 25, 2008 notice of deficiency mailed to the David Berwind Trust], [the IRS] (1) used the October 1999 Mid-term applicable Federal rate of 5.93% (semiannual compounding), which was based on the [David Berwind] Trust having sold or exchanged its BPSI stock on December 16, 1999 and receiving a December 31, 2002 payment, (2) used the $191,000,000 Settlement Amount as the "sum of the payments" to which IRC 483 applies, and (3) did not include in the "sum of the payments" the $257,353 of Investment Income Components that were part of the Escrow Fund released to the [David Berwind] Trust on December 31, 2002 . . . . Petitioners and [the IRS] agree that if the payment discussed in the Settlement Agreement is subject to IRC § 483 as of December 16, 1999 and is treated for Federal income tax purposes as paid to the [David Berwind] Trust on December 31, 2002, then for the purpose of calculating the total unstated interest under IRC § 483(b): (1) the October 1999 Mid-Term rate of 5.93% (semiannual compounding) is the applicable Federal rate; (2) the sum of the payments to which IRC § 483 applies equals $191,257,353 (i.e., the released Escrow Fund, which included both the $191,000,000 Settlement Amount and $257,353 from the Investment Income Components); and (3) the income reported by the [David Berwind] Trust for Investment Income Components on its 2002 Form 1041 should be reduced to zero (0). Petitioners and [the IRS] agree that if the payment discussed in the Settlement Agreement is subject to IRC § 483 as of December 16, 1999 and is treated for Federal income tax purposes as paid to the [David Berwind] Trust on November 25, 2002, then for purpose of calculating the total unstated interest under IRC § 483(b): (1) the October 1999 Short-term rate of 5.47% (semiannual compounding) is the applicable Federal rate; (2) the sum of the payments to which IRC § 483 applies equals $191,000,000 (i.e., the Settlement Amount); and (3) the income reported by the [David Berwind] Trust for the Investment Income Components on its 2002 Form 1041 should not be adjusted. Thus, the date of payment for purposes of IRC § 483 to the [David Berwind] Trust is unagreed and to be decided by the Court.

[*95]       183.   Petitioners and [the IRS] agree that the resolution of the deficiency determinations against each of the four petitioners other than the [David Berwind] Trust (i.e., the [David Berwind] Trust beneficiaries) is solely dependent upon the resolution of the [David Berwind] Trust Notice [the July 25, 2008 notice of deficiency mailed to the David Berwind Trust]; that is, if a portion of the Settlement Amount is treated as interest under Internal Revenue Code § 483, then the Notices of Deficiency for each beneficiary are correct, subject to any adjustments that may be required by resolution of the issue described in the immediately preceding paragraph.   Conversely, if no portion of the Settlement Amount [$191,000,000] is treated as interest under Internal Revenue Code § 483, then none of the four beneficiaries will have tax deficiencies for their respective 2002 tax years.   The parties agree that a Rule 155 computation will apply after the interest issue is decided.

On December 22, 2022, the Tax Court ordered the parties to clarify their positions as to certain questions by filing a joint memorandum.

In a joint Memorandum filed with the Tax Court on January 10, 2023, petitioners and the IRS stated that they agree that if the payment described by the settlement agreement is "subject to" section 483 and the payment occurred on November 25, 2002, then the total unstated interest with respect to the payment is $28,043,669. They further stated they agree that if the payment described in the settlement agreement is "subject to" section 483 and the date of the payment is December 31, 2002, then the total unstated interest with respect to the payment is $31,140,364.

On March 1, 2023, the Tax Court issued an Order recognizing certain inadvertent numerical errors in its December 22, 2022 Order and in the parties' January 10, 2023 joint Memorandum.

In the present case, petitioners' primary position is that the sale or exchange of the David Berwind Trust's BPSI common stock occurred on November 25, 2002. Petitioners' alternative position is that if the sale of the David Berwind Trust's common stock occurred on December 16, 1999, the payment for the stock was made on November 25, 2002. The IRS's position is that the sale or exchange of the David Berwind

[*96] Trust's BPSI common stock occurred on December 16, 1999, and that the payment for the stock was made on December 31, 2002. We summarize the parties' positions in the table below:

| | *Date of sale or exchange of David Berwind Trust's BPSI common stock* | *Date of payment for stock* | *Amount of payment for stock* | *Total unstated interest* | *Discount rate* | *Tax treatment of Investment Income Components ($257,353) separate from § 483 computations* |
|---|---|---|---|---|---|---|
| P: primary | 11/25/02 | 11/25/02 | $191,000,000 | 0 | — | Includable |
| P: alternative | 12/16/99 | 11/25/02 | 191,000,000 | 28,043,669 | 5.47% | Includable |
| IRS | 12/16/99 | 12/31/02 | 191,257,353 | 31,140,364 | 5.93% | Excludable |

## OPINION

As a general rule, it is the petitioner in a Tax Court case who bears the burden of proof. Rule 142(a). Petitioners in this case do not argue that they do not have the burden of proof. We conclude that petitioners in this case bear the burden of proof.

The dispute in this case involves the application of section 483 to the payment received by the David Berwind Trust for BPSI common stock. Several provisions of section 483 and the regulations thereunder are relevant. We summarize them below.

Section 483(a) provides that

in the case of any payment –
> (1) under any contract for the sale or exchange of any property, and
> (2) to which this section applies,
there shall be treated as interest that portion of the total unstated interest under such contract which, as determined in a manner consistent with the method of computing interest under section 1272(a), is properly allocable to such payment.

**[\*97]**  Section 483(b) provides that

> the term "total unstated interest" means, with respect to a contract for the sale or exchange of property, an amount equal to the excess of –
>
>> (1) the sum of payments to which this section applies which are due under the contract, over
>>
>> (2) the sum of the present values of such payments and the present values of any interest payments due under the contract.

By its terms, section 483(a) relies on section 1272(a) to allocate total unstated interest among payments to which section 483 applies. No party in the present case asserts that there are multiple payments to which section 483 simultaneously applies. Therefore it is unnecessary to discuss how total unstated interest should be allocated among multiple payments, including how section 1272(a) operates in that regard.

Both section 483(a) and (b) refer to a "payment" to which section 483 "applies." Section 483(c) provides the following rule for determining whether section 483 applies to a payment:

> [T]his section [i.e., section 483] shall apply to any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract—
>
>> (A) under which some or all of the payments are due more than 1 year after the date of such sale or exchange, and
>>
>> (B) under which there is total unstated interest.

There are exceptions to this rule, but they are not relevant to the present case.

Section 483(b) provides that for the purpose of calculating the total unstated interest, "the present value of a payment shall be determined under the rules of section 1274(b)(2) using a discount rate equal to the applicable Federal rate determined under section 1274(d)." Elaborating on section 483(b), regulations provide that the "present value of any deferred payment or interest payment is determined by discounting the payment from the date it becomes due to the date of the sale or exchange." Treas. Reg. § 1.483-2(b)(2). A "deferred payment" is

**[*98]** defined by these regulations as a "payment that constitutes all or a part of the sales price . . . and that is due more than 6 months after the date of the sale or exchange." Treas. Reg. § 1.483-2(b)(1). A "sales price" is defined by these regulations generally as "the amount due under the contract (other than stated interest)." Treas. Reg. § 1.483-2(b)(2). Section 1274(b)(2), referred to in section 483(b), works in conjunction with section 1274(a). Section 1274(a) provides that under certain conditions, the issue price of a debt instrument is equal to the imputed principal amount of the debt instrument. The imputed principal amount of a debt instrument is defined by section 1274(b)(1) as the "sum of the present values of all payments due under [the] debt instrument." Section 1274(b)(2) provides that the present value of a payment "shall be determined in the manner provided by regulations prescribed by the Secretary—(A) as of the date of the sale or exchange, and (B) by using a discount rate equal to the applicable Federal rate, compounded semiannually." Because the parties to the present case have stipulated to the appropriate discount rate to be used to determine the present value of any payment to which section 483 "applies," we need not discuss the determination of the discount rate referred to in section 1274(b)(2)(B) or the regulations thereunder. Similarly, the parties' stipulation as to the appropriate discount rate to be used to determine the present value of any payment to which section 483 "applies" relieves us of the need to discuss the operation of section 1274(d) (a provision referred to in section 483(b)(2)).

> Section 483(f) provides:
>
> The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purpose of this section including regulations providing for the application of this section in the case of—
>> (1) any contract for the sale or exchange of property under which the liability for, or the amount or due date of, a payment cannot be determined at the time of the sale or exchange, or
>> (2) any change in the liability for, or the amount or due date of, any payment (including interest) under a contract for the sale or exchange of property.

One of the regulations authorized by section 483(f) is Treasury Regulation § 1.483-4(a), which requires "[e]ach contingent payment under the overall contract" to be "characterized as principal and

**[\*99]** interest." An example given of this regulatory requirement is that of a taxpayer who exchanges its shares of a corporation for a contingent right, over the next three years, to receive shares in another corporation in any year in which the profits from the other corporation exceed certain amounts. *Id.* para. (b) (example 2). This regulatory example states that such transfer of shares pursuant to the contingent right is "subject to section 483 and a portion of the shares is treated as unstated interest under that section." *Id.*

With these statutory and regulatory provisions in mind, we now discuss the appropriate tax treatment of the following transfers: (1) the November 25, 2002 deposit by BPSI of $191,000,000 in "an escrow account" and (2) the December 31, 2002 release by PNC Bank of $191,257,353 from the PNC escrow account to the David Berwind Trust.

I.  *On December 16, 1999, there was a "sale or exchange" of the David Berwind Trust's shares of BPSI common stock within the meaning of section 483.*

The IRS takes the position that there was a sale or exchange of the David Berwind Trust's shares of BPSI common stock on December 16, 1999. Petitioners agree that there was a sale or exchange of the shares, but contend the date of the sale or exchange was November 25, 2002.

At the outset we explain why the holding in *Colorcon, Inc. v. United States*, 110 Fed. Cl. 650, 660 (2013), does not require us to hold that the sale or exchange of the BPSI common stock occurred on December 16, 1999. The plaintiff in *Colorcon* was Colorcon, Inc., the corporate successor to BPSI, which we refer to as BPSI. The defendant was the United States, which is considered in privity with the IRS in our case. *Lea, Inc. v. Commissioner*, 69 T.C. 762, 764 (1978). In *Colorcon, Inc.*, 110 Fed. Cl. at 660, the Court of Federal Claims agreed with BPSI that the sale or exchange of the BPSI stock occurred on December 16, 1999. The Court of Federal Claims rejected the argument by the United States that the "2002 settlement agreement superseded any payment obligation of [BPSI] for the [David Berwind] Trust shares in BPSI under the 1999 merger." *Id.* None of the petitioners in the present case were parties to *Colorcon*. For this reason, we suppose, the IRS does not argue that petitioners are bound by the holding of *Colorcon*. *See Peck v. Commissioner*, 90 T.C. 162, 166 (1988) (collateral estoppel may only be invoked against the parties to a prior judgment or their privities), *aff'd*, 904 F.2d 525 (9th Cir. 1990). For their part, petitioners

**[*100]** do not argue that we must reject the IRS's position in the present case because it is inconsistent with the position taken by the United States in *Colorcon*. Furthermore, *Colorcon* is not binding on us (unlike, say, a published Tax Court opinion). Although the holding in *Colorcon* does not require us to resolve the dispute in the present case one way or another, we will on occasion cite the *Colorcon* opinion for propositions for which we find the opinion persuasive. However, we observe that the reasoning of *Colorcon* does not easily carry over to the present case because petitioners in the present case make arguments considerably more extensive than the arguments made by the United States in *Colorcon*.

In determining under section 483 whether a sale or exchange of property has occurred, it is state law that controls. *See Williams v. Commissioner*, 1 F.3d 502, 505 (7th Cir. 1993) ("section 483 simply attaches federal tax consequences to a transaction defined by state law"), *aff'g* 94 T.C 464 (1990); *see also Colorcon, Inc.*, 110 Fed. Cl. at 661. BCL § 1928 provides that a merger is effective upon the filing of the articles of merger. BCL § 1929(a) provides that upon the merger being effective, the existence of the nonsurviving corporation will cease. The articles of merger for the merger between BPSI Acquisition and BPSI were filed on December 16, 1999. The existence of BPSI ceased on this date. On this date, therefore, the shareholders of BPSI, including the David Berwind Trust, no longer had an ownership interest in BPSI. As dissenting shareholders, they instead had the right under BCL § 1571(a) to obtain payment for the fair market value of their shares.

That the David Berwind Trust had no ownership interest in the shares of BPSI as of December 16, 1999, is reinforced by the terms of the plan of merger. Under BCL § 1922(a)(3), the plan of merger must state what the shareholders will receive in exchange for their shares in the companies to be merged. Consistent with BCL § 1922(a)(3) (and with BCL § 1929(a), discussed in the paragraph above) the plan of merger between BPSI Acquisition and BPSI provided that all shares of BPSI common stock were cancelled as of the date the articles of merger were filed. The plan of merger stated that the holders of BPSI stock would receive an $82,820,000 note, and also recognized that the owners of the shares had the right to obtain payment for the fair market value of the shares under the dissenters-rights provision of the BCL.

By operation of the BCL, therefore, on December 16, 1999, the David Berwind Trust's shares in BPSI were cancelled in exchange for either the $82,820,000 note or the fair market value of the shares. *See*

**[*101]** BCL §§ 1928, 1929.  It was on that date—December 16, 1999—that there was a "sale or exchange" of the shares.  Petitioners oppose this conclusion with a variety of arguments.  We will discuss their arguments in depth, but these are the basic reasons we are unpersuaded by petitioners' arguments:

- Petitioners have not shown that the merger was void under Pennsylvania law.  *See* OPINION, *infra*, Part I.A.  If the merger were void, that would render irrelevant the provisions of the BCL that would otherwise give effect to the merger.  *See, e.g.*, BCL §§ 1928, 1929.

- The U.S. District Court did not enter a judgment rescinding or voiding the merger.  Such a judgment seemingly would have been relevant because it would have negated the effect of the BCL provisions regarding the consequences of  the merger.  *See, e.g.*, BCL §§ 1928, 1929.

- The settlement agreement did not provide that the merger was rescinded or void.  *See* OPINION, *infra*, Part I.G.  Such a provision seemingly would have been relevant because it would have had legal effect under Pennsylvania law that would have negated the effect of the BCL provisions regarding the consequences of the merger.  *See, e.g.*, BCL §§ 1928, 1929.  *See* OPINION, *infra*, Part I.G.

- Furthermore, to the extent it is relevant, we disagree with petitioners' characterization of the nature of the claims of the *Warden* litigation and the appraisal proceeding.  *See* OPINION, *infra*, Part I.E.  In particular we disagree that the plaintiffs in that the claims (1) sought only rescission of the merger or (2) that rescission of the merger was the only remedy that could have been awarded to the plaintiffs had the claims gone to judgment.

Thus, we agree with the IRS that "the December 16, 1999 Merger [i.e., the merger of BPSI Acquisition into BPSI] triggered a sale or exchange of the [David Berwind] Trust's stock."   And we reject petitioners' argument that the November 25, 2002 settlement agreement represented "a 2002 sale of stock."

As we said, we have not yet fully discussed petitioners' extensive arguments against December 16, 1999 being the date of the sale or exchange of the stock and November 25, 2002 being the correct date. We discuss these arguments in the subparts that follow.

**[*102]** A.    *The plan of merger between BPSI Acquisition and BPSI did not violate BCL § 1922(a)(3); even if the plan of merger did violate that provision, the merger was not void.*

Petitioners contend that the plan of merger filed by BPSI with the Commonwealth of Pennsylvania on December 16, 1999, violated BCL § 1922(a)(3) because it did not set forth what would be received by the holders of three classes of stock of BPSI (preferred, preference, and preferential) in exchange for their shares. Petitioners contend that therefore the merger was void. The contention is intended to support petitioners' larger argument that the sale or exchange of the David Berwind Trust's BPSI shares did not occur on December 16, 1999. We disagree with petitioners' contention and we hold that the plan of merger did not violate BCL § 1922(a)(3).

1.    *The plan of merger complied with BCL § 1922(a)(3).*

BCL § 1922(a)(3) requires a plan of merger to set forth what the shareholders of the merging corporation will receive for their shares:

(a) Preparation of plan.—A plan of merger . . . shall be prepared, setting forth:

. . . .

(3) The manner and basis of converting the shares of each corporation into shares or other securities or obligations of the surviving . . . corporation . . . and, if any of the shares of any of the corporations that are parties to the merger . . . are not to be converted solely into shares or other securities or obligations of the surviving . . . corporation, the shares or other securities or obligations of any other person or cash, property or rights that the holders of such shares are to receive in exchange for, or upon conversion of, such shares, and the surrender of any certificates evidencing them, which securities or obligations, if any, of any other person or cash, property or rights may be in addition to or in lieu of the shares or other securities or obligations of the surviving . . . corporation.

BPSI filed the plan of merger with the Commonwealth of Pennsylvania on December 16, 1999. On the day before, December 15, 1999, BPSI had issued notices of redemption to the holders of shares of the following classes of BPSI stock: (1) preferred, (2) preference, and (3) preferential. As explained earlier, BPSI's articles of incorporation

[*103] contained several provisions regarding the redemption of these classes of stock: first, they authorized BPSI to redeem these shares at any time by paying in cash the redemption price of the shares; second, they required BPSI to send the shareholders of those classes of stock notices of redemption at least 30 days before the date fixed for such redemption; and third, they provided that "from and after the date fixed for such redemption, the shares represented thereby shall no longer be deemed outstanding . . . and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate." *See* FINDINGS OF FACT, *infra*, Parts 4, 7. The December 15, 1999 notices of redemption called for redemption of all the preferred, preference, and preferential shares on January 15, 2000. The notices of redemption stated that the redemption prices were equal to (a) a price per share of $50 per preferred share, $1 per preference share, and $1 per preferential share; plus (b) accrued dividends as of the redemption date. The notices of redemption stated that BPSI had irrevocably deposited funds sufficient for the redemptions. *See* BCL § 1758(d). The notices of redemption also stated that "[a]s a result of such action, the shares . . . shall no longer be outstanding as provided in Section 1758(d) of the Pennsylvania Business Corporation law." The term "such action" apparently meant (1) mailing the redemption notices and (2) making the deposits. The plan of merger made the following statement about BPSI's preferred, preference, and preference stock:

> [BPSI] has previously issued notices of redemption for the outstanding shares of the . . . [p]referred [s]tock, the . . . [p]reference [s]tock and the . . . [p]referential [s]tock and deposited a sum sufficient to pay the redemption price in a financial institution with irrevocable instructions to pay the redemption price to the holders thereof upon surrender of the certificates therefore [sic]. Therefore, the . . . [p]referred [s]tock, the . . . [p]reference [s]tock and the . . . [p]referential [s]tock are no longer deemed outstanding, and have no rights with respect to the transactions contemplated by this Agreement and Plan of Merger.

The term "Agreement and Plan of Merger" meant the plan of merger itself, because the plan of merger was self-titled "Agreement and Plan of Merger."

BCL § 1758(d) provides that "[u]nless otherwise provided in the articles, redeemable shares that have been called for redemption shall not . . . be deemed outstanding shares after written notice has been

**[\*104]** mailed to holders thereof that the shares have been called for redemption." *See* FINDINGS OF FACTS, *infra*, Part 9. As discussed in the paragraph above, BPSI's articles of incorporation include the provision that "from and after the date fixed for such redemption, the shares represented thereby shall no longer be deemed outstanding . . . and all rights with respect to such shares so called for redemption shall forthwith on such redemption date cease and terminate." Thus, while BCL § 1758(d) imposes the rule that shares will no longer be considered outstanding as of the *date of the redemption notice*, this rule governs only "[u]nless otherwise provided in the articles," and BPSI's articles provide that shares are no longer deemed outstanding as of the *date of the redemption*. Petitioners argue that the BPSI preferred, preference, and preferential shares remained outstanding after the December 15, 1999 notices of redemption until the redemption date of January 15, 2000. If petitioners are correct that BPSI preferred, preference, and preferential shares remained outstanding after the December 15, 1999 notices of redemption, then it would follow that BCL § 1922(a)(3) required the plan of merger to state what the holders of these shares "are to receive in exchange for . . . such shares." Petitioners argue that the plan of merger failed to meet this requirement because it erroneously stated that the preferred, preference, and preferential stock were "no longer deemed outstanding."

We hold that the plan of merger did make the statement required by BCL § 1922(a)(3) even though it was seemingly in error in stating that the non-common shares were no longer outstanding as of December 15, 1999. Despite this error, the plan of merger nonetheless explained that the shares had been called for redemption and that their holders would receive the redemption price. This was a correct statement of what the holders of the shares "are to receive in exchange for . . . such shares." *See* BCL § 1922(a)(3). Because the plan of merger accurately stated what the owners of non-common shares would receive for their shares in the merger, we conclude that the plan of merger complied with BCL § 1922(a)(3).

> 2. *Even if the plan of merger violated BCL § 1922(a)(3), the merger was not void.*

But even assuming *arguendo* that the plan of merger violated BCL § 1922(a)(3), such a violation would not result in the merger between BPSI Acquisition and BPSI being *void ab initio*.

**[\*105]** The parties in the present case disagree on the consequences of a violation of BCL § 1922(a)(3). Petitioners claim that noncompliance with BCL § 1922(a)(3) means that the merger between BPSI Acquisition and BPSI was *void ab initio*. Under this view, the merger never happened and the David Berwind Trust still held its shares of BPSI common stock until the November 25, 2002 settlement agreement. In support of their argument that the merger is *void ab initio*, petitioners rely on the opinion of the Delaware Court of Chancery in *Arnold v. Society for Savings Bancorp., Inc.*, 1995 WL 376919 (June 15, 1995), *aff'd in part on relevant grounds, rev'd in part on other grounds*, 678 A.2d 533 (Del. 1996). In *Arnold*, a shareholder of a corporation that had purportedly undergone a merger challenged the merger on the grounds that, even though the shareholders of the corporation had voted in favor of the merger, the vote was ineffective because the corporation's board of directors had failed to disclose to the shareholders information about the history of the merger negotiations. 1995 WL 376919, at \*2; 650 A.2d 1270, 1275–76 (Del. Ch. 1994) (in a prior proceeding holding that corporation failed to disclose there had been an appraisal of the value of its shares or a prior contingent bid for one of its subsidiary). In analyzing the merits of the shareholder's argument, *Arnold* explained that a "merger that fails to comply with the statutory requirements for a merger is *void ab initio*," a statement upon which petitioners in the present case rely. 1995 WL 376919, at \*2.[35]

Petitioners also invoke another opinion of the Delaware Court of Chancery, *Jackson v. Turnbull*, 1994 WL 174668 (Del. Ch. Feb. 8, 1994), *aff'd*, 653 A.2d 306 (Del. 1994). In *Jackson*, the court held that a merger was *void ab initio* because of a combination of three grounds, one of which was that the merger violated Del. Code Ann. tit. 8, C. § 251(b);

---

[35] The rest of the *Arnold* opinion is not as important for our purposes. *Arnold* held that the board of directors' failure to disclose did not violate the Delaware statutory requirements for a merger. *Id.* at \*2. *Arnold* explained that Delaware statutory law, Del. Code Ann. tit. 8, § 251(c) (West 2020), merely required the board of directors, before submitting the merger agreement to the shareholders for a vote at a shareholder meeting, to (1) notify them of the time, place and purpose of the meeting and (2) supply them with a copy or brief description of the merger agreement. 1995 WL 376919, at \*3. *Arnold* held that the statute did not require the corporation to disclose to its shareholders all material facts about the merger. *Id.* According to *Arnold*, that requirement existed as "separate fiduciary duty of disclosure, derived from the common law." *Id.* The requirement did not come from the statute. *Id.* *Arnold* concluded that the merged corporation "complied with all the statutory requirements for a valid merger" and that therefore the merger was "not void." *Id.* We assume arguendo in Part 1.A of this OPINION that the merger of BPSI Acquisition and BPSI violated BCL § 1922(a)(3).

**[*106]** 1994 WL 174668, *3. That statute requires the board of directors of a corporation desiring to merge to adopt a resolution approving an agreement of merger. Del. Code Ann. tit. 8, § 251(b); 1994 WL 174668, at *3. It further requires the agreement of merger to state what the shareholders are to receive in the merger. Del. Code Ann. tit. 8, § 251(b); *Jackson*, 1994 WL 174668, at *3. The provision thus has similarities to BCL § 1922(a)(3). In *Jackson*, the board of directors of the corporation had approved a merger agreement under which the shareholders were to receive a payment equal the greater of (a) $1,501.19 per share or (b) the appraised value of the shares pursuant to a future appraisal by an investment banker. 1994 WL 174668, at *4. Because the appraised amount was unknown at the time of the merger agreement, *Jackson* held that the merger agreement "does not specify the amount of cash the stockholders will receive." *Id.* *Jackson* held that the merger violated Del. Code Ann. tit. 8, § 251(b) and that the merger was *void ab initio*. *Jackson*, 1994 WL 174668, at *6. By analogy to *Jackson*, petitioners in the present case contend that the merger of BPSI Acquisition and BPSI is *void ab initio*.

The IRS argues that noncompliance with BCL § 1922(a)(3), and with other requirements for mergers in the BCL, does not mean that the merger is void, only that it was voidable by a court. The IRS explains that *Arnold* and *Jackson* are irrelevant for the reasons given by the Pennsylvania Court of Common Pleas in *First Union National Bank v. Quality Carriers, Inc.*, 48 Pa. D. & C. 4th 1, 2000 WL 33199269, at *7 (Pa. Ct. C.P. Oct. 10, 2000). We agree with the IRS.

In *First Union National Bank*, a corporation merged with another corporation without notifying all of its shareholders. 2000 WL 33199269, at *3. Some of the unnotified shareholders sued for equitable relief on grounds of (1) breach of the BCL and (2) breach of fiduciary duty. 2000 WL 33199269 at *3. Referring to *Arnold* and *Jackson*, *First Union National Bank* observed that the "Delaware general rule finding mergers void ab initio if they fail to comply with the relevant statutes is not universally recognized." 2000 WL 33199269 at *6. *First Union National Bank* continued, "the courts of this Commonwealth [i.e., Pennsylvania] have refused to regard corporate decisions that fail to comply with the BCL as void." 2000 WL 33199269 at *6. Finally, *First Union National Bank* held that "a merger that fails to comply with the BCL should be deemed voidable, not void." 2000 WL 33199269 at *7.

On the weight of *First Union National Bank* (and similar authorities applying Pennsylvania law, *see, e.g., MicroSignal Corp. v.*

[*107] *MicroSignal Corp.*, 147 F. App'x 227, 233 (3d Cir. 2005) (merger is not void under Pennsylvania law even where shareholders received no notice of merger)), we conclude that a violation of BCL § 1922(a)(3) would not render the BPSI squeeze-out merger *void ab initio*. Because the merger is not *void ab initio*, it remains effective to the present day because no court (including the District Court in the *Warden* litigation) has held the merger void. *See First Union National Bank*, 2000 WL 33199269 (stating that the weight of precedent is that a voidable merger may be declared void by a "Pennsylvania court" when that court considers various factors, such as the nature of the violation of the BCL, the identity of the plaintiff, and the practicality of undoing the merger). Thus, even if the merger violated BCL § 1922(a)(3), the merger was still valid.

B. *The merger of BPSI Acquisition and BPSI did not violate BPSI's articles of incorporation.*

Petitioners next argue that the merger of BPSI Acquisition and BPSI violated the requirement in BPSI's articles of incorporation that any merger must be approved by the holders of the majority of BPSI preferred shares. This argument is intended to support petitioners' larger argument that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002, not December 16, 1999.

BPSI's articles of incorporation prohibit BPSI from merging with another corporation without the "consent (given by vote at a meeting called for that purpose)" of the holders of a majority of the shares of preferred stock. The only holder of BPSI preferred shares at the relevant time was BPSI Acquisition. BPSI Acquisition's board of directors approved the merger. And an officer of BPSI Acquisition executed the plan of merger. But petitioners contend that as a matter of fact BPSI Acquisition did not vote its BPSI preferred shares in favor of the merger. In petitioners' words, "[preferred] shares of BPSI were not voted."

We assume arguendo that the approval of the plan of merger by BPSI Acquisition's board of directors, and its execution by one of its officers, is not the equivalent of BPSI Acquisition voting its preferred shares in favor of the merger. Under this assumption the record does not establish whether BPSI Acquisition submitted a vote as the sole holder of BPSI's preferred stock. Petitioners in the present case have the burden of proof. They have not adduced evidence on this point.

**[\*108]** *Estate of Gilford v. Commissioner*, 88 T.C. 38, 51 (1987). Resolving this factual issue against petitioners is required by the allocation of burden of proof in this case.

Resolving this factual issue this way is also consistent with procedural fairness. Petitioners' factual claim—that BPSI Acquisition did not submit a vote as the holder of BPSI's preferred stock—was not raised by petitioners until post-trial briefing. Petitioners did not notify the IRS before trial (in their Pretrial Memorandum or otherwise) that they would argue that BPSI Acquisition failed to approve the plan of merger as holder of BPSI preferred stock. Petitioners' argument (unlike the argument that the plan of merger violated BCL § 1922(a)(3)) was not made by the David Berwind Trust in the *Warden* litigation.

We hold that the merger between BPSI Acquisition and BPSI did not violate the requirement in BPSI's articles of incorporation that a merger must get the "consent (given by vote at a meeting called for that purpose)" of the holders of at least a majority of the shares of preferred stock.

C. *The remedies of the plaintiffs in the* Warden *litigation would not have been limited to the dissenters-rights provisions had the merger been tainted with fraud or fundamental unfairness. However, petitioners do not ask us to determine that the merger was so tainted.*

One reason petitioners argue that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002, not December 16, 1999, is that "[f]raud or fundamental unfairness is grounds for an injunction against a merger." Placing this argument in context requires some explanation.

BCL § 1105 provides in relevant part that a shareholder "shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan . . . authorized under any provision of this subpart [i.e., BCL §§ 1101–4162]" and that "[a]bsent fraud or fundamental unfairness" the shareholder's exclusive remedies are the dissenters-rights provisions of BCL §§ 1571–1580. A "proposed plan" of the type referred to by BCL § 1105 includes a plan of merger. *See* BCL §§ 1921(a), 1922. BCL § 1105 has been interpreted by Pennsylvania courts to mean that an injunction is available against a merger that is tainted by "fraud or fundamental unfairness" provided that the injunction was sought before the merger. In *Barter v.*

**[*109]** *Diodoardo*, 771 A.2d 835, 839 (2001) (citations omitted), the Superior Court of Pennsylvania stated that "[a]lthough granted by negative implication, section 1105 thus provides a dissenting shareholder with the right to enjoin a merger in cases of 'fraud or fundamental unfairness'". In *In re Jones & Laughlin Steel Corp.*, 412 A.2d 1099, 1104 (1980), the Supreme Court of Pennsylvania held that to exercise the right to enjoin proposed unfair or fraudulent corporate actions, the shareholder must institute the action "*prior* to the consummation of the proposed transaction." (Emphasis added).

The District Court in the *Warden* litigation (in part E of its August 8, 2001 opinion) held that Counts VI (injunction against merger), VII (accounting) and VIII (rescission of merger) of the amended complaint filed by the plaintiffs (including the David Berwind Trust) did not state a claim upon which relief could be granted because, the District Court held, the plaintiffs were limited to an appraisal remedy. *Warden v. McLelland*, 2001 WL 910934, at *13. The District Court was reversed on this point by the Third Circuit, which pointed out that the original complaint had been filed before the plan of merger had been filed. *Warden v. McLelland*, 288 F.3d at 115.

Petitioners in the present case contend that we must similarly reject the view of the District Court in the *Warden* litigation that the David Berwind Trust's remedy with respect to the misconduct alleged in Counts VI, VII, and VIII, was necessarily limited to an appraisal proceeding. Petitioners explain their argument in their opening brief as follows: "BPSI argued in the *Warden* litigation that the [David Berwind] Trust's remedy was limited to an appraisal proceeding, and [the IRS] now does the same. The law in Pennsylvania, however, does not support the argument made by BPSI or [the IRS]." In response to this, the IRS clarifies that it is not the IRS's contention that the David Berwind Trust's remedies were limited to appraisal:

> In their opening brief, Petitioners mistakenly argue that it is [the IRS's] position that Petitioners were limited to an appraisal proceeding after the Merger took place . . . Contrary to Petitioners' assertions, [the IRS] merely takes the position that the [David Berwind] Trust walked away from its claims for equitable relief when it agreed to accept the $191 million cash settlement.

We agree with petitioners inasmuch we think that the tax consequences of the 2002 settlement agreement should not be

**[\*110]** determined under the assumption that part E of the District Court opinion in the *Warden* litigation was correct in holding that the plaintiffs' claims in Counts VI (injunction against merger), VII (accounting), and VIII (rescission of merger) did not state a claim upon which relief could be granted. *Warden v. McLelland*, 2001 WL 910934, at \*12–13. Our agreement is consistent with the IRS's concession (discussed in the paragraph above) that the David Berwind Trust was not limited to the appraisal remedy as a matter of law. Our agreement does not mean we take the view that the particular claims for relief would have been successful had they continued to be litigated. Petitioners do not urge us to determine that the particular claims would have been successful, and specifically they do not request that we determine that the merger was tainted by "fraud or fundamental unfairness". Consequently, the IRS did not advance any views about the potential success of the claims. We do not ordinarily reach issues not raised by the parties. Therefore we do not opine on whether the plaintiffs' particular claims would have been successful.

Our limited agreement with petitioners' argument stated above does not lead to the conclusion that that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002. And it is not contrary to our holding that the sale or exchange occurred on December 16, 1999.

D. *Count XIII of the amended complaint in the* Warden *litigation should not be treated as failing to state a claim on the grounds that the Graham Berwind and McKenney's resignations as trustees of the David Berwind Trust were effective.*

In urging us to hold that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002, not December 16, 1999, petitioners argue that we should reject a certain argument they say is made by the IRS: "[The IRS] argues that the breach of trust grounds for rescission should be ignored because both Graham [Berwind] and McKenney had resigned as trustees of the [David Berwind] Trust prior to the Disputed Merger." To explain the significance of petitioners' point, we must discuss the following four interrelated subjects: first, the purported resignations of Graham Berwind and McKenney in 1997; second, the positions taken by the parties in the *Warden* litigation regarding the purported resignations; third, the District Court and Third Circuit's holdings regarding the purported resignations; and fourth, the positions taken by the parties in

**[\*111]** the present case with respect to the significance of the purported resignations to the David Berwind Trust's federal income tax liability.

As to the first subject (the purported resignations), recall that Graham Berwind was a trustee of the David Berwind Trust when it was established in 1963. The deed of trust allows a trustee to resign without court approval if the trustee designates in writing two individuals as a succession of trustees. On June 26, 1997, the following events occurred: (a) Graham Berwind designated in writing McKenney as his successor trustee, but did not designate the next successor trustee; (b) Graham Berwind and McKenney signed a document stating that Graham Berwind resigned and that McKenney accepted appointment as Graham Berwind's successor; and (c) McKenney designated in writing Graham Berwind as his successor trustee, but did not designate the next successor trustee. Then, on December 30, 1997, McKenney signed a document stating that he resigned as trustee.

As to the second subject (the positions of the plaintiffs in the *Warden* litigation), recall that this litigation began on November 22, 1999, when four trustees of the David Berwind Trust (but not Graham Berwind or McKenney) filed the original complaint. Count X of the original complaint alleged that Graham Berwind and McKenney's resignations were ineffective and that they had violated their duties as trustees of the David Berwind Trust. As a remedy for these alleged violations, Count X sought (a) recovery of monetary damages or (b) placement of the income from the alleged breaches of duty in a constructive trust. On January 4, 2000, the plaintiffs amended the complaint to allege—in new Count XIII—that as a remedy for Graham Berwind's and McKenney's alleged violation of their duties as trustees they should be enjoined from taking steps to affect the David Berwind Trust's minority shareholder interest in BPSI or the standing of the David Berwind Trust to assert the shareholder-derivative claims in the amended complaint.

As to the third subject (the holdings of the District Court and the Third Circuit), the District Court's holding on the purported resignations was stated in part I of its August 8, 2001 opinion, where it held that Counts X and XIII did not state a claim upon which relief could be granted. *Warden v. McLelland*, 2001 WL 910934, at \*17–18. One reason given by the District Court was that Graham Berwind and McKenney had resigned as trustees and that their resignations were effective. *Id.* at \*17. The Third Circuit reversed this holding on the grounds that the plaintiffs' allegation that Graham Berwind and

[*112] McKenney had not effectively resigned must be accepted as true for purposes of Fed. R. Civ. P. 12(b)(6). *Warden v. McLelland*, 288 F.3d at 110.

As to the fourth subject (the positions of the parties in our case regarding the purported resignations), we begin with petitioners' position. Petitioners argue that "[t]hese resignations . . . were not in compliance with the terms of resignation in the [David Berwind] Trust document regarding naming two successors and lodging the resignation with the trustees." Petitioners argue further that Graham Berwind continued to behave like a trustee by writing checks and correspondence for the trust. Petitioners argue further that even a valid resignation by a trustee cannot absolve the trustee of liability for improper conduct. Petitioners clarify, though, that they do not seek a determination by this Court of the "validity of its [i.e., the David Berwind Trust's] claims regarding the . . . breach of trust [by alleged trustees Graham Berwind and McKenney]." The IRS's position regarding the purported resignations is that the "[e]vidence shows that Bruce McKenney and Graham Berwind resigned as trustees of the [David Berwind] Trust before 1999." Thus, the IRS contests petitioners' view that Graham Berwind and McKenney's resignations were not effective. However, the IRS also states that the "merits of the [David Berwind] Trust's equitable claims for rescission of the Merger, based on Graham Berwind and Bruce McKenney's alleged breach of fiduciary duties to the [David Berwind] Trust, are not relevant because the [David Berwind] trust abandoned those claims when it accepted the 2002 settlement payment, and the Merger was never rescinded."

We agree with petitioners' argument inasmuch we think the tax consequences of the 2002 settlement agreement should not be determined under the assumption that the District Court in the *Warden* litigation was correct, in part I of its opinion, that (a) Graham Berwind and McKenney had effectively resigned as trustees of the David Berwind Trust and (b) therefore Count XIII did not state a claim upon which relief could be granted. *Warden v. McLelland*, 2001 WL 910934, at *17–18. By so agreeing, we do not adopt the view that Count XIII would have been successful had it continued to be litigated. The success of Count XIII would have depended in part on whether Graham Berwind and McKenney violated their fiduciary obligations as trustees of the David Berwind Trust. Petitioners do not urge us to determine that Count XIII would have been successful. As a result, the IRS has not advanced any views about the potential success of Count XIII. We do not ordinarily

**[\*113]** reach issues not raised by the parties. Therefore, we do not opine on whether Count XIII would have been successful.

Our limited agreement with petitioners' argument stated above does not lead to the conclusion that that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002. It is not inconsistent with our holding that the sale or exchange occurred on December 16, 1999.

E. *Application of the origin-of-the-claim test does not lead to the conclusion that the sale or exchange occurred on November 25, 2002.*

Petitioners observe that under the "origin-of-the-claim" test, the tax treatment of a settlement payment is resolved by determining the "nature of the claim." *See, e.g.*, *Robinson v. Commissioner*, 102 T.C. 116, 126 (1994) ("In the context of a settlement agreement, the nature of the claim underlying the taxpayer's damage award, rather than the validity of his or her claim, determines whether he or she received the damages on account of tortlike personal injuries . . . . A key question to ask is: 'In lieu of *what* were the damages awarded.'") (emphasis in original), *aff'd in part, rev'd in part*, 70 F.3d 34 (5th Cir. 1995). Petitioners further contend that the origin of the claims in the *Warden* litigation (and the appraisal proceeding) was "an effort to prevent or rescind a merger, not to seek dissenter's rights." Therefore, they urge, the payment by BPSI to the David Berwind Trust for the trust's common BPSI shares was a substitute for the relief that the plaintiffs sought (i.e., rescinding the merger), and the merger must be treated for tax purposes as if it did not occur. If the merger did not occur, that would support petitioners' larger argument that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002, not the effective date of the merger, December 16, 1999.

The IRS resists the idea that the tax treatment of the redemption payment made by BPSI to the David Berwind Trust should be determined under the origin-of-the-claim test. The IRS explains that in cases resolving the tax treatment of a settlement payment based on the origin of the claim, the dispute involved what the settlement payment was for. An example of one such type of dispute was whether to classify the settlement payment as (a) return of capital versus (b) lost profits. *See Raytheon Prod. Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir. 1944), *aff'g* 1 T.C. 952 (1943). Another such type of dispute was whether to classify the settlement payment as (a) compensation for personal

[*114] injury versus (b) damages for breach of contract. *See Robinson*, 102 T.C. at 134. But in the present case, the IRS explains, the parties are in agreement as to what the redemption payment was for. They agree that the payment was for the BPSI common stock held by the David Berwind Trust. The IRS argues that the origin-of-the-claim test is not an appropriate test for determining the timing of a sale or exchange, which the present case involves, nor is it an appropriate test for applying section 483, which the present case involves.

The origin-of-the claim test determines the tax treatment of a settlement payment by the nature of the claim the payment resolved. *Alexander v. IRS*, 72 F.3d 938, 942 (1st Cir. 1995) ("the classification of amounts received in settlement of litigation is to be determined by the nature and basis of the action settled, and amounts received in compromise of a claim must be considered as having the same nature as the right compromised"), *aff'g* T.C. Memo. 1995-51; *Sager Glove Corp. v. Commissioner*, 36 T.C. 1173, 1180 (1961) ("The taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery."), *aff'd*, 311 F.2d 210 (7th Cir. 1962); *Freeman v. Commissioner*, 33 T.C. 323, 327 (1959) (stating that absent a statement in a settlement agreement, we look to the "nature of the claim and the actual basis of recovery"). Petitioners' origin-of-the-claim argument supposes that the nature of the claims in the *Warden* litigation and the appraisal proceeding control the tax treatment of the payment by BPSI to the David Berwind Trust through the following analysis: (1) if the claims were for an appraisal remedy, then the relevant sale or exchange of the shares took place in 1999, and (2) if the claims were for an injunction against the merger, then the relevant sale or exchange of the shares took place in 2002. Petitioners assert that the claims sought an injunction, i.e., the alternative we denote as (2). Therefore they conclude that under this analysis the relevant sale or exchange of the shares took place in 2002.

We disagree with petitioners' premise that their claims sought merely an injunction against the merger. The amended complaint in the *Warden* litigation was not only a request for an injunction against the merger. It also sought an appraisal remedy in Count IX. Furthermore, the *Warden* litigation was consolidated with the appraisal proceeding. The entire purpose of the appraisal proceeding was to press for an award of the appraised value of the shares. The settlement agreement settled both the *Warden* litigation and the appraisal proceeding.

**[*115]**  Petitioners urge us to consider the case consisting of the *Warden* litigation and the appraisal proceeding to be solely an injunction action because "[t]here was no litigation action under the dissenter's rights claims." This is not true. The defendants in the *Warden* litigation and the appraisal proceeding moved to dismiss the amended complaint, including Count IX (right to statutory appraisal) under Fed. R. Civ. Proc. 12(b)(6). *Warden v. McLelland*, 2001 WL 910934, at *15–16. That motion would qualify as a "litigation action." And though the defendants' Fed. R. Civ. P. 12(b)(6) motion did not address the appraisal proceeding, we do not see why it is relevant how active a particular piece of litigation is in determining the nature of the litigation, so long as that piece of the litigation was unresolved by the time a settlement agreement came along to resolve it. The appraisal proceeding was extant, waiting to be resolved, when the settlement agreement was executed.

Petitioners also urge us to consider the case consisting of the *Warden* litigation and the appraisal proceeding to be solely an injunction action because there was "no court-appointed appraiser." BCL § 1579(c) allows the court handling the appraisal proceeding to appoint an appraiser, but it does not require the court to do so. Furthermore, the 2002 settlement agreement cut short the appraisal proceeding. Had the appraisal proceeding not been resolved by the agreement, there could have been a court-appointed appraisal.

Petitioners also urge us to consider the case consisting of the *Warden* litigation and the appraisal proceeding to be solely an injunction action because the David Berwind Trust only asserted its dissenters rights "as a precautionary measure." That may be true as a matter of subjective intent. But the David Berwind Trust's January 26, 2000 demand for payment for its BPSI common stock had the objective effect of preserving its dissenters rights as required by BCL §§ 1575 and 1576(a). And its March 3, 2000 notice of estimate of fair value of its shares similarly had the objective effect of preserving its right to seek more than the $82,820,000 estimated by BPSI under BCL § 1578(a) and (b). These actions preserved David Berwind Trust's entitlement to the dissenters rights given by BCL §§ 1571–1580. Its entitlement to these rights was only terminated with the 2002 settlement agreement and the payment required under that agreement. The trust may have preferred to prevail in its sought-after injunction of the merger, but it simultaneously had launched a claim for a cash award through the appraisal remedy.

**[\*116]** Furthermore, even if we agreed with petitioners that the *Warden* litigation and the appraisal proceeding somehow involved only an injunction, we observe that had the District Court ruled in favor of the plaintiffs in the case on their injunction theories, the District Court might not necessarily have rescinded the merger. Instead, it conceivably could have ordered rescissory damages: i.e., cash damages to compensate the David Berwind Trust, plus interest. *See Goldring v. United States*, 15 F.4th 639, 642 (5th Cir. 2021) (observing that a Delaware court had declined to award plaintiff rescission because of practical difficulties of undoing the merger; the Delaware court had instead awarded plaintiff cash damages). Thus, even had the amended complaint sought solely an injunction, the District Court could have considered awarding cash instead of rescission.

We make one further clarifying observation about the nature of the *Warden* litigation and the appraisal proceeding. We have discussed the *Warden* litigation and the appraisal proceeding as if there were only two types of relief sought: injunctive relief against the merger and the appraisal remedy. These two types for relief match up easily with certain counts in the amended complaint: VI (injunction sought for breaches of fiduciary duty of BPSI board members), VIII (injunction sought for alleged unlawful purpose of the merger), IX (right to statutory appraisal), XII (declaratory judgment that merger was void), XIII (injunction for violation of obligations of trustees of trust). But the two types of relief do not as easily match up with the following counts: I (monetary damages for racketeering), II (monetary damages for racketeering conspiracy), III (monetary relief for usurpation of corporate opportunity, IV (monetary damages for breaches of fiduciary duties of BPSI board members), V (monetary damages for aiding and abetting such breaches, VII (accounting), X (monetary damages for breaches of duties of trustees, and XI (treble damages for racketeering). None of the parties push the proposition that the amount required to be paid by the settlement agreement should be allocated to these remaining counts. Petitioners state: "Here, the parties agree that the Settlement Amount was paid for the [David Berwind] Trust's BPSI stock." Petitioners define the "Settlement Amount" as $191,000,000. The IRS similarly states: "[T]he parties agree that the Settlement Amount was paid in respect to the sale or exchange of the [David Berwind] Trust's BPSI interest." The IRS defines the "Settlement Amount" as $191,000,000. Thus it is appropriate to characterize the *Warden* litigation and the appraisal remedy as either seeking an injunctive remedy or an appraisal remedy (or both in the alternative), but not some other form of relief, in determining the tax consequences of the 2002 settlement agreement.

**[\*117]** Thus we have explained why we disagree with petitioners' view that the claims in the consolidated case (i.e., the case consisting of the *Warden* litigation and the appraisal remedy) were entirely for injunctive relief. In light of the disagreement, it is unnecessary to opine on the consequences of the nature of the claims being entirely for injunctive relief.

F. Lyeth v. Hoey *does not require us to determine the tax consequences of the payment by BPSI to the David Berwind Trust for the Trust's BPSI common stock as if the plaintiffs in the* Warden *litigation had successfully enjoined the merger between BPSI Acquisition and BPSI.*

Petitioners argue that *Lyeth v. Hoey*, 305 U.S. 188 (1938), requires that the "[s]ettlement [a]greement should be treated as if the [David Berwind] Trust successfully defended the title to the BPSI Stock through 2002." This argument is intended to support petitioners' larger argument that the sale or exchange of the David Berwind Trust's common stock of BPSI occurred on November 25, 2002, not December 16, 1999.

In *Lyeth*, the Supreme Court suggested that an amount received by a plaintiff in settlement of a lawsuit should be treated the same for tax purposes as the amount that the plaintiff would have received pursuant to a judgment had the lawsuit proceeded to judgment. *Id.* at 195–96; *see Fresenius Medical Care Holdings, Inc. v. United States*, 763 F.3d 64, 71 (1st Cir. 2014) (attributing to *Lyeth* the proposition that "amounts paid . . . in settlement should receive the same tax treatment, to the extent practicable, as would have applied had the dispute been litigated and reduced to judgment.") The underlying lawsuit in question in *Lyeth* had been brought by a grandson to set aside his grandmother's will and thus to receive his inheritance in an amount unaffected by the will's instructions. *Lyeth*, 305 U.S. at 195. *Lyeth*, held that the payment the grandson received in settlement of his suit should be treated as a tax-free inheritance because the settlement payment was a substitute for an inheritance. *Id.* at 197.

But here the parties are in agreement that the payment by BPSI to the David Berwind Trust, whether it is $191,257,353, as the IRS claims, or $190,000,000, as petitioners claim, was a payment for BPSI stock. *Lyeth* does not control the question of whether the stock was exchanged on December 16, 1999 (when the plan of merger was filed) or on November 25, 2002 (when the settlement agreement was executed).

**[\*118]** G. *The 2002 settlement agreement did not provide that the merger was rescinded or that the merger was void.*

Petitioners set forth a vast array of arguments explaining why the provisions of the 2002 settlement agreement lead to the conclusion that the sale or exchange of the BPSI common stock occurred on November 25, 2002. Petitioners list 24 differences between what they contend are the characteristics of a "dissenters' rights award" and the actual terms of the settlement. For example, petitioners explain that the date of the settlement agreement was November 25, 2002, while the date of a dissenters'-rights award would have been (they argue) 1999. Petitioners also place particular emphasis on the fact that the settlement agreement required a deposit by BPSI in the amount of $191,000,000, which supposedly suggests that the settlement relates to the value of the BPSI common stock in 2002, not 1999. Petitioners explain this point as follows: "The 2002 Settlement Amount of $191,000,000 for 16.4% of BPSI is so grossly in excess of BPSI's December 1999 determination of $82,820,000 for the value of the same percentage interest held by the [David Berwind] Trust . . . that it must reflect the increased value of BPSI [three] years later, and not merely an interest factor." Petitioners also contend that the $191,000,000 amount relates to a 2002 sale or exchange because "the Settlement Payment in 2002 includes [the] value of Zymark." Petitioners also emphasize the existence of the ride-up provisions: "Pursuant to the Ride-Up, the Base Amounts of value for BPSI and Zymark are agreed at $161 million and $30 million, respectively, with no mention of interest."

We begin our analysis of these arguments by acknowledging that the provisions of settlement agreements are significant under non-section 483 tax law such as the origin-of-the-claim test. The provisions of a settlement agreement may be relevant to the non-section 483 tax treatment of a corresponding settlement payment.[36] The underlying theory of the relevance is sometimes articulated as follows: (1) the tax treatment of a settlement payment is determined by the intent of the

---

[36] *See Robinson v. Commissioner*, 102 T.C. 116, 127 (1994) (courts respect the "allocation" of settlement proceeds "clearly" made by a settlement agreement if that allocation was "entered into by the parties in an adversarial context at arm's length and in good faith"), *aff'd in part, rev'd in part*, 70 F.3d 34 (5th Cir. 1995); *see also Bagley v. Commissioner*, 105 T.C. 396, 406 (1995) ("Where there is an express allocation contained in the agreement between the parties, it will generally be followed in determining the allocation if the agreement is entered into by the parties in an adversarial context at arm's length and in good faith."), *aff'd*, 121 F.3d 393 (8th Cir. 1997).

**[\*119]** payor and (2) the intent of the payor is discernible from the text of the settlement agreement.[37] This theory cannot be reflexively carried over to the section 483 context. That is because the intent of the parties is not relevant under the mechanistic rules of section 483.[38] Furthermore, the relevant issue to be determined in applying section 483 is the date of the sale or exchange of the BPSI common stock. This date is determined by state law.[39] Under the BCL, the plan of merger eliminated the BPSI common stock as of the date it was filed. BCL §§ 1928, 1929. Under the principle that state law controls the date of the sale or exchange, it would have been arguably relevant had the District Court entered a judgment that the merger was rescinded or was void under Pennsylvania law. However, no such judgment was entered. It also would have been arguably relevant had the settlement agreement provided that the merger was rescinded or was void under Pennsylvania law. However, the settlement agreement expressly disavowed that it

---

[37] *See Bagley*, 105 T.C. at 406 ("Where there is an express allocation contained in the agreement between the parties, it will generally be followed in determining the allocation if the agreement is entered into by the parties in an adversarial context at arm's length and in good faith. [Citation omitted] However, an express allocation set forth in the settlement is not necessarily determinative if other factors indicate that the payment was intended by the parties to be for a different purpose"); *Federal Paper Board Co., Inc. v. Commissioner*, 90 T.C. 1011, 1024 (1988) ("When an allocation of settlement payments must be made and there is no express allocation contained in a settlement agreement, the most important fact for purposes of making the allocation is the 'intent of the payor'"); *Green v. Commissioner*, 507 F.3d 857, 867–68 (5th Cir. 2007) ("We first look to the . . . agreement itself for indicia of purpose. Where the settlement agreement lacks express language of purpose, the court looks beyond the agreement to other evidence that may shed light on the intent of the payor as to the purpose in making the payment") (quotation marks and citations omitted), *aff'g* T.C. Memo. 2005-250; *Freda v. Commissioner*, 656 F.3d 570, 577 (7th Cir. 2011), *aff'g* T.C. Memo. 2009-191.

[38] *See Solomon*, 570 F.2d 28, 33–34 (2d Cir. 1977) ("Congress opted for a broad, prophylactic approach to the problem of unstated interest, making the operation of section 483 dependent upon certain objectively verifiable circumstances which had usually evidenced a potential for the abuse against which the section was aimed and not on the subjective intent of the parties to a sale. . . . [T]his approach . . . avoided the insoluble problems that might arise if the IRS were required to probe the minds of the parties to each such transaction in an effort to determine whether the deferred purchase price had in fact been adjusted upward to reflect an interest charge"), *aff'g* 67 T.C. 379, 386 (1976) ("The existence of deferred payments without provision for adequate interest, not the manner in which the deferred payments are computed, is determinative of the applicability of section 483."); *Jeffers v. U.S.*, 556 F.2d 986, 995 (Ct. Cl. 1977) ("nowhere in the statute or legislative history has Congress hinged the application of § 483 upon a showing of intentionality.").

[39] *See Williams*, 1 F.3d at 505; *see also Colorcon, Inc. v. United States*, 110 Fed. Cl. at 661.

**[*120]** had any such effect.  The settlement agreement states that the "legal status of [the shares is] an issue in the litigation" and that the defendants were "not approving or agreeing with the legal position of the [David Berwind] Trustees as to the [merger]."  Furthermore, the settlement agreement contained no provision under which the merger was rescinded or was void.  Absent such a provision, it is inappropriate to infer from the other provisions of the settlement agreement upon which petitioners rely that the parties to that agreement intended that the sale or exchange of BPSI common stock occurred on November 25, 2002.

> H. *Merely because the David Berwind Trust's holding period of BPSI common stock would have included the period from December 16, 1999, to November 25, 2002, for purposes of section 1231 of the Internal Revenue Code of 1954, does not mean that the sale or exchange of the trust's BPSI common stock did not occur on December 16, 1999, for purposes of section 483.*

The David Berwind Trust contends that under *Merrill v. Commissioner*, 40 T.C. 66, 74 (1963), *aff'd per curiam*, 336 F.2d 771 (9th Cir. 1964), which interpreted section 1231 of the Internal Revenue Code of 1954, its holding period would have included the period from December 16, 1999, to November 25, 2002.  In *Merrill*, 40 T.C. at 75, a joint venture partly owned by the taxpayer bought a grain-elevator property on April 27, 1956 and sold it the same year.  The taxpayer contended that the joint venture held the property for more than six months, and that therefore the profit from its sale was taxable as long-term capital gain under section 1231 of the Internal Revenue Code of 1954.  That provision gave favorable tax treatment to gain on sales of "property . . . held for more than 6 months."  *Merrill*, 40 T.C. at 73 n.5.  The taxpayer contended that the sale of the property took place on November 16, 1956.  *Id.* at 77.  However, the court held that the sale of the property took place not later than September 5, 1956.  *Id.* at 76.  That resulted in a holding period of less than six months.  *Id.* at 75.

In order to understand *Merrill's* holding about the timing of the sale of the grain-elevator property, one must first understand the nature of the transaction by which the joint venture sold the property.  The buyer of the grain-elevator property was the owner of an office-supply company.  *Id.* at 68–69.  The buyer wished to move the retail store of the office-supply company to the grain-elevator property.  *Id.* at 69.

[*121]  On April 16, 1956, even before it had acquired the grain-elevator property, the joint venture granted the buyer an option to buy the grain-elevator property. *Id.* The option could be exercised for 90 days. *Id.* As consideration for the option, the buyer was required to pay $25,000 at the execution of the option, which would be applied against the purchase price of the property. *Id.* The purchase price of the property was $250,000. *Id.* This $250,000 comprised (a) the $25,000 option price that had to be paid at the execution of the option (which execution date was April 16, 1956), (b) $175,000 payable at the close of escrow, and (c) $50,000 payable at the rate of $4,000 per month and accruing interest of 5%. *Id.* The option agreement provided that if the option were exercised, the escrow was to be opened. *Id.* The option agreement allowed the buyer to take immediate possession of the property after exercising the option, but only upon paying $25,000 of the $250,000 purchase price. *Id.* The option agreement also provided that if the option was exercised by the buyer, the joint venture must make specified repairs to the building. *Id.*

On the day the option was executed, April 16, 1956, the buyer paid the $25,000 option price to the joint venture. *Id.*

In late May 1956, the taxpayer, who operated his own contracting firm, began to perform the repairs specified in the option agreement on behalf of the joint venture. *Id.* at 70.

On May 28, 1956, the buyer paid the joint venture $15,000, which was a payment against the total purchase price. *Id.*

On June 20, 1956, the buyer exercised the option. *Id.* at 69.

On July 5, 1956, the joint venture and the buyer opened an escrow with an escrow agent. *Id.* at 70. Under the escrow arrangement, the escrow was to close on or before November 12, 1956. *Id.* The escrow arrangement provided that of the total purchase price of $250,000, $50,000 was to be paid outside of escrow (directly to the joint venture); $50,000 was to be paid into escrow on or before August 16, 1956; $100,000 was payable into escrow on or before the closing date; and $50,000 (with 5% interest) was to be paid in installments of $4,000 per month beginning December 12, 1956. *Id.* These terms of the escrow accelerated $50,000 of the purchase price compared to the terms of the option agreement. *Id.* at 68–69. Under the escrow arrangement, this $50,000 was to be paid on or before August 16, 1956, but the same

**[*122]** $50,000 under the option agreement was only to be to be paid at the close of escrow. *Id.*

Around the time the escrow was opened, i.e., around July 5, 1956, the joint venture and the buyer agreed that the buyer was to be given the right of possession of the property as of July 5, 1956. *Id.* at 75.

On July 16, 1956, the buyer paid the joint venture $10,000, which was a payment against the total purchase price. *Id.* at 70.

On July 17, 1956, the taxpayer entered into an agreement with the buyer to make certain repairs, improvements, and additions to property, beyond the repairs specified in the option agreement. *Id.* at 70–71. The payment required for this work was $21,620. *Id.* The agreement also provided that the taxpayer would perform asphalt concrete work at cost plus 20%. *Id.* at 71. Additional contracts were made between the buyer and the taxpayer for work on the property between July 17, 1956, and December 31, 1956. *Id.*

On August 14, 1956, the taxpayer received $10,000 for his work on the property. *Id.*

On August 16, 1956, the buyer made a $50,000 payment into escrow, thus bringing the total amount paid to $100,000. *Id.* In making the $50,000 payment, the buyer agreed to release the escrow agent from the requirement that the $50,000 be held in escrow, thus allowing the escrow agent to immediately pay the $50,000 directly to the joint venture. *Id.*

By September 5, 1956, the joint venture completed the repairs to the building specified by the option agreement. *Id.* at 76.

On September 25, 1956, the taxpayer received $7,500 for his work on the property. *Id.* at 71.

By September 30, 1956, approximately 65% of the work commissioned by the buyer from the taxpayer was done. *Id.*

On October 24, 1956, the taxpayer received $5,000 for his work on the property. *Id.*

By October 31, 1956, approximately 85% of the work commissioned by the buyer from the taxpayer was done. *Id.*

[*123] During the three months of August, September, and October, 1956, the office-supply company had all of its office-furniture inventory moved to the grain-elevator property. *Id.* at 70. This inventory amounted to about 20% of its total inventory (both office furniture and non-office furniture) in terms of value. *Id.*

On November 15, 1956, the buyer paid $100,000 into escrow *Id.* at 71.

On November 23, 1956, the buyer made a final payment into escrow of $6,123.84. *Id.* at 73.

On November 27, 1956, the joint venture recorded a grant deed of the property. *Id.*

On December 17, 1956, the taxpayer received $5,000 for his work on the property. *Id.* at 71.

By December 31, 1956, substantially all of the work commissioned by the buyer from the taxpayer was done. *Id.*

On February 18, 1957, the taxpayer received $7,500 for his work on the property. *Id.*

On March 20, 1957, the taxpayer received $1,102.56 for his work on the property. *Id.*

In explaining the legal test for determining when the joint venture transferred the property to the buyer, *Merrill* stated that "[n]ormally, ownership of real estate would be considered transferred on the date of delivery of the deed," but that when delivery of the deed is delayed, what controls is "the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred." *Id.* at 74. Under that standard *Merrill* decided that the joint venture's ownership period ended on or before September 5, 1956. *Id.* at 76. *Merrill* explained that as of that date (1) the joint venture had already received half the purchase price that was to be paid in cash, (2) the joint venture had a claim to the remainder of the purchase price, and (3) all of the repairs that the joint venture had agreed to perform were completed. *Id. Merrill* therefore held that as of that date, the buyer had assumed "almost" all the incidents of ownership. *Id.* Furthermore, *Merrill* emphasized, as of that date, the buyer could have "forced conveyance of the legal title." *Id.* Rejecting the taxpayer's argument that his ownership must have extended until the title transfer date of

[*124] November 16, 1956, *Merrill* opined that the title transfer date is not conclusive of the holding period, otherwise a taxpayer could "buy a capital asset one day, sell it the next day at a profit under an escrow agreement which gave the purchaser all the benefits and burdens of ownership immediately but which did not call for delivery of a deed for more than 6 months, and thus get the advantages of the long-term capital gains provisions." *Id.* at 77. This result, *Merrill* opined, could not have been intended by Congress in enacting section 1231 of the Internal Revenue Code of 1954. *Merrill*, 40 T.C. at 77.

Petitioners assert that an ownership transfer of the David Berwind Trust could not have taken place on December 16, 1999 because, under *Merrill*, an ownership transfer depends on the "intent of the parties." Petitioners explain that the David Berwind Trust did not intend that an ownership transfer take place on December 16, 1999.

But *Merrill* did not involve a forced transaction like the merger between BPSI Acquisition and BPSI. That type of merger is referred to as a "squeeze-out" merger because it squeezes a dissenting shareholder out of the ownership structure of a company by operation of state law. The intent of the parties to a transaction might affect the timing of the transfer of ownership in a voluntary transaction, but in a forced transaction, one party by definition does not intend the transfer to occur. Thus, we are skeptical that under *Merrill* the David Berwind Trust's holding period under section 1231 of the Internal Revenue Code of 1954 would have extended until the settlement agreement finally evinced the trust's "intent" to divest itself of the stock.

Furthermore, it is significant that *Merrill* was decided under section 1231 of the Internal Revenue Code of 1954. Even if we were to form the view that the holding period of the David Berwind Trust would under that provision be calculated to extend to November 25, 2002, that would not answer the question of whether the holding period would so extend under the current Code provisions regarding the capital-gains holding period (interpreted in accordance with regulations and cases applicable to those current Code provisions).

Furthermore, even if we were to agree that under current law the David Berwind Trust's holding period extended to November 25, 2002, petitioners have not explained how the length of the holding period affects the application of section 483. For example, in *Merrill*, one reason the joint venture was considered to have divested itself of ownership of the grain-elevator property by September 5, 1956, was that

**[\*125]** it had by that date been paid at least half the cash consideration for the property. 40 T.C. at 76. And here, petitioners take the view that because none of the consideration for the David Berwind Trust's common stock was paid until 2002, the stock was not sold or exchanged until 2002. As petitioners' brief claims: "The following factors, in addition to the case law cited above, lead inevitably to the conclusion that no sale of the BPSI stock took place until 2002 . . . [N]o payments were made by BPSI to or for the benefit of the [David Berwind] Trust until November 25, 2002." Thus petitioners seem to view *Merrill* as authority that the sale or exchange of the BPSI common stock occurred in 2002 because that is when BPSI made payment for the stock. But section 483 is expressly written to assume that there are some transactions for which the consideration for the sale or exchange of property is given after the sale or exchange of property. *See* § 483(c)(1) (for § 483 to apply to a payment, the payment must be on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange); (c)(1)(A) (for § 483 to apply to a payment, the payment must be on account of the sale or exchange of property under which some or all of the payments are due more than one year after the date of such sale or exchange). Thus, even if the David Berwind Trust's capital-gains holding period extended until 2002, it does not mean that the sale or exchange for section 483 purposes did not occur in 1999.

   I.   *That the sale or exchange of the David Berwind Trust's BPSI common stock occurred on December 16, 1999, is not inconsistent with* Megargel v. Commissioner*, 3 T.C. 238 (1944), and cases following it.*

Petitioners contend that under *Megargel v. Commissioner*, 3 T.C. 238 (1944), and other cases relying on *Megargel*, the 2002 settlement should be "treated as a 2002 disposition as if the [David Berwind] Trust was successful in its claims and then sold its BPSI stock." The IRS concedes that the *Megargel* line of cases involves litigation that bears a superficial similarity to the *Warden* litigation and the appraisal proceeding. However, the IRS contends the cases are not instructive.

We first address *Megargel* itself.

In May 1933, one Roy Megargel instituted an action against the Pepsi-Cola Co.—the company that at that time owned the Pepsi-Cola trademark and the Pepsi-Cola syrup formula—to recover amounts allegedly due under a contract with him. 3 T.C. at 240. Megargel had

[*126] been one of the organizers and original shareholders of Pepsi-Cola Co., but by the time of the lawsuit he had transferred much of his stock in Pepsi-Cola Co. to his wife, and most of the other stock in the company was held by one Charles Guth. *Id.* at 239–40. Megargel was incapacitated and his affairs were being handled by a receiver. *Id.* at 240. Pepsi-Cola Co. told Megargel's wife that it would settle the lawsuit with Megargel only if she first surrendered her stock in the company. *Id.* at 240. Megargel's wife complied. *Id.* On October 25, 1933, she transferred to Pepsi-Cola Co. her stock in the company comprising 95,000 shares. *Id.* But on April 25, 1939, Megargel's wife filed a complaint against Pepsi-Cola Co. alleging that the representation made to her was fraudulent and she requested that the transfer of stock from her to Pepsi-Cola Co. be held void and that the stock be returned to her, or if the stock could not be returned to her, that Pepsi-Cola Co. be required to pay her "the present value thereof." *Id.* On October 4, 1939, Pepsi-Cola Co. settled the lawsuit by Megargel's wife by agreeing to pay her $120,000 in 1939 and another $120,000 in 1940. *Id.* at 241. The opinion does not say how Megargel's suit against Pepsi-Cola Co. was resolved.

Megargel's wife took the position that the $120,000 payment in 1939 was the proceeds realized from the sale or exchange of Pepsi-Cola Co. stock and consequently she reported the gain as capital gain. *Id.* The IRS in *Megargel* took the position that the $120,000 payment was ordinary income. *Id.* at 242. The IRS in *Megargel* argued that "the income was ordinary, there having been a mere buying of peace by . . . Pepsi-Cola Corporation, having no such relation to the original transaction whereby the petitioner [Megargel's wife] parted with the 95,000 shares of stock in 1933, as to justify application of principles of capital gain to the income received." *Id.* *Megargel* rejected the argument, holding that the $120,000 payment should be treated as capital gain. *Id.* at 245–46. *Megargel* suggested that the sale of stock occurred in 1939 (the year of the settlement): "[T]he compromise worked in substance and proper effect not only a recovery of capital, but a sale thereof in 1939." *Id.* at 246. And, in a passage relied on by petitioners as instructive for the present case, *Megargel* stated:

> We consider the disposition made when the petitioner first realized anything from her stock, which was in 1939, and that in that year there was sale by the petitioner of capital assets. . . . The release for which petitioner received $120,000 in the taxable year [1939] and another $120,000 in 1940 settled forever the petitioner's claim to the stock,

**[\*127]** transfer of which she alleged to be a nullity and ownership in which she asserted to be in herself.  Title was affected, and in effect quieted, for the consideration received by petitioner.  In our opinion, a sale was effected equally as if she had again signed a transfer of stock.

*Id.* at 247.

Although *Megargel* stated that the sale of Pepsi-Cola Co. stock had taken place in tax year 1939, that statement was dicta.  The question in dispute was whether the $120,000 should be treated as an amount realized from the sale or a capital asset or as ordinary income.  *Id.* at 239.

To put this another way, *Megargel* would be conceivably instructive as to the tax treatment of the payment by BPSI to the David Berwind Trust if the IRS's argument in the present case was that the payment was ordinary  income because the payment was unrelated to the David Berwind Trust's common stock.  *See id.* at 242 ("[the IRS] contends that the income was ordinary . . . having no such relation to the original transaction whereby the petitioner parted with the 95,000 shares of stock in 1933.")  The IRS did not make such an argument in the present case.  That a similar argument was rejected in *Magargel* does not instruct the disposition of the present case.

Finally, in *Megargel* the IRS did not take the position that a portion of the $120,000 payment should be considered interest.  Nor could the IRS have invoked section 483 for such a theory.  Section 483 was only added to the Code in 1964 and applies only to contracts entered into after June 30, 1963. Act of February 26, 1964, Pub. L. No. 88-272, 78 Stat. at 76–79.  For that reason, too, *Megargel* does not reach the issue in the present case.

Petitioners also rely on *Goldsmith v. Commissioner*, 22 T.C. 1137 (1954).  In *Goldsmith*, the taxpayer sold stock in 1940.  *Id.* at 1138–39. He later sued to rescind the sale on the ground that it had been induced by fraud.  *Id.*  The suit was settled in 1949 with a payment of $8,000. *Id.* at 1140.  Goldsmith held that the tax treatment of the $8,000 was controlled by *Megargel*, which *Goldsmith* explained had held that (1) the "sale or exchange of the taxpayer's [Megargel's wife] stock [occurred] in the year of the settlement" and that (2) the "proceeds received were taxable as capital gains." *Goldsmith*, 22 T.C. at 1143. Petitioners in the present case take *Goldsmith's* indirect reference to the "year of the

[*128] settlement" to imply that the sale or exchange in that case took place in 1949. Yet in *Goldsmith*, like *Magargel*, the issue was not the year in which the sale or exchange took place, but whether the settlement payment related to the sale or exchange at all. *See Goldsmith*, 22 T.C. at 1137 (stating that the IRS contended that "the petitioner has failed to prove that the payment was actually related to the basis for the litigation"). Thus *Goldsmith* is also distinguishable.

Petitioners also rely on *Reid v. Commissioner*, 26 T.C. 622 (1956). In *Reid* the taxpayer transferred intangibles to a company in 1946 but several years later she threatened to file suit to rescind the transfer. *Id.* at 624–25, 629–30. In 1949, she entered into a settlement agreement with the company under which the company agreed to make royalty payments to her equal to 1% of its annual net sales in exchange for which she confirmed that the company had the right to use the intangibles. *Id.* at 630. *Reid* held that the royalty amounts paid were "the proceeds of a sale entitled to capital gains treatment" and not "for personal services rendered." *Id.* at 630. *Reid* also held that there was a sale or exchange of the intangibles, not a "merely license thereof." *Id.* at 632. *Reid* suggested that it did not resolve whether the exchange of the intangibles took place in 1946 or 1949. It held that "the payments in question were made in respect of the transfer of such rights . . . [w]hether they may be viewed as payments for finally perfecting those rights, or additional consideration for that to which [the company] was already entitled." *Id.* at 633. *Reid* rejected the IRS's argument in that case that a suit for rescission would have been unsuccessful. *Id.* ("[the IRS] has attempted to discuss the merits of petitioner's claim of a right to rescind the 1946 agreement and recover her assets. He argues that she could not."). *Reid* held that it did not matter whether the taxpayer could have prevailed in her injunction suit because "[t]he determinative factor is that petitioner believed in good faith that she could." *Id. Reid* further explained that "[h]ad she commenced litigation seeking rescission and settled her suit for the payments in question, we would have no doubt that those would be entitled to treatment as capital gains." *Id.* (citing *Goldsmith*, 22 T.C. 1137; *Megargel*, 3 T.C. 238). *Reid* explained that the underlying claim threatened by the taxpayer was a title to the intangibles and that the "amounts received by [her] must be held referable thereto. *Cf. Lyeth v. Hoey*, 305 U.S. 118." *Id.* at 634.

Petitioners attempt to leverage *Reid's* statement that it was determinative that the taxpayer had a "good faith" belief in the merits of her claim. The David Berwind Trust, they say, also believed in good faith that its amended complaint had merit.

**[\*129]** Interpreted broadly, *Reid* might arguably stand for the proposition that when the owner of a property files suit to rescind a transfer of the property (and believes in good faith in the merits of the lawsuit), a payment received by the plaintiff in settlement of the lawsuit should be considered a payment for the property.  Here, the David Berwind Trust owned BPSI common stock, filed suit (in part) to rescind the transfer of the stock to BPSI, and received a payment in settlement of the suit.  But, here, the IRS agrees that the payment was made in exchange for the common stock.  Therefore *Reid* is not relevant to the issue in the present case.

> J.  *That the sale or exchange of the David Berwind Trust's BPSI common stock occurred on December 16, 1999, is not inconsistent with* Victor E. Gidwitz Family Tr. v. Commissioner, *61 T.C. 664 (1974).*

*Victor E. Gidwitz Family Tr. v. Commissioner*, 61 T.C. 664, at 665, 668–69 (1974), concerned the tax treatment of a payment received by two trusts in settlement of their lawsuit regarding options orally granted to them by a company called Empire Properties.  The facts of the case require some explanation.

The two trusts owned stock in Material Service Corp. before it engaged in a merger with General Dynamics.  *Id.* at 665, 668.  There was to be a meeting of the shareholders of Material Service to approve the merger.  *Id.* at 665.  Before the meeting, the two trusts reviewed the terms of the merger and took the position that another shareholder, Empire Properties, would be overcompensated for its shares.  *Id.* at 666.  The relevant terms of the merger were that the shareholders of Material Service (except Empire Properties) would exchange their Material Service stock for stock of General Dynamics.  *Id.* at 668.  Empire Properties would receive the businesses of Material Service that General Dynamics did not wish to be conducted by the merged company.  *Id.* at 666, 668.  The two trusts took the position that the value of the property to be given to Empire Properties exceeded the value of its stock in Material Service by at least $20 million.  *Id.* at 666.  The two trusts told Material Service that they would take steps to block the merger unless the two trusts participated in the distribution of the property to Empire Properties.  *Id.*  In response, Material Service promised the two trusts that they would receive options to buy a portion of the properties to be given to Empire Properties.  *Id.* at 667.  Then, at the meeting of the Material Service shareholders to approve the merger with General

**[\*130]** Dynamics, the two trusts did not vote against the merger. *Id.* at 668. Nor did they file a lawsuit to stop the merger. *Id.* at 667–68.

In 1959, the merger was consummated. *Id.* at 668. But the two trusts had still not received the options that had been promised them. *Id.* They filed suit against Material Service for damages resulting from its failure to deliver the options. *Id.* at 668, 672. The suit was settled for a payment of $225,000 in 1966. *Id.* at 669. The two trusts reported the payment as capital gain, but the IRS in that case determined that the payment was ordinary income. *Id.*

*Gidwitz* first resolved a factual dispute between the two trusts and the IRS about what the two trusts had exchanged for the promise of the options. *Gidwitz* agreed with the two trusts that the promise of the options was "additional consideration for the Material Service stock owned by [the trusts]." *Id.* at 673. *Gidwitz* rejected the IRS's view in that case that the promise of the options was "in the nature of compensation for [the trusts] refraining from blocking the merger." *Id.* at 672–73.

Having found that the promise of the options was additional consideration for the two trust's stock in Material Service, *Gidwitz* then addressed how this finding affected the tax treatment of the $225,000 settlement payment. *Id.* at 673. *Gidwitz* stated that the tax treatment of a settlement payment is ultimately controlled "by the origin and character of the claim which gave rise to the litigation." *Id.* *Gidwitz* held that the claim by the two trusts against Material Service arose out of the alleged inadequacy of the consideration given the two trusts for their stock in Material Service under the terms of the merger. *Id.* at 673–74. Therefore, *Gidwitz* held that the settlement payment was additional consideration for the stock and should be given capital treatment. *Id.*

*Gidwitz* is significant, according to petitioners in the present case, because in their view the $225,000 settlement payment was held to be "proceeds as received from the sale of a capital asset (without interest)." By pointing out that *Gidwitz* did not allocate any of the settlement payment to interest, petitioners are suggesting that *Gidwitz* implicitly held that the transfer of shares took place in 1966, the year of the settlement, and not 1959, the year of the merger. We disagree.

Had the IRS in *Gidwitz* invoked section 483, specifically by attempting to apply section 483 to the $225,000 settlement payment on

[*131] the theory that the payment was a deferred payment for a sale or exchange that had taken place in 1959, the two trusts might have responded that the sale and exchange took place in 1966. Had the two trusts attempted to defeat a section 483 theory by arguing that the payment of $225,000 in 1966 was not a deferred payment because the sale or exchange had taken place in 1966, *Gidwitz* might have had occasion to consider that theory. But in actuality, the IRS in *Gidwitz* did not raise section 483. The two trusts in *Gidwitz* had therefore no reason to argue that the sale or exchange in *Gidwitz* had occurred in 1966. And *Gidwitz* therefore had no occasion to take a position as to when the sale or exchange occurred. Indeed, the IRS in *Gidwitz* contended that the $225,000 payment was not a payment for property at all, much less a deferred payment. *Gidwitz*, 61 T.C. at 672–73. Having denied that the payment was for the sale or exchange of property, the IRS in *Gidwitz* did not bring into dispute the timing of the sale or exchange of property. In the present case, unlike in *Gidwitz*, the IRS does contest the timing of the sale or exchange of property: The IRS contends that the David Berwind Trust's sale or exchange of BPSI common stock occurred in 1999, not 2002. And in the present case, unlike in *Gidwitz*, the IRS concedes that the payment by BPSI to the David Berwind Trust was for the trust's BPSI common stock. We therefore do not view *Gidwitz* as holding that the sale or exchange of Material Service stock took place in 1966 and therefore we need not consider whether by analogy the sale or exchange of the David Berwind Trust's BPSI common stock took place on November 25, 2002.

> K. *That the sale or exchange of the BPSI common stock of the David Berwind Trust occurred on December 16, 1999 is not inconsistent with judicial interpretations of section 163(a).*

Petitioners argue: "In interest deduction cases . . . interest must be based on an existing, unconditional and legally enforceable obligation to pay a principal sum. No portion of the Settlement Amount is interest under the Internal Revenue Code for the additional reason that there was no indebtedness until 2002." (The "Settlement Amount" is defined by petitioners as $191,000,000.). Petitioners' argument relies on cases interpreting section 163(a), which provides that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The word "indebtedness" as used in that provision has been interpreted to mean "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Howlett v. Commissioner*, 56 T.C. 951, 960 (1971).

[*132] In *Midkiff v. Commissioner*, 96 T.C. 724, 725 (1991), *aff'd sub. nom. Noguchi v. Commissioner*, 992 F.2d 226 (9th Cir. 1993), which is relied on by petitioners in the present case, the taxpayer leased land from a trust that had been established by the will of Bernice Pauahi Bishop, the last princess of Hawaii. Under the Hawaii Land Reform Act of 1967, the State of Hawaii was authorized to (1) acquire land such as that leased by the taxpayer either by condemning the land by exercising its eminent domain power, or by buying the land under threat of eminent domain, and to (2) transfer the land so acquired to the lessee. *Midkiff*, 96 T.C. at 725. In exchange for the land, lessees such as the taxpayer were required to pay for the value of the land as of the date Hawaii "designated" the land for acquisition (i.e., the date Hawaii officially decided to acquire the land). *Id.* at 726, 728. In 1979, the taxpayer requested that Hawaii designate the land for acquisition. *Id.* at 726, 728–29. On January 23, 1981, Hawaii designated the land for acquisition. *Id.* at 730. It brought an eminent-domain action against the trust to acquire the land. *Id.* The taxpayer was joined in the action. *Id.* In 1985, a jury determined that the value of the land on the designation date was $473,000. *Id.* at 730–31. In 1986, the case settled with the trust agreeing to offer to sell the land to the taxpayer for an amount equal to the jury's $473,000 determination of value on the date of designation plus 5% per year from the date of the designation until the date the taxpayer received the legal title to the land. *Id.* at 731. The settlement agreement provided that the taxpayer could reject any offer by the trust to sell the land. *Id.* at 732. The trust offered to sell the land to the taxpayer. *Id.* The taxpayer accepted the offer. *Id.* at 733. The taxpayer paid the trust $611,286.71, consisting of (a) the $473,000 value established by the jury as of the date of designation and (b) $138,286.71 corresponding to interest from the date of designation through the date of land-sale closing, November 28, 1986. *Id.* The taxpayer sought to deduct the $138,286.71 as interest under section 163(a), which provides a deduction for "all interest paid or accrued within the taxable year on indebtedness."

The Tax Court in *Midkiff*, 96 T.C. at 737, held no indebtedness arose on the date of the designation, January 23, 1981. It reasoned that under Hawaiian law, the taxpayer could have declined to go through with the purchase of land until the taxpayer had accepted the trust's offer to sell. *Id.*

*Midkiff* is distinguishable, most importantly, because the court interpreted section 163(a), not section 483. Section 483 is written differently from section 163(a). Section 483 may apply to contingent

**[\*133]** payments. Treas. Reg. § 1.483-4(b) (example 2); *Cocker v. Commissioner*, 68 T.C. 544, 563 (1977); *Solomon*, 570 F.2d 20, 34. Section 163(a) does not apply to contingent debt. *Howlett*, 56 T.C. at 960. *Midkiff* is also factually distinguishable because the taxpayer in *Midkiff* was not required to buy the property on the date of the land was designated in 1981. *See Noguchi*, 992 F.2d at 227 ("Until a lessee finally pays for his houselot and actually acquires the fee interest, he is free under the HLRA [Hawaii Land Reform act of 1967] to back out of the deal."). By contrast, once BPSI filed the articles of merger on December 16, 1999, BPSI was obligated to pay the David Berwind Trust for its BPSI common stock by the dissenters-rights provisions of the BCL. *See* BCL §§ 1572, 1579. BPSI could not unilaterally back out of the deal.

Petitioners also rely on *Jordan v. Commissioner*, 60 T.C. 872 (1973), *aff'd*, 514 F.2d 1209 (8th Cir. 1975). The taxpayer in that case was one of the organizers of a newly-formed life insurance company. *Id.* at 874. The life insurance company offered shares of its stock to both the public and to the organizers. *Id.* at 876. The shares sold to the public carried restrictions on resale. *Id.* at 875–76. The shares sold to the organizers carried no restrictions on resale. *Id.* at 876. The insurance company did not disclose to the public that the shares offered to the organizers carried no restrictions on resale. *Id.* Because of this nondisclosure, some public shareholders of the insurance company sued the company and its organizers for fraud. *Id.* In 1965, the taxpayer and other organizers offered to buy any of the stock that had been sold by the life insurance company to the public during the period November 4 through 7, 1962. *Id.* at 876–77. Under the terms of the offer, the purchase price was equal to the original purchase price paid the insurance company for such shares plus interest at the rate of 5% per year from the date the insurance company sold the shares until the date the taxpayer bought the shares. *Id.* In 1965, the taxpayer bought 38,066.25 shares pursuant to this offer. *Id.* Of the payments made by the taxpayer, $44,246.14 was interest as calculated at the 5% rate. *Id.* at 877. The taxpayer claimed this amount as an interest deduction on his 1965 return under section 163(a). *Jordan*, 60 T.C. at 877. However, the Tax Court held that the amount was not deductible because "there was in fact no indebtedness." *Id.* at 881.

*Jordan* too is not applicable to the present case because it interprets section 163(a), not section 483. *Jordan* is also factually distinguishable. In 1962, the taxpayer in *Jordan* had no obligation to buy the insurance-company stock from the public. BPSI by contrast was required by the BCL dissenters-rights provisions to compensate the

[*134] David Berwind Trust for its shares of common stock once the articles of merger were filed on December 16, 1999.

Petitioners also rely on *Indeck Energy Services, Inc. v. Commissioner*, T.C. Memo. 2003-101, 85 T.C.M. (CCH) 1128. In that case, Indeck (a corporation) agreed to employ Polsky, its president, for a seven-year term ending June 1, 1993. *Id.* at 1129–30. The employment agreement conferred on Polsky the right to purchase shares of Indeck. *Id.* at 1130. The employment agreement provided that Polsky's employment could be terminated during the seven-year term under certain conditions. *Id.* If Polsky's employment were so terminated, the employment agreement required Polsky to sell his stock to Indeck and required Indeck to buy it. *Id.* The employment agreement provided that the price for the sale would be equal to the greater of (1) the net book value of the stock shortly before the employment-termination date and (2) a price per share equivalent to any bona fide third-party offer to buy the stock made within one year of the termination date. *Id.* On September 22, 1990, Polsky's employment was terminated with Polsky owning 30 shares of Indeck. *Id.* He brought an arbitration proceeding against Indeck. *Id.* He received an offer to buy his Indeck shares for $750,000 per share and another offer for $501,000. *Id.* at 1131. In 1994, Indeck settled Polsky's claims against it under which Indeck paid Polsky approximately $20 million and Polsky gave up his 30 shares of Indeck stock. *Id.* at 1134. Indeck contended that $4,856,922 of the settlement agreement was interest. *Id.* at 1135. The Tax Court agreed with the IRS in that case that "the disputed $4,856,922 portion of the settlement payment cannot constitute interest deductible under section 163(a) by Indeck because there was no indebtedness within the meaning of that section." *Id.* at 1138. *Indeck* emphasized that before Polsky and Indeck struck the settlement agreement, they had various points of disagreement about the amount of Indeck's liability. *Id.* at 1140. For example, Indeck had taken the position that the $750,000 per share offer was not bona fide. *Id.*

In petitioners' view, *Indeck* is analogous to the present case: "There was too much indefiniteness to any obligation of Indeck, just as there was too much indefiniteness to the Disputed Merger [between BPSI Acquisition and BPSI] to give rise to BPSI indebtedness, the timing and amount of any obligation being vigorously disputed in both cases." *Indeck* is distinguishable because the question in the present case is whether there was a sale or exchange of BPSI common stock in 1999, not whether the sale or exchange gave rise to indebtedness within the meaning of section 163(a). Under the BCL, the David Berwind

**[*135]** Trust's ownership interest in BPSI was converted into a liability owed to it by BPSI in 1999. Whether that liability of BPSI is indefinite like the liability of Indeck is not relevant under section 483. An unconditional obligation is not a prerequisite for imputed interest under section 483. Treas. Reg. § 1.483-4(b) (example 2); *Cocker*, 68 T.C. at 563; *Solomon*, 570 F.2d at 34 (holding § 483 applied to contingent payments).

II.    *The plan of merger was the contract for the sale or exchange of the David Berwind Trust's BPSI shares.*

For a payment to be recharacterized as interest by section 483, there must be a "contract for the sale or exchange of . . . property." § 483(a)(1), (b), (c). Having held *infra* OPINION, Part 1, that there was a sale or exchange of the David Berwind Trust's common stock in BPSI on December 16, 1999, we now hold that the plan of merger was the contract for the sale or exchange. This holding reflects our agreement with the IRS's argument that "[t]he [m]erger satisfies the 'contract' language in section 483." And it reflects our rejection of petitioners' argument that "the squeeze-out Disputed Merger [defined by petitioners as the use of the BCL short-form merger statute by Berwind Group Partners and Berwind Corporation—meaning essentially the merger of BPSI Acquisition into BPSI] does not constitute a contract for purposes of IRC § 483."

Petitioners argue that the plan of merger cannot be considered a contract under section 483 because a contract must have at least two parties. Petitioners argue that, although the plan of merger was approved by BPSI Acquisition, BPSI Acquisition was not a party to the plan of merger because BPSI Acquisition's existence "is disregarded for federal income tax purposes" under Rev. Rul. 78-250, 1978-1 C.B. 83.

The plan of merger was executed by BPSI Acquisition and by BPSI and was approved by both of those corporation's boards of directors. Thus, there were two parties to the plan of merger: BPSI Acquisition and BPSI. The plan of merger was an agreement between BPSI and BPSI Acquisition. It was filed with the Pennsylvania Department of State with the articles of merger, which rendered the plan of merger effective under BCL § 1928. In our view, the plan of merger was a contract under section 483.

It does not matter that BPSI Acquisition's role in the merger was similar to the role of the subsidiary "Y" in a merger described in Rev. Rul. 78-750. In Rev. Rul. 78-250, the Internal Revenue Service ruled

[*136] that Y's existence should be disregarded in determining various federal tax consequences of a squeeze-out merger. But Rev. Rul. 78-750 is irrelevant to whether BPSI Acquisition's existence should be disregarded. In *Rauenhorst v. Commissioner*, 119 T.C. 157, 171 (2002), we held that the IRS is bound to follow revenue rulings in Tax Court proceedings because such rulings are the equivalent of concessions made by the IRS in Tax Court. But Rev. Rul. 78-250 did not involve section 483. Thus, Rev. Rul. 78-250 cannot constitute the IRS's concession in the present case that BPSI Acquisition must be disregarded in determining whether the plan of merger between BPSI Acquisition and BPSI formed a "contract" within the meaning of section 483. In *New Jersey Council of Teaching Hospitals v. Commissioner*, 149 T.C. 466, 478 n.7 (2017), we explained that although the Tax Court is not bound by revenue rulings, we afford them weight depending on their persuasiveness and consistency. But Rev. Rul. 78-250 contains no reasons for its ruling that Y should be disregarded for federal tax purposes, and thus, we cannot consider whether those reasons are as persuasive in the context of section 483 as they were in the context of the statutes involved in Rev. Rul. 78-250. We conclude that Rev. Rul. 78-250's ruling as to the transitory merger subsidiary Y does not preclude the 1999 plan of merger between BPSI and BPSI Acquisition from being a contract for the sale or exchange of the David Berwind Trust's common stock in BPSI.

III. *The payment from BPSI to the David Berwind Trust for its BPSI common stock was "under" the plan of merger even if the David Berwind Trust did not voluntarily contract to receive the payment as part of the plan of merger.*

Petitioners contend that a payment is not "under" a contract unless "the party against whom the interest was imputed was a consenting contracting seller that agreed to a deferred payment structure." Petitioners argue "even assuming the [p]lan of [m]erger is a contract, the [David Berwind] Trust was certainly not a party to it and did not agree to any terms pursuant to that contract, including any deferred payments." Petitioners explain: "[T]he [David Berwind] Trust did not voluntarily contract in 1999 to receive contingent payments or otherwise receive any payments."

The text of section 483 does not require that the person who exchanges or sells property be a party to the contract for the sale or exchange of property. By its terms, section 483 operates when there is "any payment . . . under any contract for the sale or exchange of any

[*137] property." § 483(a)(1). It does not require the parties to the "contract for the sale or exchange . . . of the property" to include the person who sells or exchanges the property. *See Jeffers v. United States*, 556 F.2d 986, 990, 997 (Ct. Cl. 1977) (when taxpayers exchanged their shares of Hayes International in return for shares of City Investing stock pursuant to a merger, section 483 applied to the payment of City Investing stock in exchange for Hayes International stock even though the merger was consummated not by the taxpayers but by the board of directors of Hayes International); *see also RJR Nabisco Inc. v. Commissioner*, T.C. Memo. 1998-252, 76 T.C.M (CCH) 71, 89. Thus, even if the David Berwind Trust were not a party to the plan of merger, that does not prevent the plan of merger from qualifying as a contract under section 483.[40] Similarly, although section 483 requires that the payment be "under" the contract, it does not go further and require the person who exchanges or sells the property to agree to the deferred payment.

*Tribune Publ'g Co. v. United States*, 836 F.2d 1176 (9th Cir. 1988), relied on by petitioners, is not to the contrary. The taxpayer, Tribune, held 7.1% of the outstanding stock in Newsprint, a company that produced its newsprint. *Id.* at 1177. In 1969, Newsprint merged with another corporation, Boise Cascade. *Id.* Under the merger agreement, Tribune received Boise Cascade stock in exchange for its Newsprint stock. *Id.* Shortly after the merger, it was reported in the press that Boise Cascade had failed to disclose material facts about its financial condition. *Id.* The value of Boise Cascade shares fell precipitously. *Id.* Tribune sued Boise Cascade for securities fraud. *Id.* In 1977, Tribune and Boise Cascade entered into a settlement agreement resolving the suit whereby Boise Cascade agreed to provide Tribune with $451,000 cash and a discount on newsprint purchased in 1978 and 1979. *Id.* at 1177, 1181. Tribune received the $451,000 cash payment in 1977. *Id.* at 1177. It received discounts on newsprint in 1978 and 1979. *Id.* Addressing the tax consequences to Tribune of the cash payment and the newsprint discounts, the government argued that interest should be imputed under section 483 on the cash payment and the discounts on newsprint for the period between (1) the merger date and (2) the dates the cash and discounts were received by Tribune. *Id.* at 1180. The Ninth Circuit opinion stated that it was "clear[]" that the interest should be imputed on the newsprint discounts from (1) the date of the settlement

---

[40] The IRS argues that the David Berwind Trust was a party to the plan of merger through the operation of the dissenters-rights provisions of the BCL. We need not reach this argument. The trust need not be a party to the plan of merger.

[*138] (in 1977) to (2) the dates the newsprint discounts were received (in 1978 and 1979). *Id.* However, the Ninth Circuit rejected the government's argument that interest should be imputed to "all of the settlement proceeds [the cash payment and the discounts on newsprint] from the date of the merger to the date of the settlement." *Id.* The Ninth Circuit gave two reasons for this holding: (1) Tribune "actually received the additional consideration [the cash payment] in 1977" and (2) Tribune "did not voluntarily contract to exchange its Newsprint stock for Boise Cascade stock plus a right to be paid cash and to receive newsprint discounts." *Id.* at 1181. *Tribune's* holding is best viewed as resolving the question of which sale or exchange the additional consideration was related to. Was it (1) the 1969 exchange by Tribune of its Boise Cascade stock or (2) the 1977 settlement agreement? *Tribune* held that the relevant sale or exchange was the 1977 settlement agreement because it explained that Tribune did not "voluntarily contract" to make the cash payment and newsprint discounts as part of the 1969 merger. *Tribune* is distinguishable. The payment by BPSI to the David Berwind Trust was contemplated by the plan of merger, which specifically referred to the David Berwind Trust's right to receive the appraised value of its shares under the BCL dissenters-rights provisions.

We make one final note regarding petitioners' argument about the lack of consent by the David Berwind Trust to the merger. They did not argue that the lack of consent precluded the merger from being a "sale or exchange." That argument would have failed anyway. A sale or exchange of property can occur without the consent of the property owner. *See Helvering v. Hammel*, 311 U.S. 504, 510–11 (1941) (holding that a forced judicial foreclosure sale constituted a "sale[] or exchange[]" under section 23(e)(2) of the Revenue Act of 1934)).

IV. *The payment made by BPSI to the David Berwind Trust for the trust's BPSI shares was a $191,257,353 payment that was made on December 31, 2002.*

Recall the following: on November 25, 2002, BPSI transferred $191,000,000 to an "escrow account"; on November 26, 2002, $191,007,012 was transferred from that "escrow account" to the PNC escrow account; and that on December 31, 2002, $191,257,353 was released from the PNC escrow account to the David Berwind Trust.

The IRS argues that the "Escrow Fund should be viewed as 'paid' for purposes of section 483 when it was released to the [David Berwind]

**[*139]** Trust on December 31, 2002." The IRS defines the "Escrow Fund" as (1) the $191,000,000 amount (referred to by the IRS as the "Settlement Amount") plus (2) the $257,353 of "investments and reinvestments thereof and any interest and other income therefrom". Thus, the Escrow Fund, as defined by the IRS, is a total amount of $191,257,353. Under the IRS's argument, $191,257,353 is the amount of the payment to which section 483(a) applies—and the date of the payment is December 31, 2002.

Petitioners' counter argument is that "[t]he effective date of receipt of the Settlement Amount [defined by petitioners as $191,000,000] for purposes of IRC Section 483 should be November 25, 2002." Thus, under petitioners' argument, $191,000,000 is the amount of the payment to which section 483(a) applies—and the date of the payment is November 25, 2002. Petitioners' argument is an alternative argument that assumes arguendo that the sale or exchange of the stock occurred on December 16, 1999, the plan of merger was a contract for the sale of the stock, and the payment for the David Berwind Trust's stock was under the plan of merger.

A payment for the purposes of section 483 means the delivery of consideration to the payee. *See Catterall v. Commissioner*, 68 T.C. 413, 419 (1977), *aff'd*, 589 F.2d 123 (3d Cir. 1978); *Solomon*, 570 F.2d at 34. The settlement agreement and the escrow agreement required PNC Bank (as the escrow agent) to hold the $191,000,000 and all interest earned on that amount. PNC Bank was required to release the funds from escrow to the David Berwind Trust only if certain nonministerial conditions were met, such as the approval of the Orphans' Court. Thus, the deposit of the $191,000,000 by BPSI into "an escrow account" on November 25, 2002, did not constitute a payment to the David Berwind Trust. Rather, the payment occurred when the conditions were satisfied, and the funds released to the David Berwind Trust, on December 31, 2002. *Cf. Bizzack Bros. Constr. Corp. v. Commissioner*, T.C. Memo. 1980-457 (holding funds held in escrow were contingent and not income to the taxpayer because receipt of the funds was contingent on the approval of a municipal government). The payment amount to the David Berwind Trust was $191,257,353.

Petitioners point out that the David Berwind Trust had (1) some measure of control over how the $191,000,000 was invested while in escrow and (2) the right to request the release of the escrow funds to pay federal and state taxes. Despite its control of how to invest the $191,000,000, the David Berwind Trust's receipt of a beneficial interest

**[*140]** in the settlement proceeds was not guaranteed. For example, the escrow agreement specifically provided that if the settlement was terminated, the $191,000,000 amount and all the investment earnings would be returned to BPSI. Similarly, while the escrow agreement provided that the David Berwind Trust could request the payment of federal taxes from the amounts, the settlement agreement provided that the trust was also required to refund the amounts to BPSI if the settlement was terminated.

We conclude that the payment occurred on December 31, 2002, when the funds, including the Investment Income Components, were released from escrow.

V.    *Conclusion*

In the terminology of paragraph 182 of the stipulation, it is our holding that (1) the "payment discussed in the Settlement Agreement . . . is treated for Federal income tax purposes as paid to the [David Berwind] Trust on December 31, 2002" and (2) the payment "is subject to IRC § 483 as of December 16, 1999".

Therefore under paragraph 182 of the stipulation, the following results ensue: (1) for the purpose of calculating the total unstated interest under section 483(b) the October 1999 Mid-Term rate of 5.93% (semiannual compounding) is the applicable federal rate and (2) for the purpose of calculating the total unstated interest under section 483(b) the sum of payments to which section 483 applies equals $191,257,353. Furthermore, under paragraph 182 of the stipulation, the amount reported by the David Berwind Trust for the Investment Income Components ($257,353) should not be adjusted.

In the terminology of the joint memorandum filed with the Court by petitioners and the IRS, it is our holding that the payment described in the settlement agreement is subject to section 483 and the date of the payment is December 31, 2002. Therefore, the joint memorandum reflects the agreement of the parties in this case that, given the holdings in this Opinion, the total unstated interest under section 483(b) is $31,140,364.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*